No. 18-10541

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,
*Plaintiffs-Appellants,*

v.

**U.S. ARMY CORPS OF ENGINEERS**, *et al.*,
*Defendants-Appellees,*

and

**MOSAIC FERTILIZER, LLC.**
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CIV. NO. 8:17-CV-00618
HON. STEVEN D. MERRYDAY, CHIEF JUDGE, PRESIDING

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

Jaclyn M. Lopez
Hannah Mary Margaret Connor
Elise Pautler Bennett
Rachael Curran
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190

*Counsel for Plaintiffs-Appellants*

*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*
Case No. 18-10541

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*Center for Biological Diversity, et al. v U.S. Army Corps of Engineers, et al.*, No. 18-10541 (filed Feb. 12, 2018)

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, the following listed attorneys, persons, associations of persons, firms, partnerships or corporations may have an interest in the outcome of this appeal:

Beelaert, Jeffrey S., United States Department of Justice – Counsel for Defendants/Appellees

Bennett, Elise Pautler, Center for Biological Diversity – Counsel for Plaintiffs/Appellants

Brown, Mark, United States Department of Justice – Counsel for Defendants/Appellees

Carfora, Debra, United States Department of Justice – Counsel for Defendants/Appellees

Caulder, Jonathan, Hunton & Williams, LLP – Counsel for Intervenor – Defendant/Appellee

Center for Biological Diversity – Plaintiff/Appellant

Cirino, Paul, United States Department of Justice – Counsel for

Defendants/Appellees

Connor, Hannah Mary Margaret, Center for Biological Diversity –

Counsel for Plaintiffs/Appellants

Curran, Rachael, Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

Duncan, Deidre, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Dykema, Peter, United States Department of Justice – Counsel for

Defendant/Appellee

Esper, Mark, United States Secretary of the Army – Related to

Defendant/Appellee

FMRP Inc. – Related to Intervenor-Defendant/Appellee Mosaic

Fertilizer, LLC

Grant, Eric, United States Department of Justice – Counsel for

Defendants/Appellees

Gray, Rachel, Assistant District Counsel, United States Army Corps of

Engineers – Counsel for Defendants/Appellees

Hopping Green & Sams, P.A. – Counsel for Intervenor –

Defendant/Appellee

Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Inkelas, Daniel, United States Army Corps of Engineers –

Counsel for Defendant/Appellee

Isani, Jamie, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Kirk, Jason A., District Commander, United States Army Corps of

Engineers – Defendant/ Appellee

Kurth, Jim, Deputy Director of Operations, United States Fish and

Wildlife Service – Defendant/ Appellee

Lopez, Jaclyn M., Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

ManaSota-88, Inc. – Plaintiff/Appellant

McGrath, Kerry, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Merryday, Honorable Steven D. – Trial Judge

Mosaic Fertilizer, LLC – Intervenor – Defendant/Appellee

Mosaic Global Holdings, Inc. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

Mosaic Global Operations, Inc. – related to Intervenor-

 Defendant/Appellee Mosaic Fertilizer, LLC

People for Protecting Peace River, Inc. – Plaintiff/Appellant

Phosphate Acquisitions Partners, LP. – related to Intervenor-

 Defendant/Appellee Mosaic Fertilizer, LLC

PRP-GP LLC – related to Intervenor-Defendant/Appellee Mosaic

 Fertilizer, LLC

Riley, Timothy, Hopping Green & Sams, P.A. – Counsel for Intervenor –

 Defendant/Appellee

Rose, John Peter – Counsel for Plaintiffs/Appellants

Savage, Amelia, Hopping Green & Sams, P.A. – Counsel for Intervenor–

 Defendant/Appellee

Semonite, Todd, Commanding General and Chief of Engineers, United

 States Army Corps of Engineers – Defendant/ Appellee

Sessions, Jefferson, United States Attorney General – Counsel for

 Defendants/Appellees

Sheehan, Greg, Principle Deputy Director, United States Fish and

 Wildlife Service – Defendant/ Appellee

Sibley, George, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Speights, Helen, United States Department of the Interior –

Counsel for Defendants/Appellees

Stephens, Susan, Hopping Green & Sams, P.A. – Counsel for

Intervenor – Defendant/Appellee

Stevens, Michael, United States Department of the Interior –

Counsel for Defendants/Appellees

Suncoast Waterkeeper – Plaintiff/Appellant

The Mosaic Company (MOS) – Parent Corporation of Intervenor –

Defendant/Appellee

Turner, Andrew, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

United States of America– Defendant/Appellee

United States Army Corps of Engineers – Defendant/Appellee

United States Department of the Army – Related to Defendant/Appellee

United States Department of the Interior – Defendant/ Appellee

United States Department of Justice –

Counsel for Defendants/Appellees

United States Fish and Wildlife Service – Defendant/ Appellee

Case No. 18-10541
*Ctr. for Biological Diversity v. U.S. Army Corps of Eng'rs*

Wood, Jeffrey H., Acting Assistant Attorney General, United States

Department of Justice – Counsel for Defendants/Appellees

Zinke, Ryan, Secretary, United States Department of the Interior –

Defendant/ Appellee

# STATEMENT REGARDING ORAL ARGUMENT

Appellants, Center for Biological Diversity, ManaSota-88, People for Protecting Peace River, and Suncoast Waterkeeper, respectfully request oral argument. In processing four Clean Water Act permit applications to mine phosphate and destroy more than 51,000 acres of land, wetlands, waterways, and habitat in west-central Florida, the U.S. Army Corps of Engineers engaged in an unlawful environmental review that ignored important issues—including the production and long-term storage of radioactive waste and habitat devastation—and deprived the public and the agency of critical information. Oral argument would assist the Court's *de novo* review of the facts and legal issues on appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ................................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................i

TABLE OF AUTHORITIES ................................................................... iv

ACRONYMS AND ABBREVIATIONS ....................................................xi

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES .............................................................. 2

STATEMENT OF THE CASE ................................................................. 3

    I.    Proceedings and Disposition Below........................................... 8

    II.   Statement of Facts..................................................................... 9

    III.  Standard of Review................................................................... 13

SUMMARY OF THE ARGUMENT ........................................................ 14

ARGUMENT ........................................................................................ 16

    I.    The Corps Violated the National Environmental Policy Act
        and Administrative Procedure Act by Failing to Analyze the
        Indirect and Cumulative Impacts of Phosphogypsum.............. 16

        A.    The Corps Violated the National Environmental
              Policy Act and Administrative Procedure Act by
              Failing to Analyze the Long-Lasting and Significant
              Indirect Impacts of Phosphogypsum ................................ 18

              1.    The Corps Was Required to Analyze and Disclose
                    the Reasonably Foreseeable, Indirect Effects of
                    Phosphate Mining, Including the Environmental
                    Impacts from Phosphogypsum ................................ 19

              2.    The Corps Ignored Phosphogypsum, Which Lacks
                    Any "Independent Utility".......................................26

B.  The Corps Failed to Analyze the Cumulative Effects
of Phosphogypsum .......................................................... 32

II.  The Corps' Approval of the SPE Mine Without a
Mine-Specific Environmental Impact Statement
Violated the National Environmental Policy Act and
Administrative Procedure Act .................................... 37

A.  The Corps Failed to Adhere to the National
Environmental Policy Act's Procedural Framework ....... 39

B.  The Corps' Failure to Prepare a Mine-Specific
Environmental Impact Statement for the SPE Mine
Violated the National Environmental Policy Act and
Administrative Procedure Act .......................................... 43

III.  The Corps' Failure to Consult Formally on the Effects of
Phosphate Mining in the Central Florida Phosphate District
Violated the Endangered Species Act and Administrative
Procedure Act .................................................................. 54

A.  The Corps Violated the Endangered Species Act by
Failing to Insure the Activities Analyzed in the
Areawide Environmental Impact Statement Will Not
Jeopardize Any Endangered or Threatened Species ....... 56

1.  The Corps' Area-Wide Phosphate Mining Permitting
is a Programmatic Action ........................................ 57

2.  The Permitting of Phosphate Mining Addressed
in the AEIS Is the Type of Programmatic
Agency Action that Requires ESA Section 7
Consultation .......................................................... 60

CONCLUSION ................................................................... 67

CERTIFICATE OF COMPLIANCE ...................................... 69

CERTIFICATE OF SERVICE ............................................... 70

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Ala.-Tombigbee Rivers Coal. v. Norton*,
  338 F.3d 1244 (11th Cir. 2003)............................................................55

*Andrus v. Sierra Club*,
  442 U.S. 347, 99 S. Ct. 2335 (1979)....................................................39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
  462 U.S. 87, 103 S. Ct. 2246 (1983)..............................................16, 42

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  781 F.3d 1271 (11th Cir. 2015)............................................................43

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir. 2011)..............................................................49

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy
  Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ...........................................41

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193 (D.
  Colo. 2011), *amended in part on other grounds by* No. 08-01624-WJM-
  MJW, 2012 U.S. Dist. LEXIS 24126 (D. Colo. Feb. 27, 2012) .......24, 25

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015)..............................................................63

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*,
  684 F.3d 1242 (11th Cir. 2012)............................................................45

*Diné Citizens Against Ruining Our Env't v. Office of Surface Mining,
  Reclamation & Enf't*, 82 F. Supp. 3d 1201 (D. Colo. 2015), *order
  vacated in part, appeal dismissed in part as moot by* 643 Fed. App'x.
  799 (10th Cir. 2016)..............................................................................26

*Earth Island Inst. v. U.S. Forest Serv.*,
  351 F.3d 1291 (9th Cir. 2003)..............................................................36

*EarthReports, Inc. v. FERC*,
    828 F.3d 949 (D.C. Cir. 2016) ............................................................. 19

*Fed. Power Comm'n v. Idaho Power Co.*,
    344 U.S. 17, 73 S. Ct. 85 (1952) ........................................................... 43

\**Fla. Key Deer v. Paulison*,
    522 F.3d 1133 (11th Cir. 2008) ..................................................... passim

*Fla. Key Deer v. Stickney*,
    864 F. Supp. 1222 (S.D. Fla. 1994) ...................................................... 55

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs.*,
    401 F. Supp. 2d 1298 (S.D. Fla. 2005) ......................................... passim

*High Country Conservation Advocates v. U.S. Forest Serv.*,
    52 F. Supp. 3d 1174 (D. Colo. 2014) .................................................... 25

\**Hill v. Boy*,
    144 F.3d 1446 (11th Cir. 1998) ........................................ 39, 40, 46, 51

*Idaho Sporting Congress v. Thomas*,
    137 F.3d 1146 (9th Cir. 1998) ....................................................... 49, 51

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ............................................................. 56

*Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) ..... 35

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ........................................................ 35, 45

*Kleppe v. Sierra Club*,
    427 U.S. 390, 96 S. Ct. 2718 (1976) .............................................. 35, 41

*Lane Cty. Audubon Soc'y v. Jamison*,
    958 F.2d 290 (9th Cir. 1992) ............................................................... 63

*Manatee Cty. v. Gorsuch*,
    554 F. Supp. 778 (M.D. Fla. 1982) ...................................................... 35

*Marsh v. Or. Nat. Res. Council,
490 U.S. 360, 109 S. Ct. 1851 (1989)..............................................45, 46

Mid States Coal. for Progress v. Surface Transp. Bd.,
345 F.3d 520 (8th Cir. 2003)...................................................26

Minisink Residents for Envtl. Pres. & Safety v. FERC,
762 F.3d 97 (D.C. Cir. 2014)...................................................22

Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining,
274 F. Supp. 3d 1074 (D. Mont. 2017)..................................24

Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,
463 U.S. 29, 103 S. Ct. 2856 (1983)..............................14, 32

N. Buckhead Civic Ass'n v. Skinner,
903 F.2d 1533 (11th Cir. 1990)......................................14, 52

N. Plains Res. Council, Inc. v. Surface Transp. Bd.,
668 F.3d 1067 (9th Cir. 2011)................................................23

Nat. Res. Def. Council v. Hodel,
865 F.2d 288 (D.C. Cir. 1988)...............................................35

Nat'l Ass'n of Home Builders v. Defs. of Wildlife,
551 U.S. 644 (2007)................................................................55

Native Ecosystems Council v. U.S. Forest Serv.,
428 F.3d 1233 (9th Cir. 2005)...............................................49

New York v. Nuclear Regulatory Comm'n,
681 F.3d 471 (D.C. Cir. 2012)...............................................19

Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs,
817 F. Supp. 2d 1290 (D. Or. 2011)......................................59

Ocean Advocates v. U.S. Army Corps of Eng'rs,
402 F.3d 846 (9th Cir. 2004)..................................................36

Ocean Advocates v. U.S. Army Corps of Eng'rs,
631 F.3d 1108 (9th Cir. 2004)................................................35

*Ouachita Watch League v. Jacobs*,
    463 F.3d 1163 (11th Cir. 2006)............................................................ 14

*Pac. Rivers Council v. Thomas*,
    30 F.3d 1050 (9th Cir. 1994), *cert. denied,* 514 U.S. 1082 (1995)........ 55

\*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332, 109 S. Ct. 1835 (1989)...................................... 38, 42, 53

\*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of the
    Interior*, 588 F.3d 718 (9th Cir. 2009) ................................................ 23

*Sierra Club v. FERC*,
    827 F.3d 36 (D.C. Cir. 2016).............................................................. 19

\*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017)........................................................ 22

\*Sierra Club v. Flowers*,
    423 F. Supp. 2d 1273 (S.D. Fla. 2006),
    *vacated in part, remanded in part,* 526 F.3d 1353 (11th Cir. 2008)....20

*Sierra Club v. Flowers*,
    526 F.3d 1353 (11th Cir. 2008)........................................................ 43

*Sierra Club v. Marin*,
    168 F.3d 1 (11th Cir. 1999)............................................................... 41

\*Sierra Club v. U.S. Army Corps of Eng'rs*,
    295 F.3d 1209 (11th Cir. 2002)..................................................... 38, 45

*Sierra Club v. U.S. Dep't of Energy*,
    255 F. Supp. 2d 1177 (D. Colo. 2002) ............................................... 25

*TVA v. Hill*,
    437 U.S. 153 (1978)......................................................................... 55

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S.
    519, 98 S. Ct. 1197 (1978), *rev'd on other grounds,* 435 U.S. 519, 98 S.
    Ct. 1197 (1978), *vacated on other grounds sub nom. Balt. Gas &*

*Electric Co. v. Nat. Res. Def. Council,* 435 U.S. 964, 98 S. Ct. 1600
(1978) ...............................................................................................47

*\*WildEarth Guardians v. Office of Surface Mining, Reclamation &
Enf't,* No. 14-103-BLG-SPW, 2015 U.S. Dist. LEXIS 145149 (D. Mont.
Oct. 23, 2015), *report and recommendation adopted in part, rejected in
part on other grounds*, 2016 U.S. Dist. LEXIS 7223 (D. Mont. Jan. 21,
2016)...............................................................................................24

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
870 F.3d 1222 (10th Cir. 2017)..........................................................24

*Wilderness Watch v. Mainella,*
375 F.3d 1085 (11th Cir. 2004)....................................................14, 52

## Statutes

5 U.S.C. §§ 701–706.................................................................................14

5 U.S.C. § 702 ...........................................................................................1

5 U.S.C. § 706 ...........................................................................................1

5 U.S.C. § 706(2) ......................................................................................14

16 U.S.C. § 1536 ........................................................................................1

16 U.S.C. § 1536(a)(2)...........................................................................16, 54

16 U.S.C. § 1540(g) ...................................................................................1

28 U.S.C. § 1291 ........................................................................................1

28 U.S.C. § 1361 ........................................................................................1

28 U.S.C. § 2201 ........................................................................................1

33 U.S.C. § 1344 ........................................................................................8

33 U.S.C. §§ 1251–1387............................................................................1

42 U.S.C. § 4331(a) ..................................................................................54

42 U.S.C. § 4332(2)(C) ............................................................ 37, 39, 51

42 U.S.C. §§ 4321–4370e ................................................................... 1

## **Regulations**

33 C.F.R. § 230.14 .......................................................................... 39

33 C.F.R. § 320.4(a) ....................................................................... 66

33 C.F.R. § 320.4(c) ....................................................................... 66

33 C.F.R. pt. 325, App. B § 7(b)(1) .............................................. 28

33 C.F.R. pt. 325, App. B § 7(b)(2) .............................................. 28

33 C.F.R. pt. 325, App. B § 7(b)(3) ........................................ 27, 32

40 C.F.R. § 230.1 ........................................................................... 65

40 C.F.R. § 230.10(a) ............................................................... 61, 65

40 C.F.R. § 230.10(a)(4) ................................................................ 65

40 C.F.R. § 230.10(b)(3) ................................................................ 66

40 C.F.R. § 230.10(c)(3) ................................................................ 65

40 C.F.R. § 230.10(d) .................................................................... 65

40 C.F.R. § 1500.1(b) .................................................................... 51

40 C.F.R. § 1500.2(d) .................................................................... 42

40 C.F.R. § 1500.4(i) ..................................................................... 45

40 C.F.R. § 1501.4 ................................................................... 39, 52

40 C.F.R. § 1501.4(e) .................................................................... 40

40 C.F.R. § 1502.1 ................................................................... 45, 52

40 C.F.R. § 1502.14 ....................................................................... 53

40 C.F.R. § 1502.14(a) ....................................................... 61

40 C.F.R. § 1502.14(e) ....................................................... 61

40 C.F.R. § 1502.15 ........................................................... 53

40 C.F.R. § 1502.16 ...................................................... 19, 53

40 C.F.R. § 1502.4 ............................................................. 45

40 C.F.R. § 1502.4(c) ......................................................... 58

40 C.F.R. § 1505.2 ........................................................ 37, 39

40 C.F.R. § 1508.13 ........................................................... 40

40 C.F.R. § 1508.25(c) .................................................. 17, 19

40 C.F.R. § 1508.27 ........................................................... 52

40 C.F.R. § 1508.28 ...................................................... 40, 45

40 C.F.R. § 1508.7 .............................................. 17, 19, 33, 34

40 C.F.R. § 1508.8 ....................................................... 17, 19

40 C.F.R. § 1508.8(a) ........................................................ 19

40 C.F.R. § 1508.8(b) ........................................................ 19

40 C.F.R. § 1508.9(a)(1) ..................................................... 40

40 C.F.R. § 1509.9 ............................................................. 37

50 C.F.R. § 402.02 .................................................... 55, 57, 61

50 C.F.R. § 402.14(a) ............................................... 16, 54, 60

## Other Authorities

Issuance of Nationwide Permits, 67 Fed. Reg. 2020 (Jan. 15, 2002).....28

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AEIS | Areawide Environmental Impact Statement |
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| CFPD | Central Florida Phosphate District |
| Corps | U.S. Army Corps of Engineers |
| CWA | Clean Water Act |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FEMA | Federal Emergency Management Agency |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |
| NFIP | National Flood Insurance Program |
| ROD | Record of Decision |
| SEA | Supplemental Environmental Assessment |
| Service | U.S. Fish and Wildlife Service |
| SPE Mine | South Pasture Extension Mine |

## STATEMENT OF JURISDICTION

This case arises under the Clean Water Act, 33 U.S.C. §§ 1251–1387; National Environmental Policy Act, 42 U.S.C. §§ 4321–4370e; Endangered Species Act, 16 U.S.C. §§ 1536, 1540(g); and Administrative Procedure Act, 5 U.S.C. § 706. The district court had subject matter jurisdiction under 28 U.S.C. § 2201, 28 U.S.C. § 1361, 16 U.S.C. § 1540(g), and 5 U.S.C. §§ 702 and 706. The district court entered an order on December 14, 2017, denying Appellants' motion for summary judgment on all claims and granting summary judgment in Appellees' favor. Appellants filed a timely notice of appeal on February 12, 2018. The Court has jurisdiction over this direct appeal from the final judgment of the district court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether the U.S. Army Corps of Engineers violated the National Environmental Policy Act when it failed to analyze the indirect and cumulative impacts of phosphogypsum production and phosphogypsum stacks in its Areawide Environmental Impact Statement and Supplemental Environmental Assessment for the South Pasture Extension Mine.

2.    Whether the U.S. Army Corps of Engineers violated the National Environmental Policy Act when it failed to produce a mine-specific Environmental Impact Statement for the South Pasture Extension Mine.

3.    Whether the U.S. District for the Middle District of Florida erred in finding that the U.S. Army Corps of Engineers and the U.S. Fish and Wildlife Service did not violate section 7 of the Endangered Species Act because the Areawide Environmental Impact Statement specifically discussed the South Pasture Extension Mine.

2

## STATEMENT OF THE CASE

This case concerns the U.S. Army Corps of Engineers' (Corps) issuance of a Clean Water Act (CWA) permit for the South Pasture Extension Mine (SPE Mine), a 7,513-acre phosphate strip mine in west-central Florida. The Corps' decision-making in approving the permit for this phosphate mine contravenes the CWA, National Environmental Policy Act (NEPA), Endangered Species Act (ESA), and Administrative Procedure Act (APA), and is precedential and consequential because the SPE Mine is the first in a series of four closely related phosphate mine permit applications that will destroy more than 51,000 acres in Florida—an area more than half the size of Atlanta. AR_0250103; AR_0250106.[1]

The Corps first prepared a generalized NEPA analysis for the four mines, called an Areawide Environmental Impact Statement (AEIS), that deferred many of the most egregious impacts of large-scale phosphate mining to later, site-specific environmental analyses, or

---

[1] The Corps and U.S. Fish and Wildlife Service filed two administrative records for this case, both of which were filed conventionally and are noted on the district court docket sheet at ECF Nos. 50 and 51. All references to the Corps' and Service's administrative records begin with either "AR_" or "FWS," respectively, followed by the Bates number(s) for the cited pages.

overlooked harms of the mines altogether. AR_0250102–24. Then, more than three years after finalizing the AEIS, the Corps published a "supplemental environmental assessment" (SEA) for the SPE Mine. AR_0275350–94. The SEA largely referred to the AEIS and did not substantively address many significant impacts from the SPE Mine. AR_0275350–94. The Corps concluded the process by issuing a Record of Decision (ROD) for the SPE Mine SEA. AR_0287119–83.

One major environmental concern the Corps failed to analyze in both the AEIS and the SEA is phosphogypsum production and storage. Phosphogypsum is a radioactive byproduct created when mined phosphate ore is processed into phosphoric acid used in fertilizer. AR_0236150. Phosphogypsum is a foreseeable byproduct of phosphate mining activities, with more than 95 percent of phosphate ore mined in Florida used to produce fertilizer. AR_0250298; AR_0292515. Phosphogypsum is stored in mountainous stacks around Florida, atop aquifers and near surface waters, including rivers and Tampa Bay. AR_0236150. This precariously placed waste has discharged into the Floridan Aquifer on several occasions, AR_0292514–15; AR_0250492, and will continue to threaten Florida's clean water into the foreseeable

4

future, AR_0001227. Despite the clear and close connection between phosphate mining and the production of this dangerous radioactive waste, the Corps failed to address these significant indirect and cumulative effects to the environment and communities in either the AEIS or the SEA.

The Corps also failed to consult with the U.S. Fish and Wildlife Service (Service) to consider whether authorizing phosphate mining in 51,000 acres of west-central Florida will jeopardize endangered and threatened species. These species—which include the Florida grasshopper sparrow, Florida scrub jay, wood stork, Audubon's crested caracara, snail kite, eastern indigo snake, bluetail mole skink, sand skink, Florida panther, and Florida manatee—are endangered or threatened because so much of their unique Florida habitat has already been lost. AR_0250533–46.

Although the District Court ruled against Plaintiffs-Appellants (hereinafter, Conservationists), they now seek reversal and remand for entry of summary judgment as to only the three most egregious errors. First, the Corps violated NEPA and the APA by failing in the AEIS and SEA to analyze one of the phosphate industry's most destructive

environmental impacts: the production and storage of millions of tons of phosphogypsum that foreseeably result from phosphate mining activities. Second, the Corps' failed to follow NEPA's procedural framework and to analyze the significant environmental effects of the SPE Mine by preparing a complete, mine-specific EIS—also a violation of NEPA and the APA. Third, the Corps violated the ESA by failing to complete "formal consultation" on its region-wide permitting plan for the mines and thereby ensure that even more large-scale phosphate mining does not jeopardize the existence of the many endangered and threatened species the mines will displace.

If allowed to stand, the Corps' unlawful actions will ultimately lead to the destruction of 51,000 acres of west-central Florida—much of the area's last unique wetlands and wildlife habitat—and will occur before many of the significant environmental impacts of these mines are lawfully examined and mitigated, as NEPA and the ESA require.



AR_0250307.

7

I.    Proceedings and Disposition Below

On November 15, 2016, the Corps approved a CWA section 404, 33 U.S.C. § 1344, dredge-and-fill permit for the SPE Mine. AR_0289830–56.  The Corps' authorization of this permit to strip mine 7,513 acres in Hardee County for phosphate is part of the Corps' area-wide evaluation of four phosphate mines that Mosaic Fertilizer, LLC (Mosaic) requests for the region. AR_0250103–07.

On December 20, 2016, Conservationists sent formal notice to the Corps and Service, notifying the agencies of their intent to sue for violations of the ESA if the violations were not corrected. AR_0292497–516. On March 15, 2017, Conservationists challenged the Corps' issuance of this permit under NEPA, the ESA, the CWA, and the APA, alleging that the Corps' approval of the SPE Mine permit was arbitrary, capricious, and in violation of these laws. Am. Compl., Doc. 52. To remedy these violations, the Conservationists requested vacatur of the SPE Mine permit and remand back to the Corps for further consideration. *Id*.

On June 30, 2017, Conservationists moved for summary judgment on all claims. Pls.' Mot. for Summ. J., Doc. 61. On July 28, 2017, Federal

8

Defendants and Intervenor-Defendant Mosaic filed cross-motions for summary judgment. Defs.' Mot. for Summ. J., Doc. 73; Def.-Ints.' Mot. for Summ. J., Doc. 74. On December 14, 2017, the District Court denied Plaintiffs' Motion for Summary Judgment and granted Defendants' and Mosaic's Motions for Summary Judgment. Doc. 78. Conservationists timely appealed that judgment on February 12, 2018.

II.    <u>Statement of Facts</u>

Phosphate strip mining is highly destructive, from the mining itself—which irreversibly changes rural and natural landscapes and groundwater, AR_0250398–403; AR_0250749–50; AR_0250904; AR_0250909–10; FWS 011851–52—to production of the end-product: phosphoric acid, a main ingredient in fertilizer. AR_0250298.

Phosphate strip mining begins by aggressively clearing the land of all vegetation, native plants, and wild animals—euphemistically called "overburden." AR_0250293. Draglines, which are one million ton excavators, strip soil up to 80 feet deep to access the "matrix," a subterranean mixture of sand, clay, and phosphate ore. AR_0250400. The matrix is then transported by pipeline to a nearby beneficiation plant to separate the phosphate ore from the byproduct. AR_0250400–

9

02. Sand is extracted and brought to a mined-out site to recontour the land, AR_0250403; the clay, now swollen with water and chemicals from the beneficiation process is set aside in acres-wide settling pits to dry out over years, AR_0250402–03; and the phosphate ore is taken by railcar to the nearby New Wales, Riverview, and Bartow fertilizer plants for processing into phosphoric acid. AR_0250287.

Fertilizer plants generate phosphogypsum, a radioactive waste byproduct that occurs when converting phosphate ore into phosphoric acid. AR_0236150 ("The phosphate industry generates over 30 million tons of phosphogypsum each year" and more than 900 million tons are stacked in more than 20 stacks in west-central Florida); AR_0250492. Phosphogypsum contains uranium, radium-226, and trace metals in concentrations that the EPA considers to be a risk to humans and the environment. AR_0001427–29; AR_0175523; AR_0175527.

Approximately five tons of phosphogypsum are created for every ton of phosphoric acid produced. AR_0250315. Phosphogypsum is stored in open-air "stacks" that are hundreds of acres wide and hundreds of feet tall. AR_0250315. The stacks are intended to "weather" the uranium and radium over time. In addition to blighting the Florida

landscape, these stacks hold reservoirs of acidic process water, sit precariously atop Florida's aquifers, and are prone to sinkholes. AR_0250492; AR_0292514; AR_0292500; AR_0250315.

For example, on September 15, 2016, news broke that a sinkhole opened up in a phosphogypsum stack at Mosaic's New Wales plant. AR_0292514. The sinkhole was deep enough that it caused at least 215 million gallons of contaminated water to pour into the Floridan aquifer. AR_0292514. The New Wales phosphogypsum stack is one of the storage sites for the radioactive phosphogypsum that will be generated by the phosphate mining authorized by the Corps at the SPE Mine. AR_0263670.

Between 2010 and 2011, the Corps received several applications from Mosaic[2] for CWA permits to dredge and fill wetlands in west-central Florida to construct many new phosphate mines and related facilities, and to expand several existing mines. AR_0250286. The Corps "determined that, when viewed collectively, the separate proposed

---

[2] Both Mosaic and CF Industries, Inc. were initial applicants, but during the permitting process ownership of the SPE Mine transferred from CF Industries, Inc. to Mosaic. Pls.' Opp. Br., Doc. 77 - Pg. 5; AR_0263100–03. This transfer of ownership was finalized in 2014. AR_0263100.

phosphate mining projects have similarities that provide a basis for evaluating their direct, indirect, and cumulative environmental impacts in a single Areawide Environmental Impact Statement." AR_0250103; *accord* AR_0250286. The AEIS would be used to support decision-making on the permit applications. AR_0250286.

Thus, in 2012, the Corps released for public comment a draft of the AEIS, purportedly to consider and inform the public about the environmental consequences of all of the planned phosphate mining in Central Florida Phosphate District. AR_0180118. The draft AEIS included a generalized review of the environmental impacts of four proposed mines: the SPE, Desoto, Ona, and Wingate mines. *Id.* Altogether, these mines destroy more than 51,000 acres of wetlands, watersheds, and habitat in across large areas of Hardee, Hillsborough, Manatee, Polk, and DeSoto counties. AR_0178392–9454.

In April 2013, the Corps published the final AEIS on phosphate mining. AR_0253146; AR_0250075–124; AR_0250285–3068. The Corps did not publish an ROD for the AEIS, nor did it enter into formal consultation under section 7(a)(2) of the ESA. In June 2016, more than three years after it released the AEIS, the Corps released a draft SEA

for the SPE Mine. AR_0275348–49. The SEA was to be the public's first opportunity to review the details of the SPE Mine as amended under Mosaic's ownership, *id.*, but for the most part it simply referenced back to the AEIS for this analysis. AR_0275350–94.

In November 2016, the Corps issued a CWA section 404 dredge-and-fill permit for the SPE Mine, AR_0289830–92456, and an ROD for the SPE Mine SEA. AR_0287119–83. In the permit, the Corps expanded the existing 17,734-acre South Pasture Mine by 7,513 acres and extended the mining timeline by 20 years. AR_0289830. The Corps repeatedly refused to hold any public hearings for the SPE Mine. *See, e.g.*, AR_0289807; AR_0287128–29. Despite the SPE Mine having significant impacts, the Corps did not publish a mine-specific EIS for the SPE Mine. The Corps also did not publish a finding of no significant impact (FONSI) on the SEA. The Conservationists timely submitted written comments to the Corps on the AEIS and SPE Mine. AR_0281160–78; AR_0281221–60.

III.    Standard of Review

Conservationists present three questions of law to be reviewed *de novo*. The standard of review is the arbitrary-and-capricious standard of

13

review pursuant to the APA, 5 U.S.C. §§ 701–706; *Ouachita Watch*

*League v. Jacobs*, 463 F.3d 1163, 1169 (11th Cir. 2006). Under that

standard, a court shall

> hold unlawful and set aside agency action, findings, and
> conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise
> not in accordance with law; . . .
> (C) in excess of statutory jurisdiction, authority, or
> limitations, or short of statutory right; [and/or]
> (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2); *see also N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d

1533, 1538–39 (11th Cir. 1990). Agency action is arbitrary and

capricious if the agency:

> relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of
> the problem, offered an explanation for its decision that runs
> counter to the evidence before the agency, or is so
> implausible that it could not be ascribed to a difference in
> view . . . .

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29

(1983). A reviewing court must not supply "a reasoned basis for the

agency's action that the agency itself has not given." *Id.*; *accord*

*Wilderness Watch v. Mainella*, 375 F.3d 1085, 1087–88 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

In conducting a NEPA review for region-wide agency action that

14

will result in the loss of more than 51,000 acres in west-central Florida
to phosphate mining operations, and the production of millions of tons
of phosphogypsum waste, the Corps failed to comply with federal
environmental laws that were enacted to protect human health and the
environment for present and future generations.

The Corps violated the law in three ways. First, the Corps violated
NEPA and the APA when it failed to analyze the *indirect* and
*cumulative* impacts of phosphogypsum production and stacks on the
human environment. AR_0250601–02. The Corps instead determined—
without factual support or a reasoned explanation—that fertilizer
processing plants and phosphogypsum have "independent utility" from
phosphate mining, AR_0250107; AR_0250314; AR_0250601–02, even
though the Corps does not deny that the very "purpose and need" for
the mines is to supply phosphate ore to make fertilizer. AR_0250298
(describing public need as one for phosphorous based fertilizers);
AR_0250304–05 (same).

Second, the Corps violated NEPA and the APA by failing to
prepare a mine-specific EIS for the SPE Mine. A mine-specific EIS was
required here because it is undisputed that the impacts of the mine are

15

"significant." In not preparing an EIS for the SPE Mine, the Corps violated NEPA's clear procedural framework, as established through its implementing regulations. Additionally, a mine-specific EIS was required for the Corps to take a comprehensive "hard look" at the direct, indirect, and reasonably foreseeable cumulative effects of the SPE Mine, including the mining and waste byproducts. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983).

Finally, the Corps violated the ESA when it failed to complete a "formal consultation" with the Service to ensure that its region-wide phosphate-mining program "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" critical habitat. 16 U.S.C. § 1536(a)(2); *accord* 50 C.F.R. § 402.14(a).

## ARGUMENT

### I.    The Corps Violated the National Environmental Policy Act and Administrative Procedure Act by Failing to Analyze the Indirect and Cumulative Impacts of Phosphogypsum.

The Corps violated NEPA and the APA by ignoring the indirect and cumulative environmental effects of phosphogypsum production and storage in its AEIS and SEA. Mosaic's production of

16

phosphogypsum is the foreseeable result of mining phosphate ore at the SPE Mine and other mines under consideration that would not occur but for the permittee's phosphate mining practices. AR_0292515; AR_0250297–98. NEPA therefore demands that the Corps take a "hard look" at the significant effects of the SPE Mine and phosphogypsum, including the indirect and cumulative impacts. 40 C.F.R. §§ 1508.7, 1508.8, 1508.25(c).

The effects of this radioactive byproduct—which will accumulate with the Corps' approval of the three other mines included in the AEIS—are significant. Phosphogypsum stacks threaten water used for drinking and recreation and phosphogypsum is a dangerous substance that never should have been ignored in either the AEIS or the SEA. Such gaps in analysis are arbitrary and capricious, violating not just the letter of NEPA, but also its intention of informed decision-making.

Yet as the AEIS acknowledged, phosphate mining on more than 51,000 acres will remove an estimated 350.6 million tons of phosphate ore, most of which Mosaic intends to turn into fertilizer. AR_0250910. The resulting, dangerous waste byproduct will persist indefinitely in the environment, in giant stacks, eventually contaminating the

environment and potentially, drinking water; this has already occurred several times in the same area. AR_0292500; AR_0250492. With no solution in sight, the newly permitted mines will only exacerbate the problem, dumping even more radioactive waste on top of the radioactive mountains that already exist.

Nevertheless, the Corps refused to analyze the indirect and cumulative impacts of fertilizer production on the human environment and public health in either the AEIS or the SEA, violating NEPA and the APA.

    A.    <u>The Corps Violated the National Environmental Policy Act and Administrative Procedure Act by Failing to Analyze the Long-Lasting and Significant Indirect Impacts of Phosphogypsum.</u>

The Corps failed to analyze phosphogypsum production and storage, which are reasonably foreseeable, would not occur but for the Corps' permitting, and, hence, are among the "indirect effects" of phosphate mining. *See, e.g.,* AR_0082345; AR_0090535.

> 1. *The Corps Was Required to Analyze and Disclose the Reasonably Foreseeable, Indirect Effects of Phosphate Mining, Including the Environmental Impacts from Phosphogypsum.*

To comply with NEPA, federal agencies must fully analyze and disclose all of the direct, indirect, and cumulative impacts of the proposed action.[3] 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c). "Direct" effects are those which are "caused by the action and occur at the same time and place" as the proposed project. *Id*. § 1508.8(a). "Indirect" effects are also "caused by the action," but they occur "later in time" or farther . . . in distance" and yet are "still reasonably foreseeable." *Id*. § 1508.8(b); *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012). Effects are "reasonably foreseeable" when they are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (quoting *Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016)). As many courts have explained, NEPA requires federal agencies conducting NEPA analyses to address *all* of the indirect effects of a proposed project.

---

[3] "Effects and impacts as used in these regulations are synonymous." 40 C.F.R. § 1508.8.

For example, this Court affirmed the Southern District of Florida's finding that the Corps erred in issuing a section 404 permit when it failed to consider the growth-inducing effects of a mine on a nearby area. *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273, 1320 (S.D. Fla. 2006), *vacated in part, remanded in part,* 526 F.3d 1353 (11th Cir. 2008). In that instance, the lower court was persuaded by the fact that the "purpose of permitting mining in the Lake Belt is to serve a predicted need from Florida's rapidly increasing population growth rate," and therefore concluded, "the Corps' simple dismissal of the negative impacts of development, even as to just the Lake Belt and nearby area, violated NEPA's requirement that all indirect effects be addressed." *Id.* at 1320–21; *see also Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs.*, 401 F. Supp. 2d 1298, 1324–26 (S.D. Fla. 2005) (holding the Corps' failure to analyze the future growth-inducing indirect effects of research facilities violated NEPA).

Here too the Corps failed to consider the indirect effects of mining, and, in particular, the effects of pollution from Mosaic's nearby fertilizer plants that are fed by Mosaic's phosphate mines. AR_0250287. Indeed, Mosaic operates its fertilizer plants near its mines, and incidentally,

these plants have historically been built on mined-out land. AR_0250404–05; AR_0250315; AR_0250573. It is the fertilizer plants that actually meet the Corps' stated "purpose and need" of the mines— *i.e.*, to create fertilizer, AR_0250297–303—and the plants also produce the radioactive phosphogypsum. This effect would not occur but for the Corps' authorization of the phosphate mines under the CWA.

Four appeals courts, including the D.C., Ninth, Tenth, and Eighth Circuit Courts of Appeals, have reached similar conclusions in cases involving mining approvals, directing federal agencies to consider downstream effects such as the transportation and processing of mined ore and the greenhouse gas emissions from mined coal. These courts and their lower district courts have consistently held that these types of downstream effects fall within the scope of indirect impacts that should be reviewed under NEPA as "reasonably foreseeable."

For example, in *Sierra Club v. FERC*, the D.C. Circuit Court of Appeals held that the Federal Energy Regulatory Commission (FERC) violated NEPA by failing to analyze the burning of natural gas, a greenhouse gas, transported by the "Sabal Trail" natural gas pipeline, finding, "greenhouse-gas emissions are an indirect effect of authorizing

this project, which FERC could reasonably foresee, and which the

agency has legal authority to mitigate." 867 F.3d 1357, 1374 (D.C. Cir.

2017) (hereinafter, *Sabal Trail*). In making this finding, the court

reasoned:

> It's not just the journey, though, it's also the destination. All
> the natural gas that will travel through these pipelines will
> be going somewhere: specifically, to power plants in Florida,
> some of which already exist, others of which are in the
> planning stages. Those power plants will burn the gas,
> generating both electricity and carbon dioxide. And once in
> the atmosphere, that carbon dioxide will add to the
> greenhouse effect, which the EIS describes as "the primary
> contributing factor" in global climate change.

*Id.* at 1371. Like FERC in *Sabal Trail*, the Corps here is charged with

balancing "'the public benefits against the adverse effects of the

project' . . . including adverse environmental effects." *Id.* at 1373

(quoting *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d

97, 101–02 (D.C. Cir. 2014). And like FERC, the Corps here has the

authority to condition or deny a permit "on the ground that [it] would be

too harmful to the environment," making the agency the "'legally

relevant cause' of the direct and indirect environmental effects of the

project it approves." *Sabal Trail,* 867 F.3d at 1373, 1375 (holding that

even though the power plants will be subject to "state and federal air

permitting processes," "the existence of permit requirements overseen by another federal agency or state permitting authority cannot substitute for a proper NEPA analysis").

The Ninth Circuit Court of Appeals has likewise held that downstream activities that affect the human environment should be considered indirect effects under NEPA. In *South Fork Band Council of West Shoshone of Nevada v. U.S. Department of the Interior*, the Ninth Circuit explained that "[t]he air quality impacts associated with transport and off-site processing of the five million tons of refractory ore are prime examples of indirect effects that NEPA requires be considered." 588 F.3d 718, 725 (9th Cir. 2009) (finding the Bureau of Land Management failed to evaluate the environmental impacts of transporting and processing ore at a facility 70 miles away); *see also N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1077–79 (9th Cir. 2011) (finding EIS for railroad line failed to review cumulative impacts from coal mine that would utilize the rail line).

Applying this authority, many district courts in the Ninth Circuit have reached similar holdings. *See, e.g., Mont. Envtl. Info. Ctr. v. U.S. Office of Surface Mining*, 274 F. Supp. 3d 1074, 1090–99 (D. Mont.

2017) (finding EA for expansion of coal mine failed to take a hard look at the indirect and cumulative effects of coal transportation, coal combustion, and foreseeable greenhouse gas emissions); *WildEarth Guardians v. Office of Surface Mining, Reclamation & Enf't*, No. 14-103-BLG-SPW, 2015 U.S. Dist. LEXIS 145149, at *19–20 (D. Mont. Oct. 23, 2015) (finding the Office of Surface Mining's FONSI failed to take hard look at environmental impacts including downstream greenhouse gas emissions from federal coal leasing), *report and recommendation adopted in part, rejected in part on other grounds*, 2016 U.S. Dist. LEXIS 7223 (D. Mont. Jan. 21, 2016).

The Tenth Circuit Court of Appeals has also held that the downstream impacts of extractive activities must be analyzed as indirect effects under NEPA. For instance, in *WildEarth Guardians v. U.S. Bureau of Land Management*, the Tenth Circuit concluded that an EIS unlawfully failed to review impacts from coal combustion emissions. 870 F.3d 1222, 1233–40 (10th Cir. 2017).

Analogous to the matter before the Court here, in *Colorado Environmental Coalition v. Office of Legacy Management*, the U.S. District Court for the District of Colorado found an agency unlawfully

failed to consider the indirect effects of processing ore that would be mined with agency-issued permits. 819 F. Supp. 2d 1193, 1212 (D. Colo. 2011), *amended in part on other grounds by* No. 08-01624-WJM-MJW, 2012 U.S. Dist. LEXIS 24126 (D. Colo. Feb. 27, 2012). As in *Colorado Environmental Coalition*, the Corps here has failed to consider the indirect effects of processing the phosphate ore that would be mined with Corps-issued CWA permits. *See also Sierra Club v. U.S. Dep't of Energy*, 255 F. Supp. 2d 1177, 1185 (D. Colo. 2002) (holding agency must review impacts from "reasonably foreseeable" mine on private land when preparing NEPA document for federal land easement related to the future mine); *High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1189–94 (D. Colo. 2014) (finding EIS for coal lease modification and mine expansion must consider downstream emissions from coal combustion); *Diné Citizens Against Ruining Our Env't v. Office of Surface Mining, Reclamation & Enf't*, 82 F. Supp. 3d 1201 (D. Colo. 2015) (holding the agency improperly limited its scope of review by failing to assess the indirect and cumulative impacts of a coal mine expansion would create an additional 12.7 million tons of coal

combustion), *order vacated in part, appeal dismissed in part as moot by* 643 Fed. App'x. 799 (10th Cir. 2016).

The same is true for the Eighth Circuit Court of Appeals. *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 548–550 (8th Cir. 2003) (holding that the agency was required to consider impacts from burning coal when reviewing a proposed railway access and transportation of the coal even though the power plants using the coal were hundreds of miles away).

The weight of authority on point dictates that in this case, the Corps failed to analyze the reasonably foreseeable, indirect effects of authorizing phosphate mining by ignoring the environmental impacts of phosphogypsum production and storage, both in the AEIS and the SEA. This appeal presents a closer causal link than at issue in most of the cases cited above, as the extractive activity here—phosphate mining—is not so far removed from the hazardous byproduct that results from its processing.

### 2. The Corps Ignored Phosphogypsum, Which Lacks Any "Independent Utility."

The impacts the Corps should have analyzed include: where the waste will be stored; how long its radioactivity will persist; the impacts

that will likely result in the event that the phosphogypsum waste stacks do affect the human environment; and the effects on the environment if a phosphogypsum stack breaches or has a sinkhole and radioactive material is released. Instead, the Corps sidestepped its obligation and decided that the fertilizer plants and phosphogypsum stacks have "independent utility" from phosphate mines. AR_0250107; AR_0287128. This confuses the relevant inquiry, and in any event, no support for it can be found in the voluminous admininstrative record.

*Arguendo*, an action can have an indirect effect even if it has "independent utility." Nothing in NEPA or the CEQ regulations states otherwise. *See Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1323 (holding, "[e]ven if the proposed project were not unlawfully segmented, and the Corps' conclusion of its independent utility were adequately supported and evaluated in the record, . . . the Corps is still duty bound to address 'direct, indirect and cumulative impacts on all Federal interests within the purview of the NEPA statute'" (quoting 33 C.F.R. pt. 325, App. B § 7(b)(3))).

In any event, *phosphogypsum does not have independent utility* from phosphate mining, and vice versa. The Corps considers a project to

have independent utility "if it would be constructed absent the construction of other projects" in the same area. Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002). Phases of a multi-phase project that would not exist but for other phases of the project—just as the phosphogypsum waste would not exist but for the Corps' authorization of the mining of phosphate ore—do not have "independent utility." AR_0227245; 67 Fed. Reg. at 2094. Where an activity requiring a permit is "merely one component of a larger project," the scope of the environmental review should "address the impacts of the specific activity requiring [the] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility." 33 C.F.R. pt. 325, App. B § 7(b)(1). The district engineer has control and responsibility "where the environmental consequences of the larger project are essentially products of the Corps permit action." *Id*. § 7(b)(2).

The Corps may try to support its "independent utility" theory by referencing the fact that two companies in Mississippi and Louisiana have imported phosphate rock from Morocco for wet-process phosphoric acid production, and therefore, those plants would have independent

utility if phosphate mines were authorized nearby. AR_0250316.

However, the record is devoid of a reasoned explanation for the Corps'

conclusion, and in fact, the record is replete with statements that

directly contradict that conclusion, including findings from the Corps

that support the interdependence of mining and fertilizer production.

AR_0250391 (rejecting any alternative that would entail the

importation of phosphate ore rather than it coming from nearby mines).

Indeed, the Corps based its alternatives analysis on the prerequisite of

*local* mining and processing. AR_0250391–93 (rejecting

import/transport alternatives); AR_0287130 (establishing all

alternatives must be within 10 miles of the South Pasture Mine

beneficiation plant); AR_0081965 ("Hardee mine is the **sole rock**

**supply** for CF's phosphate fertilizer production.").

Even Mosaic has disavowed any utility for its fertilizer plants that

is independent from its phosphate mining operations, emphasizing that

"[t]hose plants would not be able to compete in the phosphate crop

nutrient market if they were required to pay for imported phosphate

rock . . . ." AR_0263670. Mosaic also proclaimed to be "vertically

29

integrated to [ ] supply one of our key inputs, phosphate rock, to our phosphate production facilities." AR_0275052.

To the extent the Corps may have relied on Mosaic's representations to claim that the fertilizer plants have independent utility, regardless of whether the mines were permitted, AR_0250315–16, that reliance is misplaced, particularly when those representations have no support in, and indeed are contradicted by, the administrative record. In *Florida Wildlife Federation v. U.S. Army Corps of Engineers*, for example, the District Court for the Southern District of Florida found that the Corps' reliance on "[r]epresentations by the applicant alone, who clearly has an interest in obtaining the permit and whose theory of 'independent utility' . . . cannot be sufficient" to establish a project's independent utility, without independent evaluation by the agency based on record evidence." 401 F. Supp. 2d at 1323.

Here too the Corps established its "independent utility" determination on Mosaic's representations, or the Corps simply translated Mosaic's representations into its own conclusion without independent evaluation. In the process, the Corps disregarding the EPA's concern that approval of the SPE Mine would lead to piecemeal

30

analysis and necessarily omit indirect and cumulative effects resulting from the mine. *Cf. id.* at 1321–23. The Corps received many requests— including requests from the EPA and a local municipality—to analyze the effects of phosphogypsum. AR_0175523–25; AR_0175527–95; AR_0225204–09; AR_0225253–557; AR_0234723–27; AR_0251108. As a cooperating agency and once the federal regulator of phosphate mining, the EPA stated that it "has long considered phosphogypsum to be a part of the mining waste stream and an associated potential environmental impact." AR_0175527. And yet again, the Corps eliminated any alternative that did not result in the production and end use of industrial fertilizer. AR_0250391–93; *see also* AR_0263661–62 (explaining the purpose and need for the phosphate mining is to "enable the South Pasture Mine and Plant to continue providing beneficiated rock to [its fertilizer plants] without interruption at the existing production rate through at least 2035").

The Corps' AEIS celebrates the purported benefits of fertilizer, but ignores the environmental harms fertilizer production causes. The agency cannot have it both ways. The Corps focused narrowly on the impacts of phosphate mining alone, violating NEPA. AR_0251039–42;

AR_0287348–49; AR_0252000; *see Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1327 ("[T]he scope of analysis used for analyzing . . . impacts . . . should be the same scope of analysis used for analyzing the benefits of a proposal." (quoting 33 C.F.R. pt. 325, App. B § 7(b)(3))). Because the Corps "entirely failed to consider" this "important aspect of the problem," the Court should set aside the CWA permit for the SPE Mine and the AEIS. *Motor Vehicle*, 463 U.S. at 43.

> ### B. The Corps Failed to Analyze the Cumulative Effects of Phosphogypsum.

The Corps may concede that it did not analyze the indirect effects of phosphogypsum in the AEIS or SEA, and instead point the Court to its cumulative impacts analysis. AR_0250316 ("Although they are not included as part of the Proposed Action, they are included in the scope of the cumulative impacts analysis . . . ."). However, this analysis is not found in, let alone substantiated by, the decision documents or the administrative record. AR_0250821–903 (cumulative impacts analysis in the AEIS); AR_0250663–65 (discussing groundwater withdrawals generally and directly in relation to mines but failing to mention fertilizer production facilities); AR_0252618 (same); AR_0250887–88 (discussing water quality impacts from mines, agriculture, and urban

development, but not fertilizer processing facilities or phosphogypsum stacks); *compare* AR_0287128 ("[T]he [A]EIS, and the Corps' project-specific reviews . . . did not consider the direct or indirect effects of the [fertilizer] plants or the phosphogypsum stacks."), *with* AR_0250316 (concluding, without further explanation, that the "AEIS took into account the [cumulative] impacts of phosphogypsum stacks"); AR_0250602 (same).

Cumulative effects are "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Indirect effects" result from the project itself, while "cumulative effects" are the collective impact from both the project under review and other reasonably foreseeable future projects. *Id.* Here, in addition to falling within the indirect effects, phosphogypsum resulting from phosphate mining, both throughout the Central Florida Phosphate District and the SPE Mine, has a cumulative effect on the human environment. Accordingly, the Corps was required to analyze—at both the region-wide and mine-specific levels—the incremental impact of these actions

33

"when added to other past, present, and reasonably foreseeable future actions." *Id.*

However, despite its pronouncements of reasoned consideration of the cumulative effects of phosphogypsum, the inescapable conclusion is that the agency simply did not analyze it adequately there either. There is but one instance in the AEIS where the Corps affords the effects of fertilizer production facilities some discussion, but it is only to acknowledge—without further analysis—the long history of phosphogypsum spills from these facilities and their deleterious impacts on surface water quality. AR_0250492; AR_0252582–83. At the same time, the administrative record reveals a deep resistance to substantive analysis of the effects of the fertilizer plants or phosphogypsum stacks—indirectly or cumulatively. As the Corps explained its NEPA approach to EPA, the Corps would only analyze impacts from "active mining process" in areas that are directly under the Corps' jurisdiction, with "[i]ssues outside of direct impacts" like fertilizer plants or "gyp stacks" to be referenced, if at all, only "to a lesser degree." AR_0095858; *see also id*. ("We have no intention of expanding the scope.").

34

This analysis simply does not satisfy NEPA's hard-look mandate. *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) (finding that "snippets . . . [that] merely state (and restate) the obvious" and "perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts"); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410, (1976); *Klamath-Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 387 F.3d 989, 995 (9th Cir. 2004) ("This conclusory presentation does not offer any more than the kind of 'general statements about possible effects and some risk' which we have held to be insufficient to constitute a 'hard look.'" (quoting *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 631 F.3d 1108, 1128 (9th Cir. 2004)); *Manatee Cty. v. Gorsuch*, 554 F. Supp. 778, 793–94 (M.D. Fla. 1982).

To have any effect, a NEPA document must provide a "useful analysis," including a useful analysis of cumulative impacts, to realize its dual purposes of informed decision-making and public disclosure. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868

35

(9th Cir. 2004). Only by doing so may the Corps be equipped with the knowledge it needs to select among a range of alternatives or add conditions to a permit that help to avoid and mitigate—or at a minimum, document—the action's worst consequences. This also prevents agencies from undertaking a piecemeal review of environmental impacts, which would necessarily omit important information the agency should consider before making its decision. *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306–07 (9th Cir. 2003). Here, the Corps' scant analysis did not allow it to engage in informed decision-making with respect to the environmental impacts of phosphogypsum production and storage.

Because the Corps' analysis lacked anything beyond bare references to the impacts of fertilizer plants and phosphogypsum stacks, neither the AEIS nor the SEA comply with NEPA. The Corps' issuance of the CWA permit for the SPE Mine without adequate NEPA analysis of these indirect and cumulative effects was arbitrary, capricious, and contrary to law, and therefore must be set aside.

36

## II.    The Corps' Approval of the SPE Mine Without a Mine-Specific Environmental Impact Statement Violated the National Environmental Policy Act and Administrative Procedure Act.

The Corps violated NEPA and the APA when it failed to prepare a mine-specific EIS for the SPE Mine. NEPA requires an agency to prepare an EIS for any major federal action that will significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). It is undisputed that the Corps' issuance of a CWA section 404 permit for the SPE Mine meets that test, yet the Corps maintains that no mine-specific EIS is required for the SPE Mine because the AEIS provides NEPA's necessary searching analysis. Defs.' Opp. Br., Doc. 66 - Pg. 6. This argument, which is based around the superficial and irregular process the Corps relied upon in approving the SPE Mine permit, is unavailing.

First, NEPA and its implementing regulations establish a specific procedural framework that an agency must follow in analyzing the environmental effects of its actions. Under that framework, if an agency prepares an EA, that EA may be followed by either a FONSI or an EIS. 40 C.F.R. § 1509.9. An EIS, in turn, must be followed by an ROD. *Id.* § 1505.2. NEPA provides no exemption to this process. Yet the Corps

37

did not follow this clear framework in approving the SPE Mine. Instead, the Corps prepared an AEIS without an ROD and an SEA without a FONSI. This is patently arbitrary and capricious, and not in accordance with NEPA and its implementing regulations.

Second, the Corps was required, *see Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002), but failed, to take a searching, "hard look" at the environmental consequences of the SPE Mine in three primary ways: (1) based on significant developments that occurred between the AEIS and Corps approval of the CWA 404 Permit for the SPE Mine, which were ignored; (2) due to impacts identified as significant in the AEIS, but left for later analysis, which were never analyzed; and (3) because neither the AEIS or the SEA took a hard look at the consequences to the human environment from digging out 409 acres of the Payne Creek watershed.

This is not about analysis for analysis' sake. Wherever the Corps does not take its NEPA obligations seriously, it cannot accomplish NEPA's twin aims of informed agency decisionmakers and meaningful public participation. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Moreover, the steps the Corps' took in approving

38

the SPE Mine set the precedent for its future NEPA analyses. For these reasons, the Corps' decision not to prepare a mine-specific EIS for the SPE Mine was arbitrary and capricious and must be set aside under the APA. *Hill v. Boy*, 144 F.3d 1446, 1450 (11th Cir. 1998).

> A.    The Corps Failed to Adhere to the National
>        Environmental Policy Act's Procedural Framework.

NEPA's procedural framework is straightforward, yet the Corps did not follow the Act's plain requirements in conducting its NEPA analysis for the SPE Mine. The Corps' approval of the CWA permit must be set aside as a matter of law.

CEQ's implementing regulations for NEPA are a "single set of uniform, mandatory regulations" "applicable to all federal agencies." *Andrus v. Sierra Club*, 442 U.S. 347, 357–58 (1979). An agency must prepare an EIS for any action that significantly affects the quality of the human environment, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4, and, if it does prepare an EIS, it must then publish an ROD. 33 C.F.R. § 230.14; 40 C.F.R. § 1505.2.

An agency may choose to prepare an EA—a less-searching analysis—to determine whether the action will have significant

39

impacts, and, thus, whether an EIS is necessary.[4] 40 C.F.R.

§ 1508.9(a)(1); *see also Hill*, 144 F.3d at 1449–50. If an agency chooses

to prepare an EA, however, it may conclude the NEPA process only in

one of two ways: (1) conclude that the project will have a significant

impact(s) and prepare an EIS; or (2) reach a finding of no significant

impact, or FONSI, which must explain why the proposed action will not

significantly impact the environment. 40 C.F.R. § 1508.9(a)(1)*; see also*

*id.* §§ 1501.4(e), 1508.13. There is no exception to these requirements,

even for a multi-tiered environmental review process.[5]

---

[4] An EA "has three defined functions: (1) it briefly provides sufficient evidence and analysis for determining whether to prepare an EIS; (2) it aids an agency's compliance with NEPA when no EIS is necessary . . . ; and (3) it facilitates preparation of an EIS when one is necessary." AR_0003418–19. The EIS, on the other hand, should provide "all the information on environmental impacts and alternatives that the decisionmaker and the public need, in order to make the decision and to ascertain that every significant factor has been examined. The EIS must explain or summarize methodologies of research and modeling, and the results of research that may have been conducted to analyze impacts and alternatives." NEPA TASK FORCE, REPORT TO THE COUNCIL ON ENVIRONMENTAL QUALITY, MODERNIZING NEPA IMPLEMENTATION, Question 25a (2003), AR_0003410–11.

[5] "Tiering" refers to the "coverage of general matters in broader environmental impact statements . . . with subsequent narrower statements or environmental analysis." 40 C.F.R. § 1508.28; *see also* NEPA TASK FORCE, REPORT TO THE COUNCIL ON ENVIRONMENTAL QUALITY, MODERNIZING NEPA IMPLEMENTATION, Question 24c (2003), AR_0003410. Appellants do not question the Corps' use of the tiering

The Corps ignored these clear procedural requirements when it approved the SPE Mine before issuing an ROD for the AEIS and when it prepared a mine-specific ROD without preparing a mine-specific EIS for the SPE Mine. The Corps' approach was procedurally improper and should be overturned as a matter of law. *Sierra Club v. Marin*, 168 F.3d 1, 4 (11th Cir. 1999) (explaining a court "must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself"); s*ee also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–17 (1971); *Kleppe*, 427 U.S. at 406 ("The procedural duty imposed upon agencies by [section 102(2)(C)] is quite precise, and the role of the courts in enforcing that duty is similarly precise."); *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n.*, 449 F.2d 1109, 1112 (D.C. Cir. 1971) (While "the general substantive policy of the [NEPA] is a flexible one," it "also contains very important 'procedural' provisions[.] . . . These provisions are not highly flexible. Indeed, they establish a strict standard of compliance.").

---

process, but maintain that the application of that process must follow the procedural requirements of NEPA and its implementing regulations.

The purpose of these procedures is to ensure that agencies inform their decision-making and provide a meaningful and *predictable* process for the public to engage in the NEPA process. *See Robertson*, 490 U.S. at 349 (finding that NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed federal actions *and* ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decision-making process and the implementation of that decision"); *Balt. Gas*, 462 U.S. at 97 (same); 40 C.F.R. § 1500.2(d) ("Federal agencies shall *to the fullest extent possible* . . . encourage and facilitate public involvement in decisions which affect the quality of the human environment." (emphasis added)).

As a result, the Corps' failure to follow NEPA's established framework arbitrarily harms its ability to fulfill NEPA's broad national commitment to protecting and promoting environmental quality. *Robertson*, 490 U.S. at 348. Despite this, the district court concluded that the Corps' process here was procedurally appropriate because "the Corps approved the ROD . . . three years after the April 2013 EIS and five months after a supplemental assessment in which the Corps

concluded that updated information from Mosaic about the proposed
SPE mine warranted no new EIS." Order, Doc. 78 - Pg. 5 n. 6. Short of
changing NEPA's implementing regulations to include the exemption
that the district court ostensibly creates here, neither the court nor the
agency can ignore NEPA's plain procedural demands. The appropriate
response to a procedurally flawed analysis is that the matter should be
vacated and remanded back to the agency for further proceedings. *See
Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952) ("[T]he
function of the reviewing court ends when an error of law is laid bare.
At that point the matter once more goes to the . . . [agency] for
reconsideration"); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of
Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015) (acknowledging that
"vacatur . . . is the ordinary APA remedy" (quoting *Sierra Club v.
Flowers*, 526 F.3d 1353, 1369 (11th Cir. 2008)).

> B. <u>The Corps' Failure to Prepare a Mine-Specific
> Environmental Impact Statement for the SPE Mine
> Violated the National Environmental Policy Act and
> Administrative Procedure Act.</u>

It is undisputed that the Corps' issuance of a CWA section 404
permit for the SPE Mine is a major federal action that will significantly
affect the quality of the human environment. Order, Doc. 78 - Pg. 5

43

("The parties agree that the SPE mine, which affects 7,531 acres in

Hardee County (including more than a thousand acres of wetlands),

significantly impacts the environment and requires an EIS."); Defs.'

Mot. for Summ. J., Doc. 73 - Pg. 2 ("The Corps received four applications

for . . . projects to expand existing mines and to create new phosphate

mines, and to construct attendant facilities in the Central Florida

Phosphate District (CFPD), including the SPE project[.] . . . The Corps

determined that the cumulative impacts of these proposed phosphate

mining projects in the CFPD could significantly affect the quality of the

human environment . . . ."); AR_0250103 ("Federal authorizations

approving the requested permits would constitute a 'Major Federal

Action.'"). Since the Corps' action here was a major federal action that

will significantly affect the quality of the human environment, instead

of preparing an SEA for the SPE Mine, it should have prepared a mine-

specific EIS, and in failing to do so the Corps violated NEPA and the

APA.

The Corps may contend that it was exempt from preparing an EIS

for these admittedly significant impacts and maintain that tiering the

SEA from the 2013 AEIS satisfies its mine-specific NEPA obligations. The facts do not support such a position.

To "provide a full and fair discussion of [all] significant environment impacts," 40 C.F.R. § 1502.1, NEPA provides that an agency may perform a single, individual NEPA review or undertake a "tiered" review process. *Id*. §§ 1500.4(i), 1502.4, 1508.28. If the agency chooses to conduct a tiered analysis, it must follow the broader—here "area-wide"—EIS with a subsequent, site-specific review that at a minimum ensures the agency addresses all relevant matters not considered in a previous EIS, and analyzes and substantively considers new or changed circumstances that bear on the proposed action or its impacts. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372–74 (1989); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d at 1215; *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1251 (11th Cir. 2012); *Klamath-Siskiyou*, 387 F.3d at 997–98 (holding an inadequate EA not cured by tiering to EIS that included only "general statements" about effects). Only then can it be said that the agency has taken a "hard look" at the environmental consequences of its action.

Ultimately, "the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance." *Marsh*, 490 U.S. at 374. As this Circuit has held, an agency's decision not to prepare an EIS should be considered arbitrary and capricious if it fails to (1) identify all of the relevant environmental concerns; (2) take a "hard look" at the environmental effects; (3) make a "convincing case" for any finding of insignificant impacts; and (4) ensure that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Hill*, 144 F.3d at 1450.

The Corps here did not conduct this essential, mine-specific review of all relevant and significant new matters in its SPE Mine SEA, and its AEIS is not an adequate substitute. *First*, the Corps' SEA did not analyze the numerous substantial changes or significant new circumstances related to the proposed action that occurred between the Corps finalization of the AEIS in April 2013 and its issuance of the SPE Mine permit in November 2016. These changes included: (1) changes in ownership and administration of the SPE Mine, AR_0263100–03, AR_0263659; (2) revisions to the project design and SPE permit application, including amending the project's "purpose and need,"

46

AR_0263661; AR_0262991–94; Def.-Ints.' Mot. for Summ. J., Doc. 74 -
Pg. 6–7; (3) changes to the timing and duration of the mining plan,
*compare* AR_0250106 *with* AR_0287124; and (4) significant changes to
the compensatory mitigation plan, AR_0269058–117; AR_0274037;
AR_0277714–94; AR_0269358–64; AR_0271822–44. Each one of these
changes is significant and relevant to the Corps' hard-look analysis—
including any amendments that it should have made to its earlier
analysis to consider and incorporate these changes. *Robertson*, 490 US
at 350–51 (NEPA prohibits "uninformed" agency action); *Vt. Yankee
Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558
(1978) (NEPA's mandate to agencies "is to insure a fully informed and
well-considered decision"), *rev'd on other grounds,* 435 U.S. 519 (1978),
*vacated on other grounds sub nom, Balt. Gas & Electric Co. v. Nat. Res.
Def. Council,* 435 U.S. 964 (1978). Certainly, when taken together they
warrant further scrutiny.

For example, "[t]he applicant listed in the June 1, 2012, public
notice for the project was CF Industries, Inc. On March 17, 2014,
Mosaic Fertilizer, LLC, acquired CF Industries Florida phosphate
operations, including the proposed South Pasture Extension project."

47

AR_0275351. It is unlikely that two completely separate mining companies, CF Industries, Inc. and Mosaic Fertilizer, LLC, would conduct their mining practices in the same manner and with the same impacts on the environment. A change of the permit applicant—and, ultimately, in corporate and shareholder interests as well as financial stability and risk tolerance—could lead to significant changes in management and mining practices that may result in changes to the direct, indirect, or cumulative impacts of the SPE Mine on the human environment. Those foundational changes could not have been analyzed in the AEIS since the ownership transfer happened after the AEIS was made final, and despite their importance, they were not substantively considered in the SEA.

Further, when the Corps prepared the AEIS, it estimated that "[m]ining would be conducted over approximately 13 years . . . from 2020 to 2033." AR_0250311. However, that start time had been moved up by the time the SEA was published, with "mining activities . . . projected to begin in 2016," AR_0275353, and extended, with mining operations anticipated to continue for approximately 14 years. AR_0275351. These changes, which are important to the impact and

48

footprint of this mine, could affect the severity and extent of the action's impact to the environment (including in both short- and long-term consequences). *See* AR_0250593 ("[E]ffects are . . . evaluated in terms of their significance," and "[b]oth short- and long-term effects are relevant to the consideration of the significance of an effect.").

In deciding whether an EIS analysis is required, courts have held that a contesting party "need not show that significant effects *will in fact occur*"—rather, "raising substantial questions whether a project may have a significant effect is sufficient." *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998); *Cal. Wilderness Coal. v. U.S. Dep't of Energy,* 631 F.3d 1072, 1097 (9th Cir. 2011) (finding that the standard for preparing an EIS is "low"). Given substantial questions as to whether changes in this project's timeline may significantly affect the environment in ways yet to be analyzed, the Corps should have prepared a mine-specific EIS to analyze and disclose those effects. *Native Ecosystems Council v. U.S. Forest Serv.,* 428 F.3d 1233, 1239 (9th Cir. 2005) (finding that an EIS should be prepared if there are "substantial questions" about whether the action "*may*" significantly affect the environment").

49

Significant changes to the compensatory mitigation plan, project design, and SPE permit application also indicate that the AEIS could not have conducted an adequate mine-specific significance review. *See, e.g.,* AR_0263661; AR_0262991–94; AR_0269058–117; AR_0274037–39; AR_0277714–94; AR_0269358–64; AR_0271822–44; Def.-Ints.' Mot. for Summ. J., Doc. 74 - Pg. 6–7, 8. As the AEIS itself provides, "adverse effects can be reduced in intensity by mitigation," AR_0250593, and, as such, "the determination of significance may also be changed by the . . . mitigative measures" implemented. AR_0250594. Therefore, to adequately conduct a significance analysis for the SPE Mine, the significant changes to the project design, including the compensatory mitigation plan, should have been considered in a mine-specific EIS.

*Second*, the SPE Mine SEA relies upon a relevant impact and mitigation analysis that the Corps insists is contained in the AEIS, but it is not. As an example, for impacts to the physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity; contaminant availability; aquatic ecosystem; proposed disposal site; and cumulative effects, the SEA states that "[c]hapter 4 of the [A]EIS describes the [ ] effects of the South Pasture Extension project."

50

AR_0275372. However, the AEIS does not meaningfully discuss—much less analyze—those impacts, other than to acknowledge that the effects would be moderate without mitigation. AR_0250645. This does not meet the requirements of NEPA. *Hill*, 144 F.3d at 1451; *Idaho Sporting*, 137 F.3d at 1150 (holding that an agency cannot rely on the conclusions and opinions of its employees without providing "hard data" and analysis for both the public and the court to review).

*Third*, neither the AEIS nor the SPE Mine SEA analyze the effects of mining 409 acres within the Payne Creek watershed—a point the Corps concedes. Defs.' Opp. Br., Doc. 66 - Pg. 8–9; *see also* AR_0250639. The Corps attempts to argue around this omission by claiming that mining practices affect a small the segment of the Payne Creek watershed, giving no further consideration to the impacts to the environment or water quality in this area. Defs.' Opp. Br., Doc. 66 - Pg. 9. But this is unavailing considering NEPA's clear mandate that *all* significant effects of an agency action must be analyzed *before* an action is taken. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1(b). Indeed, "[a]ccurate scientific analysis . . . [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). This is in part related to the "primary purposes"

51

of the EIS: "to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." *Id.* § 1502.1.

The destruction of more than 400 acres in the Payne Creek watershed may have significant effects on environmental resources, water quality, and aquatic species and their habitats in the watershed, and it may harm public health and safety by, *e.g.*, reducing water quality and flood protection—all matters relevant to the Corps' NEPA analysis that should have triggered a m-specific review in this instance. *Id.* §§ 1508.27, 1501.4. Given these substantial questions as to the potential gravity of the impact of this mining operation to the watershed, the Corps reasonably should have analyzed these effects in a mine-specific EIS.

Beyond procedural concerns, it is important for the Corps to adequately consider and disclose the environmental impacts of the SPE Mine because "the detailed EIS . . . serves as a springboard for public comment," *N. Buckhead*, 903 F.2d at 1540, and is fundamentally necessary to ensure that the agency's decision is reasoned and appropriate. *Wilderness Watch*, 375 F.3d at 1094; *see also Robertson*,

52

490 U.S. at 349. A NEPA review builds off of itself, using one level of analysis to inform the next, with the agency relying on the analysis conducted in the EIS to establish alternatives to the action and mitigation.[6] If the foundational analysis is arbitrarily constrained and significant effects are left unanalyzed, then the additional steps in the NEPA review will necessarily fall short of the Act's goals by arbitrarily limiting the agency's analysis and consideration of the action.

Despite having had a substantial amount of time to meaningfully comply with NEPA, the Corps used the AEIS and SEA to merely simulate the steps of compliance, shirking their responsibility to "use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare, to create conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of

---

[6] The alternatives analysis is considered "the heart" of the environmental analysis under NEPA, and is based on the information and analysis presented in the agency's analysis of the affected environment and environmental consequences. 40 C.F.R. § 1502.14; *see also id*. §§ 1502.15, 1502.16. Agencies *must* evaluate all reasonable alternatives to a proposed action. *Id.* Further, an EIS must contain a "reasonably complete discussion" of measures to mitigate impacts. *Robertson*, 490 U.S. at 351–52. Omission or limitation of such a discussion would "undermine the 'action forcing' function of NEPA." *Id*.

Americans." 42 U.S.C. § 4331(a). Because the Corps has failed to truly take a "hard look" at the environmental effects of approving the SPE Mine, the agency's NEPA review of the mine should be considered deficient, and the action that it undergirds—the CWA section 404 permit—considered arbitrary and capricious.

**III.  The Corps' Failure to Consult Formally on the Effects of Phosphate Mining in the Central Florida Phosphate District Violated the Endangered Species Act and Administrative Procedure Act.**

The Corps violated the ESA when it failed to consult on the AEIS. Section 7(a)(2) of the ESA requires all federal agencies taking an action that may affect an endangered or threatened species or its critical habitat to consult with the Service to "insure . . . [the action] is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" designated critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The purpose of section 7(a)(2) is to ensure federal agencies consider how their actions will impact species well before the action is taken to ensure it will not push a species beyond the brink of extinction or preclude a species' recovery. *See* 50 C.F.R. §§ 402.14(a)

(requiring consultation at "the earliest possible time"), *id.* § 402.02 (defining "jeopardize the continued existence" as used in section 7).

To that end, agency "action" subject to consultation is construed broadly and encompasses "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" including but not limited to "actions directly or indirectly causing modifications to the land, water, or air." *Id.* § 402.02; *Ala.-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244, 1247 (11th Cir. 2003); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054–55 (9th Cir. 1994), *cert. denied,* 514 U.S. 1082 (1995) ("Following the Supreme Court's lead in *TVA*, we have . . . construed 'agency action' broadly." (citing *TVA v. Hill*, 437 U.S. 153, 172–74 (1978))); *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1228 (S.D. Fla. 1994) ("The term 'agency action' is interpreted broadly.").

Thus, section 7 consultation is required for all "actions in which there is *discretionary* Federal involvement or control." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665–67 (2007) (quoting 50 C.F.R. § 402.03); *Ala.-Tombigbee Rivers Coal.*, 338 F.3d at 1247. An action is discretionary if the agency has discretion in

55

administering its statutory obligations "to consider the protection of threatened or endangered species as an end." *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1141 (11th Cir. 2008). The action "need only leave the agency 'some discretion'" for section 7(a)(2) consultation to be triggered. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012).

<blockquote>
A.   <u>The Corps Violated the Endangered Species Act by Failing to Insure the Activities Analyzed in the Areawide Environmental Impact Statement Will Not Jeopardize Any Endangered or Threatened Species.</u>
</blockquote>

Before the district court, Conservationists argued that the Corps unlawfully failed to ensure, through formal consultation with the Service, that the area-wide phosphate mining considered in the AEIS will not be likely to jeopardize the continued existence of any endangered or threatened species. Complaint, Doc. 1 - Pg. 77–78; Pls.' Mot. for Summ. J., Doc. 61 - Pg. 24–25; Pls.' Opp. Br., Doc. 77 - Pg. 17–19. The district court disposed of this claim in a footnote, stating:

> The plaintiffs claim that the [A]EIS 'is a 'programmatic level' action that requires its own consultation . . . , but . . . the [A]EIS specifically discusses the proposed SPE mine.

56

Order, Doc. 78 - Pg. 13 n. 13 (citations omitted). As an initial matter, on its face, it is not clear that the district court actually adjudicated the claim.

To the extent a holding may be gleaned from this footnote, the court made an error of law by finding that the area-wide CWA section 404 permitting in the AEIS is not a programmatic action that requires ESA section 7(a)(2) formal consultation.

As demonstrated below, the Corps' programmatic CWA section 404 permitting in the AEIS is an "agency action" that requires consultation because it is a discretionary activity or program that indirectly causes modification to the land, water, or air that may affect endangered or threatened species or critical habitat. *See generally Paulison*, 22 F.3d at 1141–43; 50 C.F.R. § 402.02.

### 1. The Corps' Area-Wide Phosphate Mining Permitting is a Programmatic Action.

The Corps' "area-wide" CWA section 404 permitting for phosphate mining, as set forth and analyzed in the AEIS, is by its very nature a programmatic action. A "programmatic" NEPA analysis is one that concerns "broad actions" and analyzes such actions "[g]eographically, including actions occurring in the same general location," or

57

"[g]enerically, including actions that have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter" 40 C.F.R. § 1502.4(c) (CEQ regulations describing programmatic NEPA analyses); *accord* COUNCIL ON ENVIRONMENTAL QUALITY, EFFECTIVE USE OF PROGRAMMATIC NEPA REVIEWS 10–11 (Dec. 18, 2014), AR_0265892–93 (explaining that programmatic NEPA reviews address "broad decisions, such as those establishing . . . [a] suite of projects" and that "can effectively frame the scope of subsequent site- and project-specific Federal actions").

Here, the CWA-permitting action analyzed in the AEIS is broad in its scope and geographic scale, with the potential to produce similar and interrelated impacts from four proposed phosphate mines, four alternative mines, and future mines. *See generally* AR_0250373–96 (reviewing environmental impacts of the proposed mines and alternatives); AR_0250646 (describing the Pine Level/Keys Tract off-site alternative as "a future mine extension to the DeSoto Mine"); AR_0250654 (describing the Pioneer Tract off-site alternative as "a future mine extension to the Ona Mine"); AR_0250286 (stating that the AEIS "will provide information to support the evaluation of possible

58

future applications for future mining activity"). All the foreseeable

mines would extract ore within overlapping timeframes and across the

same discrete geographic area, described in the AEIS as the "Central

Florida Phosphate District" (CFPD). AR_0250308–11 (projecting that

mining timelines for each of the four mines would begin between 2019

and 2021 and end between 2033 and 2050); AR_0250288–90 (describing

the CFPD); AR_0250395 (showing mine alternatives in a map of the

CFPD).

The Corps must consult on its area-wide CWA-review in the AEIS

because it sets a framework that directs individual CWA-permitting

decisions on phosphate strip mines in the CFPD, which will

unquestionably impact endangered or threatened species. *Cf. Paulison*,

522 F.3d at 1142 (finding the Federal Emergency Management Agency's

(FEMA) implementation of the national flood insurance program

triggered consultation because the agency exercised its discretion to

formulate a framework that would direct future land management

decisions affecting endangered species); *Nw. Envtl. Def. Ctr. v. U.S.*

*Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1296–98 (D. Or. 2011)

(reviewing ESA consultation on a CWA section 404 regional permit that

authorized gravel mining at three locations on the same river).

Engaging in consultation at the programmatic level fulfills the Service's

mandate to review actions at "the earliest possible time." 50 C.F.R.

§ 402.14(a).

Although reticent to call it "programmatic" by name—instead

calling it "area-wide," AR_0250318—the Corps itself has acknowledged

that it analyzed phosphate mining at a programmatic level in its AEIS.

AR_0250286 (explaining that the AEIS is designed to "support decision-

making" on four mining permit applications and to "provide information

to support the evaluation of possible future applications for additional

phosphate mining activity"). Regardless of what the Corps may prefer to

call it, however, the AEIS is a programmatic action that requires ESA

section 7(a)(2) formal consultation.

> 2. *The Permitting of Phosphate Mining Addressed in the AEIS Is the Type of Programmatic Agency Action that Requires ESA Section 7 Consultation.*

Precedent in this jurisdiction dictates that programmatic agency

actions like the one at issue here—an interrelated series of CWA

"dredge-and-fill" permits—must undergo ESA section 7(a)(2)

consultation because such permitting involves the Corps' discretion in

60

deciding whether to approve land-disturbing phosphate mining, which in turn impacts endangered or threatened species. *See generally Paulison*, 522 F.3d at 1141–43; 50 C.F.R. § 402.02 (defining "action"). Through its programmatic-level analyses of environmental impacts and alternatives in the AEIS, the Corps approved section 404 permits for four pending mines and set precedent for future phosphate mines. AR_0250286 (explaining that the AEIS is designed to "support decision-making" regarding phosphate mining in central Florida); 40 C.F.R. § 1502.14(a), (e) (authorizing agencies to "rigorously explore and objectively evaluate all reasonable alternatives" and "[i]dentify the agency's preferred alternative or alternatives"); *id.* § 230.10(a) (requiring the Corps to select the least environmentally damaging practical alternative when issuing a CWA section 404 permit).

This decision will result in the short- and long-term destruction of natural habitats and hydrology, which will affect endangered or threatened species living in the area for decades, perhaps centuries. AR_0250306–16 (describing the preferred alternative, which would permit phosphate strip mining on approximately 51,755 acres of land and water); AR_0250314 (describing impacts to wetlands and streams);

AR_0250757–58 (explaining that the alternatives "would potentially result in direct and indirect impacts to listed species, including direct disturbance and loss of habitat" and the "potential for listed species to be harmed or killed"). For example, the SPE Mine will strip and excavate thousands of acres of habitat, ejecting the threatened northern crested caracara, eastern indigo snake, and wood stork. FWS 022189 (2,630.7 acres of caracara foraging habitat); FWS 022194 (4,928.7 acres of habitat for indigo snakes); FWS 022195 (2,011.4 acres of wetland foraging habitat for wood storks). The operation of heavy machinery to destroy thousands of acres of habitat will prevent these species from feeding, *e.g.*, FWS 022197 (estimating wetland destruction at the SPE Mine will result in the loss of 1,249.38 kilograms of fish prey for the wood stork), breeding, *e.g.*, FWS 022189 (suggesting the SPE Mine could cause temporary or permanent abandonment of caracara nesting territory), and surviving, *e.g.*, FWS 022192 (anticipating eastern indigo snakes will be injured or killed during operation of the SPE Mine). Because the mines approved under the AEIS's framework have similar impacts, timing, and geographic location, the Corps' continued approval

of permits will only serve to expand and intensify these types of species impacts.

The Corps' failure to engage in programmatic ESA consultation stands in contrast to court decisions that have found similar broad-scale actions require ESA section 7(a)(2) consultation. *See Paulison*, 522 F.3d at 1141; *Pac. Rivers Council*, 30 F.3d at 1054–55 (consultation required for Forest Service land and resource management plan); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084–88 (9th Cir. 2015) (consultation required for amendment to a forest plan); *Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 293–294 (9th Cir. 1992) (consultation required for species management guidelines).

For instance, in *Florida Key Deer v. Paulison*, this Court found that FEMA's administration of the National Flood Insurance Program was an agency action that triggered ESA section 7 consultation, as it "effectively authoriz[ed] . . . development that pushed the Key deer to the brink of extinction" and granted FEMA "ample discretion . . . to consider listed species." 522 F.3d at 1139, 1142–43. Specifically, the Court found that the National Flood Insurance Act of 1968 sets forth a broad purpose, including land management of flood-prone areas, and

authorizes FEMA to restrict land development through criteria it
develops for the National Flood Insurance Program. *Id.* Thus, although
FEMA is required to issue flood insurance to localities that satisfy
certain criteria, it "is charged with developing those criteria and enjoys
broad discretion in so doing." *Id.* at 1142. This discretion permits FEMA
to consider impacts to the environment and species through setbacks
and buffers for wildlife habitat, water pollution standards, and
restrictions on environmentally incompatible uses in flood plains. *Id.* at
1143 (citing FEMA's regulations implementing the National Flood
Insurance Program). Implementing these measures could, in turn,
benefit species like the Florida Key deer by limiting or discouraging
development and degradation that push them toward the brink of
extinction. *Id.* at 1144.

Comparatively, in the instant case, CWA section 404 permitting of
the SPE Mine authorizes the destruction of thousands of acres of
habitat for threatened and endangered species, and the Corps has
ample discretion to consider the impacts of its decision on those species
and select an alternative action for their benefit. Like the National
Flood Insurance Act, CWA section 404 permitting fulfills a broad

64

purpose that includes protecting ecosystems by preventing the

discharge of dredge or fill material "unless it can be demonstrated that

such discharge will not have an unacceptable adverse impact" on the

ecosystems. 40 C.F.R. § 230.1.

The Corps exercises broad discretion in issuing CWA section 404

permits. For instance, the Corps has discretion to deny or alter a permit

for a project "if there is a practicable alternative . . . which would have

less adverse impact" on the environment, *id.* § 230.10(a), using an

alternatives analysis that mirrors the NEPA analysis, *id* § 230.10(a)(4).

The Corps can also exercise its discretion to deny or alter a permit if the

permitted activity would significantly degrade the aquatic ecosystem by

harming "aquatic ecosystem diversity, productivity, and stability,"

including causing the "loss of fish and wildlife habitat." *Id.*

§ 230.10(c)(3). Likewise, if the Corp deems minimization or mitigation

of harmful impacts to the environment inadequate, it may decline to

issue a permit. *Id.* § 230.10(d). This discretion granted to the Corps in

exercising its section 404 permitting allows it to "consider the protection

of endangered and threatened species as an end in itself" and prevent

actions that would harm them or their habitat. *Paulison*, 522 F.3d at 1141.

In fact, the Corps is *required* to consider the protection of endangered or threatened species when determining whether to issue a section 404 permit, and it may deny a or alter a permit if it determines the permitted activity "[j]eopardizes the continued existence of [a] species" or is likely to destroy critical habitat. 40 C.F.R. § 230.10(b)(3). In this vein, the Corps' own regulations require it to coordinate with the Service "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application" and to consider these impacts "in deciding on the issuance, denial, or conditioning of individual or general permits." 33 C.F.R. § 320.4(c); *see also id.* § 320.4(a) (authorizing the Corps to analyze a broad range of factors including "fish and wildlife values," "land use," and "wetlands"). In the instant case, the Corps did just that. *See e.g.*, AR_0250535–46 (reviewing the presence of listed species at each mine); AR_0250757–74 (analyzing each alternative's impacts to listed species) AR_0250967–69 (discussing mitigation of impacts to listed species).

As the frameworks of the CWA and the AEIS themselves demonstrate, the Corps was at liberty to use its discretion to inure to the benefit of endangered and threatened species, and thus its "area-wide" CWA section 404 permitting, as set forth in the AEIS, was a discretionary action subject to section 7 consultation. Consequently, this Court should remand this case to the district court to enjoin the Corps to consult on the AEIS.

## CONCLUSION

The Corps failed to comply with federal environmental laws designed to protect human health and the environment in authorizing phosphate mining in west-central Florida. It violated NEPA and the APA when it failed to analyze the reasonably foreseeable indirect impacts of phosphogypsum. It violated NEPA and the APA by failing to produce an EIS to analyze the significant impacts of the SPE Mine. It violated the ESA when it failed to consult with the Service on the AEIS to insure the project is not likely to jeopardize species or result in the destruction or adverse modification of their designated critical habitat.

For the foregoing reasons, Conservationists respectfully request that the Court reverse the ruling and judgment of the district court and

remand the matter with appropriate instructions.

Respectfully submitted,

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez
Florida Bar No. 96445
Hannah Mary Margaret Connor
Florida Bar No. 125378
Elise Pautler Bennett
Florida Bar No. 106573
Rachael Curran
Florida Bar No. 1002221

CENTER FOR BIOLOGICAL
DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
jlopez@biologicaldiversity.org
ebennett@biologicaldiversity.org
hconnor@biologicaldiversity.org
rcurran@biologicaldiversity.org
Tel: (727) 490-9190
Fax: (510) 844-7150

*Attorneys for Appellants*

CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing Opening Brief complies with the type-volume limitations and typeface requirements of FED. R. APP. P. 32(a). Specifically, this brief is printed in proportionally spaced, 14-point Century Schoolbook font in compliance with FED. R. APP. P. 32(a)(5)-(6), and with the exception of footnotes and indented quotations, it is printed with double-spacing and one-inch margins in compliance with FED. R. APP. P. 32(a)(4). Excluding the items that are exempted under FED. R. APP. P. 32(a)(7)(B)(iii), this brief contains a total of 12,815 words to meet the type-volume limitation of FED. R. APP. P. 32(a)(7)(B)(i). This certificate was prepared in reliance on the word-processing system (Microsoft Word) used in this brief.


*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez

69

CERTIFICATE OF SERVICE

I hereby certify that, on this 26th day of March 2018, I filed the

foregoing OPENING BRIEF OF PLAINTIFFS-APPELLANTS

electronically through the Court's CM/ECF system, which caused all

parties and counsel of record to be served by electronic means, as more

fully reflected on the Notice of Electronic Filing.


*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez