No. 18-10541

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,
*Plaintiffs-Appellants*,

v.

**U.S. ARMY CORPS OF ENGINEERS**, *et al.*,
*Defendants-Appellees,*

and

**MOSAIC FERTILIZER, LLC.**
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CIV. NO. 8:17-CV-00618
HON. STEVEN D. MERRYDAY, CHIEF JUDGE, PRESIDING

**APPELLANTS' APPENDIX
VOLUME I**

Jaclyn M. Lopez
Hannah Mary Margaret Connor
Elise Pautler Bennett
Rachael Curran
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190

*Counsel for Plaintiffs-Appellants*

# INDEX OF APPELLANTS' APPENDIX

# VOLUME I

| Date | Description | Docket/ Tab # |
|------|-------------|---------------|
| — | District Court Docket Sheet, Case No. 8:17-cv-00618- SDM-MAP | A |
| 03/15/2017 | Complaint for Declaratory and Injunctive Relief | 1 |
| 05/22/2017 | Federal Defendants' Answer to Complaint | 46 |
| 05/22/2017 | Defendant-Intervenors' Answer to Complaint | 47 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME II

| | Excerpts of U.S. Army Corps of Engineers' Administrative Record District Court Docket No. 50 | |
|---|---|---|
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 1977 | Effects of Phosphate Mineralization and the Phosphate Industry on Radium-226 in Ground Water of Central Florida | AR_0001227 |
| 1978 | Final EIS - Central Florida Phosphate Industry | AR_0001427 |
| 3/23/1981 | Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations | AR_0003410 |
| 10/6/2010 | CF Industries (powerpoint presentation) | AR_0081965 |
| 10/6/2010 | Developing an Areawide or Programmatic EIS: EPA Expectations | AR_0082345 |
| 10/6/2010 | Developing an Areawide or Programmatic EIS: EPA Expectations (duplicate copy of AR_0082345) | AR_0090535 |
| 6/2/2011 | Email from John Fellows to Calvin Alvarez and Steve Gong | AR_0095858 |
| 2/28/2012 | Email from John Fellow to Paul Gagliano | AR_0175523 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME II
## (CONTINUED)

| Excerpts of U.S. Army Corps of Engineers' Administrative Record District Court Docket No. 50 | | |
|---|---|---|
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 2/28/2012 | Email from Paul Gagliano to John Fellows; Background for NEPA Reviewers: Non-Coal Mining Operations (Dec 1994) | AR_0175527 |
| May 2012 | Draft Areawise EIS on Phosphate Mining in the Central Florida Phosphate District | AR_0178393 |
| 6/8/2012 | Notice of Availability of Draft Areawide EIS on Phosphate Mining in the CFPD (newspaper notice) | AR_0180118 |
| 8/3/2012 | Email from James Cooper to John Fellows | AR_0225204 |
| 8/5/2012 | Email from James Cooper to John Fellows and Steve Gong | AR_0225253 |
| undated | 2012 Nationwide Permits, Conditions, District Engineer's Decision, Further Information, and Definitions | AR_0227245 |
| 11/29/2012 | Email from Mitch Griffin to John Fellows and Valerie Ross | AR_0234723 |
| undated | Phosphogypsum Facts: Issues Surrounding Phosphate Mine Tailings | AR_0236150 |

# INDEX OF APPELLANTS' APPENDIX

# VOLUME III

| | Excerpts of U.S. Army Corps of Engineers' Administrative Record District Court Docket No. 50 | |
|---|---|---|
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 4/26/2013 | Final Areawide EIS on Phosphate Mining in the Central Florida Phosphate District | AR_0250075 |
| 6/22/2012 | Letter from Glenn Compton, ManaSota-88, to John Fellows, Army Corps | AR_0251039 |
| 6/11/2012 | Letter from Christine Robinson, Sarasota County Commission, to John Fellows, Army Corps | AR_0251108 |
| 4/26/2013 | Army Corps, Summary of Comments and Responses | AR_0252000 |
| 4/26/2013 | Appendix D – Surface Water Quality Evaluations for the Final AEIS | AR_0252582 |
| 4/26/2013 | Appendix F – Groundwater Impact Analysis for the Final AEIS | AR_0252619 |
| 3/3/2014 | Letter from Kevin Kane, Army Corps, to Robert May, CF Industries | AR_0262991 |
| 3/17/2014 | Letter from Craig Kovach, Mosaic Fertilizer, and Diana Jagiella, Mosaic Company, to Kevin O'Kane, Army Corps | AR_0263100 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME IV

<table>
<tr><td colspan="3"><b>Excerpts of U.S. Army Corps of Engineers'<br>Administrative Record<br>District Court Docket No. 50</b></td></tr>
<tr><th>Date</th><th>Description</th><th>Tab/<br>Starting<br>Bates #</th></tr>
<tr><td>Jul 2014</td><td>Mosaic Fertilizer, Response to March 3, 2014 Request for Information</td><td>AR_0263659</td></tr>
<tr><td>12/18/2014</td><td>Memorandum from Michael Boots, CEQ, (Effective Use of Programmatic NEPA Reviews)</td><td>AR_0265892</td></tr>
<tr><td>Dec 2015</td><td>Mosaic Fertilizer, Compensatory Mitigation Plan Narrative</td><td>AR_0269058</td></tr>
<tr><td>1/20/2016</td><td>Email from John Fellows to Michael DeNeve and Michelle Sims; Attached Letter from John Fellows to Mike DeNeve</td><td>AR_0269358</td></tr>
<tr><td>2/17/2016</td><td>Email from John Fellows to Michelle Sims; Attached Draft South Pasture Extension Long Term Management Plan</td><td>AR_0271822</td></tr>
<tr><td>4/14/2016</td><td>Email from Jon Faletto to Christina Storz</td><td>AR_0274037</td></tr>
<tr><td>2/17/2015</td><td>Mosaic Company, Form 10-K</td><td>AR_0275052</td></tr>
<tr><td>6/16/2016</td><td>Public Notice - Supplemental EA for South Pasture Extension Phosphate Mine</td><td>AR_0275348</td></tr>
</table>

# INDEX OF APPELLANTS' APPENDIX

## VOLUME IV
## (CONTINUED)

| Excerpts of U.S. Army Corps of Engineers' Administrative Record District Court Docket No. 50 | | |
|---|---|---|
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 6/16/2016 | Supplemental EA for Permit Application SAJ-1993-01395 | AR_0275350 |
| Jul 2016 | Mosaic Fertilizer, Compensatory Mitigation Plan | AR_0277714 |
| 9/28/2016 | Comments Received in Response to June 1, 2012, Public Notice | AR_0281160 |
| 6/18/2016 | Letter from Jaclyn Lopez, Center for Biological Diversity, to John Fellows, Army Corps | AR_0281221 |
| 11/10/2016 | Record of Decision and Statement of Findings for Permit Application SAJ-1993-01395 | AR_0287119 |
| 6/18/2016 | Letter from Jaclyn Lopez, Center for Biological Diversity, to John Fellows, Army Corps | AR_0287348 |
| 11/14/2016 | Letter from Jason Kirk, Army Corps, to Jaclyn Lopez, Center for Biological Diversity | AR_0289807 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME V

| Excerpts of U.S. Army Corps of Engineers' Administrative Record District Court Docket No. 50 | | |
|---|---|---|
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 11/15/2016 | Department of the Army Permit (Permit No. SAJ-1993-01395 (SP-JPF)) | AR_0289830 |
| 12/20/2016 | Letter from Jaclyn Lopez to Army Corps, FWS, and Department of Interior, with attachment | AR_0292497 |
| Excerpts of U.S. Fish and Wildlife Service's Administrative Record District Court Docket No. 51 | | |
| **Date** | **Description** | **Tab/ Starting Bates #** |
| 7/26/2012 | CF Industries, South Pasture Extension Biological Assessment for the CF South Pasture Mine Extension | FWS 011851 |
| 6/9/2014 | U.S. Fish and Wildlife Service, Biological Opinion for South Pasture Phosphate Mine Extension | FWS 022189 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME VI

| Date | Description | Docket/ Tab # |
|---|---|---|
| 06/02/2017 | Amended Complaint for Declaratory and Injunctive Relief | 52 |
| 06/20/2017 | Federal Defendants' Answer to Amended Complaint | 59 |
| 06/28/2017 | Defendant-Intervenors' Answer to Amended Complaint | 60 |
| 06/30/2017 | Plaintiffs' Motion for Summary Judgment and Supporting Memorandum of Law | 61 |
| 06/30/2018 | Declaration of Andre Mele | 61-1 |
| 06/30/2018 | Declaration of Amy Lee Richardson | 61-2 |
| 06/30/2018 | Declaration of Brooks Armstrong | 61-3 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME VII

| Date | Description | Docket/ Tab # |
|---|---|---|
| 06/30/2018 | Declaration of Dennis Mader | 61-4 |
| 06/30/2018 | Declaration of Glenn Compton | 61-5 |
| 06/30/2018 | Declaration of Henry Joseph Kuhlman | 61-6 |
| 06/30/2018 | Declaration of Hugh Bracey Richardson | 61-7 |
| 06/30/2018 | Declaration of Kristie Lynn Simpson | 61-8 |
| 06/30/2018 | Declaration of Lori Ann Burd | 61-9 |
| 06/30/2018 | Declaration of Nancy Armstrong | 61-10 |
| 06/30/2018 | Declaration of Sarah Hollenhorst | 61-11 |
| 06/30/2018 | Declaration of Sandra Stinnette Ripberger | 61-12 |
| 06/30/2018 | Declaration of Stuart McCornack Smith | 61-13 |
| 06/30/2018 | Declaration of Thuong N. Dang | 61-14 |
| 07/05/2017 | Second Declaration of Thuong N. Dang | 63 |
| 07/14/2017 | Intervenor-Defendants' Response in Opposition to Motion for Summary Judgment | 65 |

# INDEX OF APPELLANTS' APPENDIX

## VOLUME VI
## (CONTINUED)

| Date | Description | Docket/ Tab # |
|------|-------------|---------------|
| 07/14/2017 | Defendants' Memorandum in Opposition to Motion for Summary Judgment | 66 |
| 7/28/2017 | Defendants' Motion for Summary Judgment | 73 |
| 7/28/2017 | Defendant-Intervenors' Motion for Summary Judgment | 74 |
| 08/18/2017 | Plaintiffs' Response in Opposition to Motions for Summary Judgment | 77 |
| 12/14/2017 | Order Denying Plaintiffs' Motion for Summary Judgment, Granting Defendant and Defendant-Intervenors' Motions for Summary Judgment | 78 |
| 12/14/2017 | Judgment in Favor of Defendants and Defendant-Intervenors | 79 |
| 02/12/2018 | Notice of Appeal | 80 |
| | Certificate of Service | |

# Docket / Tab No: A

District Court Docket Sheet,
Case No. 8:17-cv-00618- SDM-MAP

APPEAL, CLOSED

# U.S. District Court
# Middle District of Florida (Tampa)
# CIVIL DOCKET FOR CASE #: 8:17-cv-00618-SDM-MAP

Center for Biological Diversity et al v. U.S. Army Corps of Engineers et al
Assigned to: Judge Steven D. Merryday
Referred to: Magistrate Judge Mark A. Pizzo
Case in other court: 11th Circuit, 18-10541-K
Cause: 33:1319 Clean Water Act

Date Filed: 03/15/2017
Date Terminated: 12/14/2017
Jury Demand: None
Nature of Suit: 893 Environmental Matters
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**Center for Biological Diversity**                     represented by     **Elise Pautler Bennett**
Center for Biological Diversity
PO Box 2155
St Petersburg, FL 33731
727-755-6950
Email: ebennett@biologicaldiversity.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hannah M. Connor**
Center for Biological Diversity
PO Box 2155
St Petersburg, FL 33731
202-681-1676
Email: hconnor@biologicaldiversity.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
Center for Biological Diversity
PO Box 2155
St Petersburg, FL 33731
727/490-9190
Email: jlopez@biologicaldiversity.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Peter Rose**
Center for Biological Diversity
1212 Broadway St Ste 800
Oakland, CA 94612-1810
510-844-7100
Fax: 510-844-7150

Email: jrose@biologicaldiversity.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Manasota-88, Inc.**        represented by  **Elise Pautler Bennett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hannah M. Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Peter Rose**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**People for Protecting Peace River**    represented by  **Elise Pautler Bennett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hannah M. Connor**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Peter Rose**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Suncoast Waterkeeper**      represented by  **Elise Pautler Bennett**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Hannah M. Connor**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaclyn Lopez**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Peter Rose**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**U.S. Army Corps of Engineers**            represented by **Debra Carfora**
U.S. Department of Justice - Washington
ENRD
P.O. Box 7611
Washington, DC 20044-7611
202-514-2640
Fax: 202-514-8865
Email: debra.carfora@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Arthur Brown**
US Department of Justice - ENRD
PO Box 7369
Washington, DC 20044-7369
202/305-0204
Fax: 202/305-0275
Email: mark.brown@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
U.S. Department of Justice
Environmental Defense Section
PO Box 7611
Washington, DC 20044-7611
202/514-1542
Fax: 202/514-8865
Email: paul.cirino@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Todd T. Semonite**
*Lt. Gen., in his official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of Engineers*

represented by **Mark Arthur Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jason A. Kirk**
*Col., in his official capacity as District Commander of the U.S. Army Corps of Engineers*

represented by **Mark Arthur Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Department of the Interior**

represented by **Debra Carfora**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Arthur Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ryan Zinke**
*in his official capacity as Secretary of the U.S. Department of the Interior*

represented by **Debra Carfora**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Arthur Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. Fish and Wildlife Service**    represented by  **Debra Carfora**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark Arthur Brown**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jim Kurth**    represented by  **Mark Arthur Brown**
*in his official capacity as Acting Director*    (See above for address)
*of U.S. Fish and Wildlife Service*    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mosaic Fertilizer, LLC**    represented by  **Andrew J. Turner**
Hunton & Williams, LLP
2200 Pennsylvania Ave NW
Washington, DC 20037-1701
202-955-1658
Fax: 202-828-3771
Email: aturner@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Deidre G. Duncan**
Hunton & Williams, LLP
2200 Pennsylvania Ave NW
Washington, DC 20037-1701
202/955-1500
Email: dduncan@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**George Peter Sibley , III**
Hunton & Williams, LLP
Riverfront Plaza - E Tower
951 E Byrd St
Richmond, VA 23219-4074
804-788-8262
Fax: 804-343-4869
Email: gsibley@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jamie Zysk Isani**
Hunton & Williams, LLP
Suite 2500
1111 Brickell Ave
Miami, FL 33131
305/810-2500
Fax: 305/810-2460
Email: jisani@hunton.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul Cirino**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amelia A. Savage**
Hopping, Green & Sams, PA
119 S Monroe St Suite 300
P.O. Box 6526
Tallahassee, FL 32314-6526
850/222-7500
Fax: 850/521-2713
Email: amelias@hgslaw.com
*ATTORNEY TO BE NOTICED*

**Jonathan L. Caulder**
Hunton & Williams, LLP
Riverfront Plaza - E Tower
951 E Byrd St
Richmond, VA 23219-4074
804-788-8016
Fax: 804-343-4869
Email: JCaulder@hunton.com
*ATTORNEY TO BE NOTICED*

**Kerry L. McGrath**
Hunton & Williams, LLP
2200 Pennsylvania Ave NW

Washington, DC 20037-1701
202-955-1519
Fax: 202-861-3677
Email: kmcgrath@hunton.com
*ATTORNEY TO BE NOTICED*

**Timothy Michael Riley**
Hopping, Green & Sams, PA
119 S Monroe St Suite 300
P.O. Box 6526
Tallahassee, FL 32314-6526
850/222-7500
Fax: 850/521-2775
Email: timothyr@hgslaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/15/2017 | 1 | COMPLAINT against Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke (Filing fee $ 400.00 receipt number TPA-042378) filed by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. (Attachments: # 1 Civil Cover Sheet)(AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 2 | SUMMONS issued as to U.S. Army Corps of Engineers, U.S. Attorney and U.S. Attorney General. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 3 | SUMMONS issued as to Todd T. Semonite. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 4 | SUMMONS issued as to Jason A. Kirk. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 5 | SUMMONS issued as to U.S. Department of the Interior. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 6 | SUMMONS issued as to Ryan Zinke. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 7 | SUMMONS issued as to U.S. Fish and Wildlife Service. (AMD) (Entered: 03/15/2017) |
| 03/15/2017 | 8 | SUMMONS issued as to Jim Kurth. (AMD) (Entered: 03/15/2017) |
| 03/16/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney John P. Rose, appearing on behalf of Center for Biological Diversity (Filing fee $150 receipt number TPA042379). (LMD) (Entered: 03/16/2017) |
| 03/16/2017 | 9 | MOTION for John Peter Rose to appear pro hac vice by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Lopez, Jaclyn) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/16/2017) |
| 03/16/2017 | 10 | NOTICE of designation under Local Rule 3.05 - Track 2 (SKB) (Entered: 03/16/2017) |
| 03/16/2017 | 11 | **ORDER re: 10 notice of designation of track. See document for details. Signed by Judge Steven D. Merryday on 3/16/2017. (SKB)** (Entered: 03/16/2017) |

| | | |
|---|---|---|
| 03/17/2017 | 12 | AMENDED NOTICE of designation under Local Rule 3.05 - Track 1 (SKB) (Entered: 03/17/2017) |
| 03/17/2017 | 13 | Unopposed MOTION to intervene *As A Defendant and Supporting Memorandum of Legal Authority* by Mosaic Fertilizer, LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 14 | MOTION for Deidre G. Duncan to appear pro hac vice by Mosaic Fertilizer, LLC. (Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 15 | MOTION for Andrew J. Turner to appear pro hac vice by Mosaic Fertilizer, LLC. (Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 16 | MOTION for George P. Sibley, III to appear pro hac vice by Mosaic Fertilizer, LLC. (Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 17 | MOTION for Kerry L. McGrath to appear pro hac vice by Mosaic Fertilizer, LLC. (Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 18 | MOTION for Jonathan L. Caulder to appear pro hac vice by Mosaic Fertilizer, LLC. (Isani, Jamie) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 03/17/2017) |
| 03/17/2017 | 19 | CORPORATE Disclosure Statement by Mosaic Fertilizer, LLC identifying Corporate Parent Mosaic Company for Mosaic Fertilizer, LLC.. (Isani, Jamie) (Entered: 03/17/2017) |
| 03/21/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Andrew J. Turner, appearing on behalf of Mosaic Fertilizer, LLC (Filing fee $150 receipt number TPA042522) Related document: 15 MOTION for Andrew J. Turner to appear pro hac vice. (LMD) (Entered: 03/21/2017) |
| 03/21/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Deidre G. Duncan, appearing on behalf of Mosaic Fertilizer, LLC (Filing fee $150 receipt number TPA042522) Related document: 14 MOTION for Deidre G. Duncan to appear pro hac vice. (LMD) (Entered: 03/21/2017) |
| 03/21/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Kerry L. McGrath, appearing on behalf of Mosaic Fertilizer, LLC (Filing fee $150 receipt number TPA042522) Related document: 17 MOTION for Kerry L. McGrath to appear pro hac vice. (LMD) (Entered: 03/21/2017) |
| 03/21/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney George P. Sibley, III, appearing on behalf of Mosaic Fertilizer, LLC (Filing fee $150 receipt number TPA042522) Related document: 16 MOTION for George P. Sibley, III to appear pro hac vice. (LMD) (Entered: 03/21/2017) |
| 03/21/2017 | | ***PRO HAC VICE FEES paid and Special Admission Attorney Certification Form filed by attorney Jonathan L. Caulder, appearing on behalf of Mosaic Fertilizer, LLC |

| | | |
|---|---|---|
| | | (Filing fee $150 receipt number TPA042522) Related document: 18 MOTION for Jonathan L. Caulder to appear pro hac vice. (LMD) (Entered: 03/21/2017) |
| 03/22/2017 | 20 | **ORDER granting 9 Plaintiff's motion to appear pro hac vice. See order for details. Signed by Magistrate Judge Mark A. Pizzo on 3/22/2017. (ACS)** (Entered: 03/22/2017) |
| 03/22/2017 | 21 | **ORDER granting Defendant-Intervenor Mosaic Fertilizer, LLC's motions for counsel to appear pro hac vice (docs. 14-18). See order for details. Signed by Magistrate Judge Mark A. Pizzo on 3/22/2017. (ACS)** (Entered: 03/22/2017) |
| 03/23/2017 | 22 | CERTIFICATE of interested persons and corporate disclosure statement by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Lopez, Jaclyn) (Entered: 03/23/2017) |
| 03/23/2017 | 23 | NOTICE of pendency of related cases re 12 Notice of designation of track *one* per Local Rule 1.04(d) by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. Related case(s): no (Lopez, Jaclyn) (Entered: 03/23/2017) |
| 03/23/2017 | 24 | NOTICE of compliance by Mosaic Fertilizer, LLC (Caulder, Jonathan) (Entered: 03/23/2017) |
| 03/23/2017 | 25 | NOTICE of compliance by Mosaic Fertilizer, LLC (McGrath, Kerry) (Entered: 03/23/2017) |
| 03/23/2017 | 26 | NOTICE of compliance by Mosaic Fertilizer, LLC (Duncan, Deidre) (Entered: 03/23/2017) |
| 03/23/2017 | 27 | NOTICE of compliance by Mosaic Fertilizer, LLC (Sibley, George) (Entered: 03/23/2017) |
| 03/23/2017 | 28 | NOTICE of compliance by Mosaic Fertilizer, LLC (Turner, Andrew) (Entered: 03/23/2017) |
| 03/26/2017 | 29 | NOTICE of compliance re 20 Order on motion to appear pro hac vice by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper (Rose, John) (Entered: 03/26/2017) |
| 03/28/2017 | 30 | NOTICE of Appearance by Paul Cirino on behalf of Jason A. Kirk, Jim Kurth, Mosaic Fertilizer, LLC, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke (Cirino, Paul) (Entered: 03/28/2017) |
| 03/29/2017 | 31 | Summons Returned Executed by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper (Bennett, Elise) Modified text on 3/30/2017 (CTR). (Entered: 03/29/2017) |
| 03/29/2017 | 32 | Summons Returned Executed by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper (Bennett, Elise) Modified text on 3/30/2017 (CTR). (Entered: 03/29/2017) |
| 03/31/2017 | 33 | **ORDER granting 13 --motion to intervene. Mosaic must respond to the complaint no later than May 22, 2017. Signed by Judge Steven D. Merryday on 3/31/2017. (SKB)** (Entered: 03/31/2017) |

| | | |
|---|---|---|
| 04/04/2017 | 34 | NOTICE of Appearance by Mark Arthur Brown on behalf of Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke (Brown, Mark) (Entered: 04/04/2017) |
| 04/13/2017 | 35 | RETURN of service executed on 03/24/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to Jim Kurth. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/13/2017 | 36 | RETURN of service executed on 03/24/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to Ryan Zinke. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/13/2017 | 37 | RETURN of service executed on 03/28/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to Todd T. Semonite. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/13/2017 | 38 | RETURN of service executed on 03/28/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to U.S. Army Corps of Engineers. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/13/2017 | 39 | RETURN of service executed on 03/24/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to U.S. Department of the Interior. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/13/2017 | 40 | RETURN of service executed on 03/24/2017 by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc. as to U.S. Fish and Wildlife Service. (Bennett, Elise) (Entered: 04/13/2017) |
| 04/14/2017 | 41 | PROOF of service by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper (Bennett, Elise) (Entered: 04/14/2017) |
| 05/03/2017 | 42 | NOTICE of Appearance by Timothy Michael Riley on behalf of Mosaic Fertilizer, LLC (Riley, Timothy) (Entered: 05/03/2017) |
| 05/03/2017 | 43 | NOTICE of Appearance by Amelia A. Savage on behalf of Mosaic Fertilizer, LLC (Savage, Amelia) (Entered: 05/03/2017) |
| 05/03/2017 | 44 | Joint MOTION for miscellaneous relief, specifically Entry of Scheduling Order by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Attachments: # 1 Text of Proposed Order)(Lopez, Jaclyn) (Entered: 05/03/2017) |
| 05/05/2017 | 45 | **ORDER granting in part and denying in part 44 --motion for entry of case-management order, for an exception from Local Rule 3.01's page limit, and for leave to submit a reply to a motion for summary judgment. Signed by Judge Steven D. Merryday on 5/5/2017. (SKB)** (Entered: 05/05/2017) |
| 05/22/2017 | 46 | ANSWER and affirmative defenses to 1 Complaint by Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke.(Cirino, Paul) (Entered: 05/22/2017) |
| 05/22/2017 | 47 | ANSWER and affirmative defenses to 1 Complaint by Mosaic Fertilizer, LLC.(Isani, Jamie) (Entered: 05/22/2017) |
| 06/02/2017 | 48 | NOTICE by Jim Kurth, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke *(Notice of Conventional Filing of Administrative Record of U.S. Fish and* |

|  |  | *Wildlife Service)* (Attachments: # 1 Exhibit Ex. 1-Certification of Administrative Record, # 2 Exhibit Ex. 2-Index to Administrative Record)(Brown, Mark) (Entered: 06/02/2017) |
|---|---|---|
| 06/02/2017 | 49 | NOTICE by Jason A. Kirk, Todd T. Semonite, U.S. Army Corps of Engineers *(Notice of Conventional Filing of Administrative Record of U.S. Army Corps of Engineers)* (Attachments: # 1 Exhibit Ex. 1-Certification of Administrative Record, # 2 Exhibit Ex. 2-Index to Administrative Record)(Brown, Mark) (Entered: 06/02/2017) |
| 06/02/2017 | 50 | APPENDIX/DVD-ROM Disk 1 copy re 48 Notice (Other) Filed Separately on Shelf. (CTR) (Entered: 06/02/2017) |
| 06/02/2017 | 51 | APPENDIX/DVD-ROM Disk Set of 5 re 49 Notice (Other) Filed Separately on Shelf. (CTR) (Entered: 06/02/2017) |
| 06/02/2017 | 52 | AMENDED COMPLAINT against All Defendants filed by People for Protecting Peace River, Center for Biological Diversity, Suncoast Waterkeeper, Manasota-88, Inc.. (Lopez, Jaclyn) (Entered: 06/02/2017) |
| 06/08/2017 | 53 | Unopposed MOTION for Extension of Time to File Answer re 52 Amended Complaint by Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke. (Attachments: # 1 Text of Proposed Order)(Brown, Mark) (Entered: 06/08/2017) |
| 06/09/2017 | 54 | **ENDORSED ORDER granting 53 the Federal Defendants' motion for an extension through June 28, 2017, of the time within which to respond to the amended complaint. Signed by Judge Steven D. Merryday on 6/9/2017.** (Entered: 06/09/2017) |
| 06/09/2017 | 55 | NOTICE by Jason A. Kirk, Todd T. Semonite, U.S. Army Corps of Engineers re 49 Notice (Other) *(Notice of Conventional FIling of Replacement Copy of Disk 5 of Administrative Record of U.S. Army Corps of Engineers)* (Brown, Mark) (Entered: 06/09/2017) |
| 06/12/2017 | 56 | Unopposed MOTION for Extension of Time to File Answer re 52 Amended Complaint by Mosaic Fertilizer, LLC. (Isani, Jamie) (Entered: 06/12/2017) |
| 06/12/2017 | 57 | APPENDIX/DVD-ROM of Replacement of disk #5 re: 55 by U.S. Army Corps of Engineers Filed Separately. (CTR) (Entered: 06/12/2017) |
| 06/14/2017 | 58 | **ENDORSED ORDER granting 56 Mosaic Fertilizer, LLC's unopposed Motion for Extension of Time to Answer or respond. Mosaic Fertilizer, LLC's answer or response due 6/28/2017. Signed by Magistrate Judge Mark A. Pizzo on 6/14/2017. (ACS)** (Entered: 06/14/2017) |
| 06/20/2017 | 59 | ANSWER and affirmative defenses to 52 Amended Complaint by Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke.(Cirino, Paul) (Entered: 06/20/2017) |
| 06/28/2017 | 60 | ANSWER and affirmative defenses to 52 Amended Complaint *Answer of Defendant-Intervenor Mosaic Fertilizer, LLC to Plaintiffs' First Amended Complaint* by Mosaic Fertilizer, LLC.(Isani, Jamie) (Entered: 06/28/2017) |
| 06/30/2017 | 61 | MOTION for summary judgment *and Supporting Memorandum of Law* by Center for |

| | | |
|---|---|---|
| | | Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Attachments: # 1 Declaration of Andre Mele, # 2 Declaration of Amy Richardson, # 3 Declaration of Brooks Armstrong, # 4 Declaration of Dennis Mader, # 5 Declaration of Glenn Compton, # 6 Declaration of Henry Kuhlman, # 7 Declaration of Hugh Richardson, # 8 Declaration of Kristie Simpson, # 9 Declaration of Lori Ann Burd, # 10 Declaration of Nancy Armstrong, # 11 Declaration of Sarah Hollenhorst, # 12 Declaration of Sandra Ripberger, # 13 Declaration of Stuart Smith, # 14 Declaration of Thuong Dang)(Lopez, Jaclyn) (Entered: 06/30/2017) |
| 06/30/2017 | 62 | MOTION to supplement and/or complete administrative record by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Attachments: # 1 Declaration of Jaclyn Lopez, # 2 Exhibit Index, # 3 Exhibit # 1 to Lopez Decl., # 4 Exhibit # 2 to Lopez Decl., # 5 Exhibit # 3 to Lopez Decl., # 6 Exhibit # 4 to Lopez Decl., # 7 Exhibit # 5 to Lopez Decl., # 8 Exhibit # 6 to Lopez Decl., # 9 Exhibit # 7 to Lopez Decl., # 10 Exhibit # 8 to Lopez Decl., # 11 Exhibit # 9 to Lopez Decl.)(Lopez, Jaclyn) (Entered: 06/30/2017) |
| 07/05/2017 | 63 | DECLARATION of Thuong N. Dang (Second) (Correcting Previous Statement) re 61 MOTION for summary judgment *and Supporting Memorandum of Law* by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Lopez, Jaclyn) (Entered: 07/05/2017) |
| 07/11/2017 | 64 | NOTICE of Appearance by Debra Carfora on behalf of U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke (Carfora, Debra) (Entered: 07/11/2017) |
| 07/14/2017 | 65 | RESPONSE in Opposition re 61 MOTION for summary judgment *and Supporting Memorandum of Law* filed by Mosaic Fertilizer, LLC. (Sibley, George) (Entered: 07/14/2017) |
| 07/14/2017 | 66 | MEMORANDUM in opposition re 61 Motion for summary judgment filed by Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke. (Brown, Mark) (Entered: 07/14/2017) |
| 07/14/2017 | 67 | MEMORANDUM in opposition re 62 Motion to supplement filed by Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke. (Brown, Mark) (Entered: 07/14/2017) |
| 07/18/2017 | 68 | MOTION for leave to file Reply *to Federal Defendants' and Intervenor-Defendant's Responses in Opposition to Plaintiffs' Motion for Summary Judgment* by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Bennett, Elise) (Entered: 07/18/2017) |
| 07/19/2017 | 69 | RESPONSE in Opposition re 68 MOTION for leave to file Reply *to Federal Defendants' and Intervenor-Defendant's Responses in Opposition to Plaintiffs' Motion for Summary Judgment* filed by U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke. (Carfora, Debra) (Entered: 07/19/2017) |
| 07/20/2017 | 70 | RESPONSE in Opposition re 68 MOTION for leave to file Reply *to Federal Defendants' and Intervenor-Defendant's Responses in Opposition to Plaintiffs' Motion for Summary Judgment* filed by Mosaic Fertilizer, LLC. (Sibley, George) (Entered: 07/20/2017) |

| | | |
|---|---|---|
| 07/21/2017 | 71 | **ENDORSED ORDER denying 68 the plaintiff's motion for leave to reply. Signed by Judge Steven D. Merryday on 7/21/2017.** (Entered: 07/21/2017) |
| 07/28/2017 | 72 | NOTICE by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper *of Designation of Elise Pautler Bennett as Trial Counsel* (Bennett, Elise) (Entered: 07/28/2017) |
| 07/28/2017 | 73 | MOTION for summary judgment by Jason A. Kirk, Jim Kurth, Todd T. Semonite, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Ryan Zinke. (Brown, Mark) (Entered: 07/28/2017) |
| 07/28/2017 | 74 | MOTION for summary judgment *Defendant-Intervenor Mosaic Fertilizer, LLC's Motion for Summary Judgment and Supporting Memorandum of Law* by Mosaic Fertilizer, LLC. (Sibley, George) (Entered: 07/28/2017) |
| 07/31/2017 | 75 | First MOTION for Extension of Time to File Response/Reply *in Opposition to Defendants' and Defendant-Intervenor's Cross-motions for Summary Judgment* by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Bennett, Elise) Motions referred to Magistrate Judge Mark A. Pizzo. (Entered: 07/31/2017) |
| 07/31/2017 | 76 | **ENDORSED ORDER granting 75 Plaintiff's unopposed Motion for Extension of Time to Respond to Defendants' and Defendant-Intervenor's motions for summary judgment. Plaintiff's responses are due by 8/18/2017. Signed by Magistrate Judge Mark A. Pizzo on 7/31/2017. (ACS)** (Entered: 07/31/2017) |
| 08/18/2017 | 77 | RESPONSE in Opposition re 73 MOTION for summary judgment , 74 MOTION for summary judgment *Defendant-Intervenor Mosaic Fertilizer, LLC's Motion for Summary Judgment and Supporting Memorandum of Law* filed by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. (Bennett, Elise) (Entered: 08/18/2017) |
| 12/14/2017 | 78 | **ORDER denying 61 --motion for summary judgment; denying 62 --motion to supplement; granting 73 --motion for summary judgment; granting 74 --motion for summary judgment; directing the clerk to ENTER JUDGMENT for the defendants and against the plaintiffs and to CLOSE the case. Signed by Judge Steven D. Merryday on 12/14/2017. (BK)** (Entered: 12/14/2017) |
| 12/14/2017 | 79 | **JUDGMENT in favor of Mosaic Fertilizer, LLC, U.S. Army Corps of Engineers, U.S. Department of the Interior, U.S. Fish and Wildlife Service, Jason A. Kirk, Jim Kurth, Ryan Zinke, Todd T. Semonite against Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper Signed by Deputy Clerk on 12/14/2017. (CTR)** (Entered: 12/14/2017) |
| 02/12/2018 | 80 | NOTICE OF APPEAL as to 79 Judgment, 78 Order on motion for summary judgmentOrder on motion to supplement by Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, Suncoast Waterkeeper. Filing fee not paid. (Attachments: # 1 Exhibit Exhibit A to Plaintiffs' Notice of Appeal, # 2 Exhibit Exhibit B to Plaintiffs' Notice of Appeal)(Lopez, Jaclyn) (Entered: 02/12/2018) |
| 02/12/2018 | 81 | TRANSMITTAL of initial appeal package to USCA consisting of copies of notice of appeal, docket sheet, order/judgment being appealed, and motion, if applicable to USCA re 80 Notice of appeal. (CTR) (Entered: 02/12/2018) |

| | |
|---|---|
| 02/14/2018 | USCA appeal fees received $ 505 receipt number TPA048795 re 80 Notice of appeal filed by People for Protecting Peace River, Center for Biological Diversity, Manasota-88, Inc., Suncoast Waterkeeper (AG) (Entered: 02/14/2018) |

<table>
<tr><td colspan="4" align="center">**PACER Service Center**</td></tr>
<tr><td colspan="4" align="center">**Transaction Receipt**</td></tr>
<tr><td colspan="4" align="center">03/05/2018 14:45:16</td></tr>
<tr><td>**PACER Login:**</td><td>cynthiaelkins:4421053:4389161</td><td>**Client Code:**</td><td></td></tr>
<tr><td>**Description:**</td><td>Docket Report</td><td>**Search Criteria:**</td><td>8:17-cv-00618-SDM-MAP</td></tr>
<tr><td>**Billable Pages:**</td><td>12</td><td>**Cost:**</td><td>1.20</td></tr>
</table>

# Docket / Tab No: 1

Complaint for Declaratory and Injunctive Relief

03/15/2017

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| | |
|---|---|
| _____ ) | |
| CENTER FOR BIOLOGICAL DIVERSITY; ) | |
| MANASOTA-88, INC; PEOPLE FOR ) | |
| PROTECTING PEACE RIVER; and ) | |
| SUNCOAST WATERKEEPER, ) | |
| ) | |
| _Plaintiffs,_ ) | Civil No: |
| ) | |
| v. ) | |
| ) | |
| U.S. ARMY CORPS OF ENGINEERS; ) | |
| LT. GEN. TODD T. SEMONITE, in his ) | |
| official capacity as Commanding General and ) | |
| Chief of Engineers of the U.S. Army Corps of ) | |
| Engineers; COL. JASON A. KIRK, in his ) | |
| official capacity as District Commander of the ) | |
| U.S. Army Corps of Engineers; U.S. ) | |
| DEPARTMENT OF THE INTERIOR; ) | |
| RYAN ZINKE, in his official capacity as ) | |
| Secretary of the U.S. Department of Interior; ) | |
| U.S. FISH AND WILDLIFE SERVICE; and ) | |
| JIM KURTH, in his official capacity as ) | |
| Acting Director of U.S. Fish and Wildlife ) | |
| Service, ) | |
| ) | |
| _Defendants._ ) | |
| _____ ) | |

**PLAINTIFFS' COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

1.      The Center for Biological Diversity; ManaSota-88, Inc.; People for Protecting

Peace River; and Suncoast Waterkeeper (collectively, Plaintiffs) challenge two related

actions by the U.S. Army Corps of Engineers (Corps) and the U.S. Fish & Wildlife

Service (Service): (1) the decision to grant a 20-year Clean Water Act Section 404 permit

for the South Pasture Extension Mine, permit numberSAJ-1993-01395, which would strip

mine 7,513 acres in the Peace River watershed for phosphate; and (2) the decision to rely

on an incomplete and unlawfully insufficient National Environmental Policy Act (NEPA)

analysis to support the South Pasture Extension Mine permit as well as three other

proposed phosphate strip mining permits, which together cover more than 50,000 total

acres of vital ecosystems and watersheds in an area of central Florida known as Bone

Valley.  Plaintiffs contend the above referenced actions and decisions are in violation of

the Clean Water Act, Endangered Species Act (ESA), NEPA, and the Administrative

Procedure Act (APA).

2.      Florida's rich natural heritage is steeped in rural locales, grassy prairies, lush

wetlands, abundant forests, and diverse wildlife.  Generations of panthers have prowled

the lands of central Florida.  Wood storks nest and fish in the area's rich, ephemeral

wetlands.  Eastern indigo snakes travel hundreds of miles over the sandy soils of the pine

uplands to find their mates, resting periodically in protective gopher tortoise burrows.

And people have witnessed it all, living in relative harmony with the land and seeking

comfort in the bounty of central Florida's clean water, rich soil, and fresh air.

3.      Industrial phosphate mining practices squander this heritage by degrading and

destroying huge swaths of life-giving watersheds, uprooting precious habitat, and

displacing species.  These practices rely on technologies that strip away and disfigure the

land and its water systems only to replace them many years later with an artificial veneer

that, while perhaps superficially convincing, is functionally deficient.  Once destroyed,

the complex natural functions of these lands and waters are forever lost, and the

communities and wildlife that define this region may never return.

4.      Indeed, as the phosphate industry's record in Florida lays bare, phosphate mining

comes at a heavy cost to local communities, imperiled species, and the ecosystems on

which they rely.

5.      Environmental statutes such as the Clean Water Act, NEPA, and the ESA are

designed to support early, comprehensive planning and environmental review of federal

actions.  These laws are intended to guarantee thoughtful consideration by the

government, private applicants, and the public of all federal activities *prior to approval*

so those actions will not irretrievably harm the environment for this or future generations.

6.      The Corps and Service have a solemn obligation to uphold and give meaning to

these laws.  When deciding whether to approve phosphate mining activities in

jurisdictional waterways, Congress and the public trust demand that the Corps and

Service meaningfully comply with the law by observing statutory and regulatory

conditions and rigorously analyzing environmental impacts.  These efforts are not only

legally mandatory but are also indispensable to protecting Florida's dwindling natural

heritage and environment.

7.      Yet the Corps and Service have failed to fulfill these key directives in approving

strip-mining for phosphate across more than 7,000 acres in the Peace River watershed,

and by conveying their intention to continue relying on a substantively and procedurally

inadequate area-wide NEPA review to approve the strip-mining of more than 40,000

additional acres of vital ecosystems and watersheds in Bone Valley.

8.      As a result of the Corps' and Service's unlawful actions, Bone Valley and its

residents, wildlife, and downstream neighbors risk permanent injury, including

endangerment to the public's health, safety, and welfare; imperilment of endangered and

threatened species; and forfeiture of long-term, productive use of these lands and the

continued vitality of the environment and communities.

9.      For the reasons described below, Plaintiffs request that the Court: declare that the

Corps' issuance of Clean Water Act permit number SAJ-2008-00615 is in violation of the

Clean Water Act, NEPA, the ESA, and the APA; order the Corps to rescind Clean Water

Act permit number SAJ-2008-00615; order the Service to withdraw the biological

opinion and rescind its incidental take statement; and enjoin the Corps from authorizing

any further action under the permit until the Corps lawfully complies with the statutory

and regulatory demands of the Clean Water Act, NEPA, the ESA, and the APA.

## II. PARTIES

10.     Plaintiff Center for Biological Diversity (Center) is a non-profit 501(c)(3)

organization with more than 52,000 active members across the country, including in

Bone Valley.  The Center's Florida office is in St. Petersburg, Florida.  The Center's

mission is to protect and conserve endangered species and their habitats.  Pursuant to that

mission, the Center advocates against unsustainable mining practices and for sustainable

agricultural solutions.

11.     The Center has members who live in or visit counties impacted by phosphate

mining and fertilizer production in Florida, including Charlotte, DeSoto, Hardee, Hillsborough, Manatee, Polk, and Sarasota counties.  The Center and its members are concerned with the conservation of imperiled species impacted by phosphate mining, including the wood stork, Audubon's crested caracara, and eastern indigo snake, and the effective implementation of the ESA.

12.     The Center has members who have visited areas where these species are known to occur.  The Center's members use these areas for observation of these species and other wildlife, research, nature photography, aesthetic enjoyment, recreation, education, and other activities.  The Center's members derive professional, aesthetic, spiritual, recreational, economic, informational, and educational benefits from these species and their habitat.  These members have concrete plans to continue visiting and recreating in areas where they can observe these species and their habitat.

13.     The Center and its members' interests are adversely affected by the Corps' and Service's failure to comply with the ESA and other relevant federal environmental laws like the Clean Water Act and NEPA.  The agency's inactions are likely harming the prospects of recovery for these imperiled species and may be jeopardizing their ability to survive.

14.     The Center and its members also have a procedural interest in seeing the Corps and Service comply with their legal obligations, and they suffer procedural injury from the agencies' failure to do so.

15.     Unless the requested relief is granted, the Center's interests and the interests of its members will continue to be adversely affected and injured by the agencies' failure to

protect these species from jeopardy.  The injuries described above are actual, concrete

injuries presently suffered by the Center and its members, and the injuries will continue

to occur unless this Court grants the requested relief.

16.     Plaintiff ManaSota-88, Inc. (ManaSota-88) is a public-interest conservation and

environmental protection organization, a Florida not-for-profit corporation.  The

corporate purposes of ManaSota-88 include the protection and preservation of water

quality and wildlife habitat in Manatee and Sarasota counties, both of which will be

adversely affected by the challenged mining activities in Bone Valley.

17.     ManaSota-88 and its members will be substantially and adversely affected by the

conditions and activities that will result if the proposed phosphate mining actions move

forward, including water pollution, degradation of the quality of surface and ground

waters, and long-term degradation and destruction of natural habitat for wildlife, which

members of ManaSota-88 enjoy and value observing.  These impacts will have a

substantial and adverse effect on the quality of life of ManaSota-88's members.

18.     Phosphate mining is likely to impair, pollute, and otherwise injure Florida's

natural resources, directly and cumulatively, which will significantly injure ManaSota-88

and its members.

19.     ManaSota-88's members will be negatively impacted, in-part, because the

removal of native vegetation and wetland species through phosphate mining practices

will harm their aesthetic enjoyment of the native plant and animal life.

20.     This loss of flora and fauna will negatively affect ManaSota-88's members'

enjoyment of birding and general wildlife observation.  In fact, the loss of flora and fauna

from phosphate mining has already negatively affected ManaSota-88 members'
enjoyment of birding and general wildlife observation.  The further impairment of native
ecosystems will fundamentally diminish its members' continued and future use and
enjoyment of the mined lands and nearby areas.

21.     ManaSota-88's members share the organization's goal of ensuring that native
areas of Florida—which are areas of national importance—are preserved and protected.

22.     ManaSota-88 and its members also have a procedural interest in seeing the Corps
and Service comply with their obligations, and they suffer procedural injury from the
agencies' failure to do so.

23.     Plaintiff People for Protecting Peace River (3PR) is a non-profit 501(c)(3)
organization incorporated in the State of Florida and committed to educating the public
on the extraordinary value of the natural and agricultural lands of the Peace and Myakka
River watersheds.  Two of 3PR's primary goals are to end the damage caused by
phosphate strip mining and promote a superior quality of life in the heartland of the Peace
River.

24.     In furtherance of its mission, 3PR seeks to maintain the rural quality of life
characteristic to the region; keep clay waste disposal areas out of Charlotte, Desoto,
Hardee, and Manatee counties; keep soils intact and aquifers functioning; be free of the
danger of harmful pollutants left in the ground and aquifer after phosphate mining; and
see the beauty of Florida's unique natural world left for future generations to experience
and appreciate.

25.     Many of 3PR's members live within the rural areas adjacent to or near proposed

phosphate mines.

26.     Appreciation of rural Hardee County, including its natural peacefulness and

unique biodiversity, is one of the main reasons many of 3PR's members live in the area.

In the region, 3PR's members have observed eastern indigo snakes, deer, bobwhite quail,

barred owls, hawks, bald eagles, Audubon's crested caracaras, rattlesnakes, gopher

tortoises, swallowtail kites, alligators, and hundreds of plant species.  Some of these

plants and animals are endangered species.  3PR's members have educated themselves

regarding these species, as well as the natural systems and their functioning.  This

knowledge and involvement has greatly enhanced 3PR's members' lives intellectually,

emotionally, and spiritually.

27.     3PR's members have seen the impacts of phosphate strip mining in the region and

understand that the complexity of natural systems cannot be readily restored.  Phosphate

mining permanently disrupts natural hydrology and habitat for populations of animal and

plant species, and this harms 3PR's members.

28.     Many of 3PR's members obtain their drinking water from local wells and are

concerned about impacts to water quality and quantity from phosphate mining in Bone

Valley.

29.     Many of 3PR's members recreate on Horse Creek and the Peace River and are

concerned about impacts to these waterways from phosphate mines in Bone Valley which

would injure their recreational, aesthetic, and health interests.  3PR's members also hike,

canoe, and photograph the wild areas of Hardee and Desoto counties.  All of these interests are harmed by phosphate mining.

30.      Some of 3PR's members are concerned that they will suffer economic injuries, including depreciation in the value of real property, as mining operations expand south.

31.      Many of 3PR's members are further concerned about effects from the expansion of mining operations to the quiet use and enjoyment of their nearby properties, as well as the security of the community.  3PR's members value their homes and community by many measures beyond just monetary standards.

32.      3PR and its members also have a procedural interest in seeing the Corps and Service comply with their legal obligations, and they suffer procedural injury from the agencies' failure to do so.  The injuries 3PR and its members suffer can only be remedied through the relief requested herein.

33.      Plaintiff Suncoast Waterkeeper is a non-profit 501(c)(3) organization incorporated in Florida and dedicated to protecting and restoring Florida's west-coast waterways through enforcement, fieldwork, advocacy, and environmental education for the benefit of communities that rely on these precious coastal resources.

34.      Suncoast Waterkeeper has more than 600 members in Bone Valley and adjacent coastal areas.  Its members are active hikers, birders, boaters, travelers, kayakers, and park enthusiasts.  They have a deep appreciation of the intrinsic value of nature and particularly treasure Florida's pristine native habitat and the many species that thrive in that habitat.  A number of Suncoast Waterkeeper's members live adjacent to or near one or more of the proposed phosphate mines.

35.     Suncoast Waterkeeper's members are concerned about the destructive character and effects of phosphate strip mining in Florida.  Suncoast Waterkeeper and its members have significant concerns about the future use and safety of mined lands in Bone Valley and the applicant's ability to create reclaimed mined lands that function naturally and provide habitat for imperiled species.

36.     Suncoast Waterkeeper and its members are specifically concerned about the individual and cumulative effects of permitting thousands of additional acres of Florida habitat and agricultural lands for phosphate mining and fertilizer production, including effects to water quality and species that depend on those lands for survival.

37.     Suncoast Waterkeeper and its members deeply appreciate and find value in the diversity of the plant and animal species that thrive in and around Bone Valley, and they are concerned about the effects of phosphate mining on those interests.  They are specifically concerned about the viability and practicality of the proposed reclamation practices that will be used in this region as well as the direct link between those practices and continuing harm to the interests of Suncoast Waterkeeper and its members.

38.     Suncoast Waterkeeper and its members derive satisfaction from living in and exploring the natural environments in the heartland of Florida and are concerned about the effects of increased phosphate mining on those interests.  For example, Suncoast Waterkeeper's members have enjoyed sightings of bald eagles, Audubon's crested caracaras, scrub jays, wood storks, gopher tortoises, eastern indigo snakes, red-cockaded woodpeckers, and Florida panthers.  They are concerned about how the expansion of mining operations in the area will affect these species and their enjoyment of them.

10

39.     Suncoast Waterkeeper and its members are also concerned about the use of

pesticides and herbicides prior to and during the reclamation process, and the effect of

those chemicals on human health, the natural environment, water quality, and species.

40.     Suncoast Waterkeeper and its members are also concerned about the impact

phosphate mining, ore processing, and waste disposal have on surface and groundwater

quality and quantity, which are essential to the region's drinking water supply.  In

addition to these concerns, they are worried the proposed phosphate mines will degrade

and impair perennial and headwater streams.  All of these effects will harm their

environmental, aesthetic, and recreational interests.

41.     Suncoast Waterkeeper and its members are particularly concerned about harm to

the water quality and function of the Manatee, Myakka, and Peace rivers, and the Horse

Creek tributary.  The Myakka River, for example, becomes a state-designated Wild and

Scenic River when it enters Sarasota County from Manatee County.  The Manatee and

Peace rivers are both significant drinking water sources.

42.     Suncoast Waterkeeper and its members are further concerned about the

production, storage, and disposal of hazardous waste produced during the phosphate

manufacturing process, and the effect of this process on public health and their individual

interests.

43.     The members of Suncoast Waterkeeper share a belief in the principles and values

of the organization's mission statement and, along with Suncoast Waterkeeper itself, will

sustain injury from the actions alleged.  The relief sought will redress these injuries.

44.     Suncoast Waterkeeper and its members further have a procedural interest in

seeing the Corps and Service comply with their obligations, and they suffer procedural injury from the agencies' failure to do so.

45.     Defendant U.S. Army Corps of Engineers is an agency of the United States and a subdivision of the U.S. Department of the Army, which is in the U.S. Department of Defense.  The Corps is responsible for, among other things, regulating the placement of dredged and fill material into navigable waters and, in doing so, must meet all environmental standards and requirements. *See* 33 U.S.C. § 1344(a).

46.     Defendant Lieutenant General Todd T. Semonite is Commander and Chief of Engineers for the U.S. Army Corps of Engineers and is responsible for ensuring that the Corps complies with the requirements of the Clean Water Act, NEPA, the ESA, and the APA.  Defendant Colonel Jason A. Kirk is the District Commander for the Jacksonville District of the U.S. Army Corps of Engineers and is also responsible for ensuring that the Corps complies with the requirements of the Clean Water Act, NEPA, the ESA, and the APA.  Defendants U.S. Army Corps of Engineers; Lt. Gen. Todd T. Semonite, in his official capacity as Commander and Chief of Engineers; and Col. Jason A. Kirk, in his official capacity as District Commander, have waived sovereign immunity pursuant to 5 U.S.C. § 702, 33 U.S.C. § 1365, and 16 U.S.C. § 1540(g).

47.     Defendant Department of Interior is an agency of the United States charged with administering the ESA for non-marine species.

48.     Defendant Ryan Zinke is the Secretary of the Interior.  As Secretary of the Interior, he has the ultimate responsibility to enforce and implement the provisions of the ESA.  Defendant Zinke is sued in his official capacity.

49.     Defendant U.S. Fish and Wildlife Service  is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the ESA through the APA and other federal laws.

50.     Defendant Jim Kurth is the Acting Director of the U.S. Fish and Wildlife Service. As Acting Director, Defendant Kurth is the federal official vested with responsibility for enforcing the ESA and its joint regulations.  Defendant Kurth is sued in his official capacity.

51.     Defendants U.S. Fish and Wildlife Service; Department of the Interior; Ryan Zinke, in his official as Secretary of the Interior; and Jim Kurth, in his official capacity as Acting Director of the U.S. Fish and Wildlife Service, have waived sovereign immunity pursuant to 5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

52.     Defendants Corps and Service are agencies of the federal government, which may be named as defendants and against which a writ in the nature of mandamus, a declaratory judgment, and injunctive relief may be entered pursuant to 28 U.S.C. §§ 1361, 2201 and 2202, and Federal Rules of Civil Procedure 57 and 65(a).  The Corps is the action agency for purposes of environmental review under the Clean Water Act, NEPA, and the ESA.  Likewise, the Service is an action agency under the ESA.

### III. JURISDICTION AND VENUE

53.     Plaintiffs bring this action under the Clean Water Act, 33 U.S.C. § 1251, *et. seq*.; NEPA, 42 U.S.C. §§ 4321-4370e; the ESA, 16 U.S.C. §§ 1536, 1540(g); and the APA, 5 U.S.C. § 706.

54.     This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA

judicial review provisions); 28 U.S.C. § 2201 (Declaratory Judgment Act); 28 U.S.C.

§ 1361 (action in the nature of mandamus to compel an officer or employee of the United

States or any agency thereof to perform a duty owed to the Plaintiffs); and 16 U.S.C.

§ 1540(g) (ESA citizen suit provision).  The relief requested is authorized by 28 U.S.C.

§ 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); 5 U.S.C. §§ 701-706;

and 16 U.S.C. § 1540(g).

55.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants

federal district courts "original jurisdiction of all civil actions arising under the . . . laws

. . . of the United States."

56.     Plaintiffs provided legally sufficient notice to Defendants of their intent to file suit

under the ESA more than 60 days prior to filing this complaint, consistent with the Act's

statutory requirements. 16 U.S.C. § 1540(g)(2).  Defendants have not remedied the issues

raised in that notice.  Plaintiffs have exhausted all administrative remedies, the agency's

actions are final and ripe for review, and Plaintiffs have standing to bring these claims.

57.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because the Corps

and Service, agencies of the United States, have committed and will commit the unlawful

conduct alleged herein in Jacksonville and Vero Beach, Florida, respectively. The

affected areas are in Charlotte, DeSoto, Hardee, Hillsborough, Manatee, Polk, and

Sarasota counties, Florida.

58.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702 and 16 U.S.C. § 1540(g).

## IV. STATUTORY AND REGULATORY FRAMEWORKS

### A. CLEAN WATER ACT

59.     Congress created the Clean Water Act to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters" and to prohibit the discharge of

pollutants into waters of the United States unless expressly authorized. 33 U.S.C.

§§ 1251(a), 1311(a), 1344.

60.     Section 404 authorizes the Corps to issue permits for the discharge of "dredged or

fill materials" after providing "notice and opportunity for public hearings." *Id.* § 1344(a).

61.     Two sets of implementing regulations govern the Section 404 permit program:

Corps regulations, 33 C.F.R. Parts 320-330; and Environmental Protection Agency (EPA)

regulations, called the "404(b)(1) Guidelines," 40 C.F.R. §§ 230.1-230.98.

62.     Under the Corps' regulations, a Section 404 permit application must include all

activities the applicant plans to undertake that are "reasonably related to the same

project," along with a complete description of such activities "sufficient for public

notice." 33 C.F.R. § 325.1(d)(1), (2).  When the Corps receives a complete application, it

must issue a public notice soliciting comments from interested persons as to the

advisability of granting the permit. 33 U.S.C. § 1344(a); 33 C.F.R. §§ 325.2(a)(2), 325.3.

63.     When performing its substantive review of permit applications, the Corps is

required to give wetlands, such as those in this matter and those connected and adjacent

thereto, the highest possible level of protection.

64.     The Corps has found that "wetlands constitute a productive and valuable public

resource, the unnecessary alteration and destruction of which should be discouraged as

contrary to the public interest." 33 C.F.R. § 320.4(b)(1).

65.    The Corps' regulations list wetland functions that are "important to the public

interest." *Id*. § 320.4(b)(2).  These include:

> (i) Wetlands which serve significant natural biological functions,
> including food chain production, general habitat and nesting, spawning,
> rearing and resting sites for aquatic or land species;
>
> . . .
>
> (iii) Wetlands the destruction or alteration of which would affect
> detrimentally natural drainage characteristics, sedimentation patterns,
> salinity distribution, flushing characteristics, current patterns, or other
> environmental characteristics;
>
> . . .
>
> (v)  Wetlands which serve as valuable storage areas for storm and flood
> waters;
>
> (vi) Wetlands which are ground water discharge areas that maintain
> minimum baseflows important to aquatic resources and those which are
> prime natural recharge areas;
>
> (vii) Wetlands which serve significant water purification functions; and
>
> (viii) Wetlands which are unique in nature or scarce in quantity to the
> region or local area.

*Id*.

66.    The regulations further provide that "[n]o permit will be granted which involves

the alteration of wetlands identified as important" unless the Corps finds under its "public

interest review" that "the benefits of the proposed alteration outweigh the damage to the

wetlands resource." *Id.* § 320.4(b)(4).

67.    In making these determinations, the Corps must consider "[a]ll factors which may

be relevant to the proposal . . . including the cumulative effects thereof." *Id.* § 320.4(a).

68.    The Corps must also consult with the Service "with a view to the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application," and it must give "full consideration" to the views of the Service "in deciding on the issuance, denial, or conditioning of individual or general permits." *Id*. § 320.4(c).

69.    The EPA's "guidelines" for the issuance of dredge and fill permits are also binding on the Corps. 40 C.F.R. Part 230; 33 C.F.R. § 320.4(b)(4).  These guidelines articulate a strong presumption against allowing any damage to wetlands: "From a national perspective, the degradation or destruction of special aquatic sites, such as filling operations in wetlands, is considered to be among the most severe environmental impacts . . . ." 40 C.F.R. § 230.1(d).  "The guiding principle should be that degradation or destruction of [wetlands] may represent an irreversible loss of valuable aquatic resources." *Id.*

70.    Thus, the guidelines provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c).

71.    EPA's guidelines further provide that the Corps may not issue a dredge and fill permit "which will cause or contribute to significant degradation of the waters of the United States," *Id*. § 230.10(c).  Effects "contributing to significant degradation considered individually or collectively, include . . . loss of fish and wildlife habitat . . . ."

*Id*. § 230.10(c)(3).

72.    EPA's guidelines also strictly prohibit the Corps from issuing any permit "if there is a practicable alternative . . . [that] would have less adverse impact on the aquatic ecosystem." *Id.* § 230.10(a).  An alternative is considered "practicable" if it is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10 (a)(2).  Practicable alternatives are "presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

**B. NATIONAL ENVIRONMENTAL POLICY ACT**

73.    NEPA is the Nation's charter for protection of the environment. 40 C.F.R. § 1500.1(a).  Its central goals are "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation . . . ." 42 U.S.C. § 4321.  The president, federal agencies, and courts share responsibility for enforcing NEPA and guaranteeing that high quality information is available to the public and analyzed by the federal agencies before the agencies make decisions and take actions. 40 C.F.R. § 1500.1(a).

74.    Congress designed NEPA to "insure that environmental information is available to public officials and citizens *before* decisions are made and actions are taken" and to "help public officials make decisions that are based on understanding of environmental consequences." *Id.* § 1500.1(b)-(c) (emphasis added).

75.     Pursuant to 42 U.S.C. § 4342, Congress created the Council on Environmental

Quality (CEQ) to promulgate regulations applicable to all federal agencies consistent

with the intent and purposes of NEPA. *See* 40 C.F.R. § 1500 *et seq.*  In addition, the

Corps promulgated a set of regulations to guide the application of NEPA to its actions;

these regulations incorporate and expand upon the regulations promulgated by the CEQ.

33 C.F.R. pt. 325, app. B (NEPA Implementation Procedures for the Regulatory

Program).

76.     Federal agencies must engage in NEPA review for any major federal agency

action.  "Major Federal action includes actions with effects that may be major and which

are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18

(internal quotation marks omitted).

77.     NEPA reviews may be on a site- or project-specific level, or on a broader

programmatic or regional level.  A programmatic analysis is one that considers the

aggregate effects of a broad federal policy.  A regional analysis assesses the

environmental impact of individual projects within a discrete area.  Agencies that engage

in a programmatic or regional analysis often subsequently tier narrower or site-specific

analyses to the broader programmatic or regional analyses. *Id.* § 1508.28.

78.     To start the NEPA process, federal agencies are required to either prepare an

Environmental Impact Statement (EIS) if it is already known that the action will

significantly affect the human environment or an Environmental Assessment (EA) if the

extent of effects is unclear or unknown.  EAs are meant to assess the impacts of the

action on the environment, determine if those actions will significantly affect the human

environment, and establish if a more in-depth EIS analysis is required.  Thus, while the

purpose of an EA is generally to determine whether the agency must prepare an EIS, the

preparation of EA is not a necessary predicate to the preparation of an EIS. *Id.* §§ 1501.4;

1508.9.

79.     If after completing an EA the agency concludes that an EIS is unnecessary, it

must make a finding of no significant impact (FONSI) on the human environment from

the proposed agency action. *Id*. §§ 1501.4(e); 1508.9(a)(1); 1508.13; 33 C.F.R. pt. 325,

app. B, § 7.  If the EA results in a finding that an action will likely significantly affect the

human environment, the agency is required to prepare an EIS. 40 C.F.R. § 1501.4.

80.     The "human environment" is defined "comprehensively to include the natural and

physical environment and the relationship of people with that environment." *Id.*

§ 1508.14.  "Significantly," as used in NEPA, "requires considerations of both context

and intensity." *Id*. § 1508.27.  In the case of a site-specific action, "context" means "the

effects in the locale rather than in the world as a whole.  Both short- and long-term effects

are relevant." *Id.* § 1508.27(a) "Intensity" refers to "the severity of impact." *Id.*

§ 1508.27(b).

81.     Public controversy or uncertainty surrounding the potential impacts of a federal

agency action on the human environment strongly suggests that an action is significant

and requires the preparation of an EIS. *Id.* § 1508.27(b)(4), (5).

82.     Other factors an agency must consider in determining whether a project will have

significant effects include the degree to which the proposed action affects public health or

safety; the unique characteristics of the geographic area such as proximity to park lands,

prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas; whether

the action is related to other actions with individually insignificant but cumulatively

significant impacts (significance cannot be avoided by terming an action temporary or by

breaking it down into small component parts); and the degree to which the action may

adversely affect an endangered or threatened species or its habitat that has been

determined to be critical under the ESA. *Id.*

83.    An EIS must describe:

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the
> proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv)  the relationship between local short-term uses of man's environment
> and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitment of resources which
> would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C)(i)-(v).

84.    The EIS must additionally "specify the underlying purpose and need to which the

agency is responding." 40 C.F.R. § 1502.13.  The purpose and need statement is intended

to explain why the agency is proposing an action and what the agency expects to achieve

in taking that action.  Similarly, within an EA the agency "shall include brief discussions

of the need for the proposal, of alternatives as required by section 102(2)(E) [of NEPA],

[and] of the environmental impacts of the proposed action and alternatives." *Id.*

§ 1508.9(b).

85.    Each federal agency must "study, develop, and describe appropriate alternatives

to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(E).  An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including alternatives that are "not within the jurisdiction of the . . . agency." 40 C.F.R. § 1502.14(a), (c).  In addition, an agency "shall state how alternatives … will or will not achieve the requirements of section 101 and 102(1) of the Act," which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of national heritage." 42 U.S.C. § 1502.2(d); 42 U.S.C. § 4331(b).  An agency must also determine how alternatives "will or will not achieve the requirements of . . . other environmental laws and policies." 40 C.F.R. § 1502.2(d).

86.    Although the Corps' primary function in issuing Clean Water Act Section 404 permits is to protect the integrity of the waters of the United States, 33 U.S.C. § 1251(a), NEPA demands a broader analysis that must include consideration of reasonably foreseeable, direct, indirect, and cumulative impacts to the natural and physical environment, not just impacts to wetlands. 40 C.F.R. § 1508.14.

87.    Likewise, agencies must include discussions of "[i]ndirect effects and their significance" in the EIS. *Id.* § 1502.16(b).

88.    Indirect effects are

     caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

*Id.* § 1508.8(b).

89.     Effects are further defined to include "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" impacts. *Id.* § 1508.8.

90.     According to the Corps' regulations, NEPA analyses should "address the impacts of the specific activity requiring a . . . permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B, § 7(b)(1).

91.     Further, "[t]he district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action." *Id.* § 7(b)(2).

92.     One factor to consider in evaluating whether the district engineer has sufficient control and responsibility to warrant federal review is "[w]hether there are aspects of the upland facility in the immediate vicinity of the regulated activity which affect the location and configuration of the regulated activity." *Id.* § 7(b)(2)(ii).

93.     Cumulative impacts are impacts on the environment that result from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R.

§ 1508.7.  Cumulative impact analyses include private, state, and federal actions. *Id.*

§§ 1708.7; 1508.25(a), (c).

94.     The Corps defines "independent utility" as:

> [a] test to determine what constitutes *a single and complete project* in the Corps regulatory program. A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate single and complete projects with independent utility. Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002) (emphasis added).

95.     A "[s]ingle and complete project" is the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. 33 C.F.R. § 330.2(i).

96.     Neither NEPA nor implementing regulations allow federal agencies to analyze effects of their actions in isolation.  Rather, the entire body of law under NEPA directs federal agencies to analyze the effects of proposed actions to the extent they are reasonably foreseeable consequences of the proposed action, regardless of where those impacts might occur.  Agencies must analyze indirect effects, "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

97.     After completing and considering an EIS, the agency shall prepare a concise public record of decision (ROD) stating the agency's decision, identifying all alternatives considered, and stating whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted. *Id.* § 1505.2.  Corps regulations

additionally provide that "in those cases involving an EIS, the statement of findings will

be called the record of decision and shall incorporate the requirements of 40 C.F.R.

§ 1505.2." 33 C.F.R. pt. 325, app. B, § 18.

98.     Until an agency issues an ROD pursuant to NEPA, no action concerning a

proposal may be taken that would have an adverse environmental impact or limit the

choice of reasonable alternatives. 40 C.F.R. § 1506.1(a).

99.     It is expected that a public hearing will be held for a permit application that

requires an EIS. 33 C.F.R. pt. 325, app. B, § 11.  When a member of the public requests a

public hearing, the Corps shall grant that request unless the Corps determines in writing

that the issues raised are insubstantial or there is otherwise no valid interest to be served

by a hearing." 33 C.F.R. § 327.4(b).  "In case of doubt," the Corps should hold a public

hearing. *Id.* § 327.4(c).

100.    NEPA requires agencies to take a "hard look" at the environmental consequences

of their actions.  To meet NEPA's "hard look" requirement, "the agency must examine

the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*

*Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing

*Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  This includes

requiring that environmental effects are "discussed in sufficient detail to ensure that

environmental consequences have been fairly evaluated." *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 352 (1989).

101.    The agency must also "[i]nclude appropriate mitigation measures not already

included in the proposed action or alternatives." 40 C.F.R. § 1502.14(f); *see also id.*

§ 1502.16(h).

102.    Finally, an agency "[s]hall prepare supplements to either draft or final

environmental impact statements if . . . [t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed action or its

impacts," and it "[m]ay also prepare supplements when the agency determines that the

purposes of the Act will be furthered by doing so." *Id.* § 1502.9(c)(1)-(2).

103.    In sum, the purpose of the NEPA process is to lead to better outcomes; include

meaningful public engagement; provide transparent, accountable, and informed

government decisionmaking; allow for consideration of reasonable alternatives that may

not otherwise be identified; identify mitigation alternatives and measures; and encourage

collaboration with interested parties.

## C. ENDANGERED SPECIES ACT

104.    The Supreme Court has found through examination of the language, history, and

structure of the ESA that "Congress intended endangered species to be afforded the

highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).  The ESA

"represent[s] the most comprehensive legislation for the preservation of endangered

species ever enacted by any nation." *Id.* at 180.  To that end, the ESA's purpose is to

"provide a program for the conservation of . . . endangered species and threatened

species" and "to provide a means whereby the ecosystems upon which endangered

species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).  The

ESA requires that "all Federal departments and agencies . . . seek to conserve endangered

species and threatened species and . . . utilize their authorities in furtherance of the

purposes" of the ESA. *Id.* §1531(c)(1).

105.    The Secretaries of the Departments of the Interior and Commerce have delegated

their ESA duties to the U.S. Fish and Wildlife Service and the National Marine Fisheries

Service, respectively. 50 C.F.R. § 402.01(b).

106.    Listed species are entitled to significant protections under the ESA, including a

number of congressionally mandated measures designed to protect and restore their

populations.  For example, under the ESA and its implementing regulations it is illegal

for anyone to "take" an endangered or threatened animal. 16 U.S.C. § 1538(a)(1); 50

C.F.R. §§ 17.21, 17.31.  "The term 'take' means to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16

U.S.C. § 1532(19).  "Harm" includes significant habitat modification or degradation that

results in death or injury to listed species "by significantly impairing essential behavioral

patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3.  "Harass" is

defined as intentional or negligent actions that create a likelihood of injury to listed

species "to such an extent as to significantly disrupt normal behavioral patterns which

include, but are not limited to, breeding, feeding or sheltering." *Id.*  Congress intended

the term "take" to be defined in the "broadest possible manner to include every

conceivable way" a person could harm or kill fish or wildlife. *See* S. Rep. No. 93-307, at

7 (1973), *as reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.  "Incidental take" is defined as

take that is "incidental to, and not the purpose of, the carrying out of an otherwise lawful

activity." 50 C.F.R. § 17.3.

107.    The Act also requires the Service to "develop and implement . . . 'recovery plans . . . for the conservation and survival of endangered species and threatened species." 16 U.S.C. § 1533(f)(1).

108.    In addition, Section 7 of the ESA provides that each federal agency "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized . . . by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of a listed species' designated critical habitat. *Id*. § 1536(a)(2); *see* 50 C.F.R. Part 402 (regulations implementing the requirements of Section 7).

109.    To fulfill its obligations under Section 7, each federal agency must review its actions to determine whether they "may affect" an endangered or threatened species. 50 C.F.R. § 402.14(a).  An agency may first initiate "informal consultation" to determine whether an action is likely to adversely affect a listed species or its critical habitat. *Id*. § 402.13(a).  The process ends if the agency determines, "with concurrence of the Service, that the action is not likely to adversely affect listed species," *Id.*; however, formal consultation is required if the Service does not agree with the agency's finding or if informal consultation leads to the conclusion that the action "may affect listed species." *Id*. § 402.14(a).

110.    Formal consultation begins when the agency submits a written request to the Service. *Id*. § 402.14(c).  This request must include:

        (1) A description of the action to be considered;

        (2) A description of the specific area that may be affected by the action;

(3) A description of any listed species or critical habitat that may be affected by the action;

(4) A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;

(5) Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and

(6) Any other relevant available information on the action, the affected listed species, or critical habitat.

*Id*. § 402.14(c)(1)-(6).  The agency must provide the Service with the "best scientific and commercial data available or which can be obtained during the consultation for an adequate review." *Id*. § 402.14(d).

111.    The Service must analyze the effects of the proposed action on listed species and habitat, which includes the direct and indirect effects, "together with effects of other activities that are interrelated or interdependent with that action, [which] will be added to the environmental baseline." *Id*. § 402.02.

112.    "The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id*.

113.    Indirect effects are "caused by the proposed action and [occur] later in time, but still are reasonably certain to occur." *Id*.

114.    Interrelated actions "are part of a larger action and depend on the larger action for their justification." *Id*.

115.    Interdependent actions "have no independent utility apart from the action under consideration." *Id.*

116.    The Service must also analyze the cumulative effects of "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.*  "Action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.*

117.    During the formal consultation process, the Service must review all relevant information, evaluate the status of the listed species, "evaluate the effects of the action and cumulative effects on the listed species," and formulate its biological opinion of "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." *Id.* § 402.14(g)(1)-(4).  This evaluation must be based on the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

118.    Also, while formal consultation is underway, the agency and permittee's ability to continue to undertake activities is strictly curtailed.  The agency and permittee "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" the ESA. *Id.* § 1536(d).  This prohibition remains "in force during the consultation process and continues until the requirements of [the ESA] are satisfied." 50 C.F.R. § 402.09.

119.    At the conclusion of the consultation process, the Service must issue a "biological opinion," which "detail[s] how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and sets forth the Service's opinion as to whether the action is "likely to

jeopardize" the continued existence of a listed species. 50 C.F.R. § 402.14(h)(1)-(3).  If

the Service concludes that the action is likely to jeopardize a listed species, it must

suggest "reasonable and prudent alternatives" that ensure such jeopardy is not likely to

occur. 16 U.S.C. § 1536(b)(3)(A).

120.    If the agency action is expected to cause "take," the Service must also include an

incidental take statement (ITS) in its biological opinion. 50 C.F.R. § 402.14(i).  The ITS

must, where practicable, quantify the amount of take allowed for each species, thereby

creating a meaningful "trigger" to reinitiate consultation when an allowable level of take

is exceeded. *Id.* § 402.14(i)(1)(i). The Service may use a rational surrogate for take in the

ITS where it: (1) demonstrates that it cannot express anticipated take in numerical form;

(2) articulates a causal connection between the surrogate and the anticipated take; and (3)

"sets a clear standard for determining when authorized take has been exceeded." *Id.*

121.    To minimize the impact of incidental take, in an ITS the Service must include

Reasonable and Prudent Measures (RPMs) that are necessary or appropriate. *Id.*

§ 402.14(i)(1)(ii).

122.    Even after the Service issues a biological opinion, the ultimate duty to ensure that

the action will not jeopardize a listed species lies with the action agency, here the Corps.

*See id.* § 402.15.  An agency cannot rely on an inadequate, incomplete, or flawed

biological opinion to satisfy its duty to avoid jeopardy.

123.    An agency must reinitiate consultation with the Service if any of the following

circumstances occur:

> (a) If the amount or extent of take specified in the incidental take
> statement is exceeded;

(b) If new information reveals effects of the action that may affect a listed species in a manner or to an extent not previously considered;

(c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that not considered in the biological opinion; or

(d) If a new species is listed or critical habitat designated that may be affected by the identified action.

*Id.* § 402.16(a)-(d).

124.    Under the terms of Section 7(b)(4) and Section 7(o)(2), take that is incidental to and not intended as part of an agency action, may be permitted only if such taking complies with the terms and conditions of an ITS issued as part of a biological opinion. 16 U.S.C. § 1536(b)(4), (o)(2).

125.    Federal agencies have additional responsibilities under Section 7(a)(1) of the ESA, including a requirement that they "utilize their authorities in furtherance of the purposes of [the Act]" and to "carry[ ] out programs for the conservation of" listed species. *Id.* § 1536(a)(1).  The ESA defines "conservation" to mean the use of "all methods and procedures" that are necessary to recover a listed species to the point where protections under the act are no longer necessary. *Id.* § 1532(3).  Thus, section 7(a)(1) requires each federal agency to ensure that its actions are consistent with the recovery of listed species. *See* 50 C.F.R. § 402.15(a) (explaining that it is each agency's continuing obligation to "determine whether and in what manner to proceed with the action in light of its section 7 obligations" to protect and recover listed species).

126.    Additionally, individuals may apply to take listed species through Section 10 of the ESA. 16 U.S.C. § 1539.  The Service may not issue a take permit unless the

applicant's take application specifies the impact that will result from the taking; efforts to

minimize and mitigate such impact; alternatives to the taking; and other necessary or

appropriate measures. 16 U.S.C. § 1539(a)(2)(A)(i)-(iv).  The Service must then self-

consult under Section 7 on the issuance of the incidental take permit (ITP) and likewise

ensure that the authorization is not likely to jeopardize the continued existence of any

endangered or threatened species. *Id.* § 1539(a)(2)(B)(iv).

## D. ADMINISTRATIVE PROCEDURE ACT

127.     Pursuant to the APA, any person who has suffered legal wrong because of agency

action or who is adversely affected or aggrieved by agency action within the meaning of

a relevant statute is entitled to judicial review thereof. 5 U.S.C. § 702.

128.     Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of

law, interpret constitutional and statutory provisions, and determine the meaning or

applicability of the terms of an agency action." The APA also requires a reviewing court

to:

>  (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
>  (2) hold unlawful and set aside agency action, findings, and
>  conclusions found to be—
>
>  >  (A) arbitrary, capricious, an abuse of discretion, or
>  >  otherwise not in accordance with law; [or]
>  >
>  >   . . .
>  >
>  >  (D) without observance of procedure required by
>  >  law . . . .

*Id.* § 706(1)-(2).

129.     "In making the foregoing determinations, the court can review the whole record

or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." *Id.* § 706.

130.    The Corps' issuance of a Section 404 permit is a final agency action reviewable under the APA. *See* 5 U.S.C. § 704.

131.    The Corps' statement of findings and decision not to prepare an EIS under NEPA are final agency actions reviewable under the APA. *See id.*

132.    The Corps' failure to issue a ROD for an Areawide EIS is reviewable under the APA as unlawfully withheld. *See id.* § 706(1).

133.    The Service's issuance of a biological opinion  is a final agency action reviewable under the APA. *See id.* § 704.

## V. FACTUAL AND PROCEDURAL BACKGROUND

134.    Phosphate mining aggressively transforms the environment, ruins the natural hydrology of watersheds, destroys and displaces species, and irreparably changes the character of the habitats on which species rely.  The Corps and Service are entrusted with purposefully enforcing environmental laws to safeguard the nation's shared natural resources and to protect the health and safety of Floridians as well as people drawn to the state by its thriving ecotourism economy.  Compliance with these laws ensures against preventable degradation of environmental resources and precludes avoidable adverse effects on already imperiled endangered and threatened species and their habitats. Plaintiffs allege that the Corps and the Service failed in these obligations when authorizing the South Pasture Extension Mine, permit number SAJ-1993-01395, and as a result, industrial phosphate mining now threatens to consume more than 51,000 acres in

Hardee, Manatee, and DeSoto counties.

## A. PHOSPHATE MINING IN FLORIDA

135.    Phosphate mining in Florida begins in open pit strip mines, where a phosphate mining company—such as Mosaic here—strips all vegetation and approximately 30 feet of existing landscape (referred to as "overburden") using dragline or dredging technology to expose and facilitate the removal of the phosphate ore deposits below.

136.    A dragline is a one million pound extractor-crane that can remove tons of earth at a time.  A single dragline can mine 15 acres in one month.  Meanwhile, dredging involves mounting excavating equipment on a barge and creating a moving lake, digging out phosphate ore at one end, and depositing sand tailings or fill at the other end. Dredging is used when the ore is too deep to mine with a dragline.

137.    Using either the dragline or dredging technique, the mining company extracts a mixture of phosphate pebbles, sand, and clay known as phosphate "matrix."  The mining company then conveys the extracted matrix by pipelines to a beneficiation plant where it forcibly separates the phosphate ore from the sand and clay.

138.    The sand is set aside for the re-contouring of mined-out lands.

139.    There is no mandate to restore mined lands to their pre-mined condition, only to reclaim them to support some beneficial use.

140.    The clay is stored in industry-termed "clay settling areas" or "CSAs," where the water-logged clay slowly settles in a process called "dewatering."  Clay settling areas comprise 40 percent of the post-mining landscape, have dam walls between 20 to 60 feet in height, and remain irreclaimable for many years during active use.  When no additional

clays are to be added, the clay settling area must undergo a protracted process of draining and clay drying, and even then are still virtually unusable.

141.    The phosphate ore is then treated with sulfuric acid to produce phosphoric acid, which is principally used in synthetic fertilizer.  This process also creates the abundant radioactive byproduct phosphogypsum.  Due to phosphogypsum's hazardous nature, the EPA requires that it be stored in mountainous "stacks" that are hundreds of acres wide and hundreds of feet tall.  Phosphogypsum contains uranium and radium-226 in concentrations well above background levels, as well as trace metals in concentrations the EPA considers to be a risk to human and environmental health.  Many established stacks also hold open-air reservoirs of acidic process water.  The presence of these stacks—in current and expanding form—will indefinitely remain an insecure part of Florida's landscape.

142.    From extraction as phosphate rock to refinement as phosphoric acid, each step of the process depends on the prior steps to produce a marketable finished product: fertilizer.  As it relates to the phosphate mining operations at issue here, each of these interrelated steps will take place within Bone Valley.

143.    The phosphate industry has an indisputable history of environmental violations and incidents connected to its phosphate operations, including during the mining, reclamation, and fertilizer stages of production.  For example, on September 30, 2015, Mosaic and the EPA reached a $2 billion settlement agreement regarding Mosaic's unlawful disposal and commingling of hazardous wastes, including sulfuric acid,

diammonium phosphate, monammonium phosphate fertilizer, and fluorocilic acid, with

its phosphogypsum waste.

144.    On September 15, 2016, news broke that a sinkhole had opened up in a

phosphogypsum stack at Mosaic's New Wales plant that allowed at least 215 million

gallons of industrial process water to pour into the Floridan aquifer, which supplies

drinking water for nearly 10 million people.

145.    The New Wales, Riverview, and Bartow fertilizer plants and phosphogypsum

stacks are in Bone Valley and are the destination sites of the phosphoric ore and eventual

radioactive phosphogypsum that will be generated by the proposed Project.

146.    The Corps acknowledges that the phosphogypsum stacks where the waste from the

fertilizer plants are stored have generally been built on unused or mined-out land at the

processing site.

## B. THE AREAWIDE ENVIRONMENTAL IMPACT STATEMENT

### *Project Description*

147.    The applicant wants to mine more than 51,000 acres of wetlands, watersheds, and

habitat in Bone Valley, Florida, starting now and continuing through the next several

decades.

148.    On February 18, 2011, the Corps published a Notice of Intent to Prepare a Draft

Areawide Environmental Impact Statement for Phosphate Mining Affecting Waters of the

United States in the Central Florida Phosphate District (Draft AEIS) to assess the impacts

of the applicant's proposed mines.  The Draft AEIS includes the South Pasture Extension

Mine, Desoto Mine, Ona Mine, and Wingate Mine, and states that a "record of decision

based on the AEIS is planned for release in early 2013." The Corps hosted two public

meetings on the Draft AEIS in June 2012, four years before the specific details of the

South Pasture Extension Mine or any of the preferred alternative mines were released to

the public.

149.    There are nine watersheds in Bone Valley, including the Hillsborough River,

Withlacoochee River, Alafia River, Tampa Bay, Little Manatee River, Manatee River,

Myakka River, Peace River, and Sarasota Bay.

150.    The South Pasture Extension Mine would be a 7,513-acre expansion of the

existing South Pasture Mine in Hardee County, in the Peace River watershed. The Desoto

Mine would be a new 18,287-acre phosphate mine in northwestern DeSoto County, also in

the Peace River watershed. The Ona Mine would be a new 22,320-acre phosphate mine in

western Hardee County, in the Peace and Myakka river watersheds. The Wingate East

Mine would be a 3,635-acre expansion of the existing Wingate Creek Mine in eastern

Manatee County, also in the Peace and Myakka river watersheds. The Myakka River is

designated by the state legislature as a Wild and Scenic River.





151.    The Corps describes the permit applicant, Mosaic, as a company that mines

phosphate ore and manufactures phosphoric acid, and that owns facilities that mine and

process phosphate rock and produce phosphate fertilizers.

152.    On May 3, 2013, the Corps published a notice of availability for the Final

Areawide Environmental Impact Statement (Final AEIS) on Phosphate Mining in the

Central Florida Phosphate District.

153.    According to the Final AEIS, rather than produce an ROD on the AEIS as

promised in the Draft AEIS, the Corps will prepare individual, project-specific RODs and

Statements of Findings for each of the four projects that were the focus of the AEIS.

*Phosphogypsum*

154.    Phosphogypsum stacks are located in the study area, and their number and extent

are a direct result of past and future phosphate mining.  The proposed mines will increase

the need for such facilities and add to the recently observed impacts and costs of stack

maintenance and closures.

155.    The Corps ignored multiple requests from the public to evaluate the indirect

impacts the fertilizer plants and phosphogypsum stacks will have on the region, and it

maintains that the four phosphate mines have independent utility from the existing

fertilizer plants in Bone Valley.

156.    Upon information and belief, the U.S. is the leading importer of phosphate rock in

the world and does not export phosphate rock.

157.    In concluding that mineral processing plants have independent utility, and

therefore declining to evaluate their indirect effects, the Corps relies in part on the

applicant's representation that the mineral processing plants would be able to continue

operations independent of any future mines by purchasing rock from other sources, or

that it could ship phosphate ore to other areas for processing into fertilizer.

158.     However, in evaluating the possibility of the applicant using imported phosphate

rock in the Final AEIS's alternatives analysis, the Corps concludes that importing

phosphate rock to Florida for processing would be prohibitively expensive and

operationally difficult, and therefore not a viable option. Thus, the creation of

phosphogypsum in Florida is the unavoidable, predictable, and necessary result of

phosphate mining in Florida because the fertilizer plants only exist to process the

phosphate ore that is mined and the applicant makes clear that the phosphate ore is only

to be processed at those nearby fertilizer plants.

159.     Despite earlier claims that phosphate mining has independent utility from

fertilizer production, in the Final AEIS's economic analysis, the Corps repeatedly

considers the effects of the entire phosphate industry in Florida, not merely the effects of

mining—the implication being that the mines alone would have a lesser, if any, positive

effect on the economy.  Specifically, the Corps extensively cites the benefits of fertilizer

production, not phosphate ore production.

160.     Similarly, in the Final AEIS's section on Stated Purpose and Need, the Corps

presents the benefits of the project exclusively in terms of the ability to produce fertilizers

and the resulting effects on agriculture.

161.     The only time that the applicant or the Corps considers the mining of phosphate

rock in isolation, as opposed to also considering its ultimate use in fertilizers, is in their

evaluation of environmental effects.

***Project Purpose & Alternatives Analysis***

162.    The Corps describes the basic project purpose and need as to "mine phosphate ore" and the overall project purpose as to "extract phosphate ore from the mineral reserves in [Bone Valley] and to construct the associated infrastructure required to extract and process the phosphate ore at separation/beneficiation facilities, recognizing that the ore extracted must be within a practicable distance of a new or existing beneficiation plant."

163.    The Corps evaluates eight alternatives: the applicant's preferred alternatives (the four proposed mines), the Pine Level/Keys Tract alternative (which is the future mine expansion site of the DeSoto mine), the Pioneer Tract alternative (which is the future mine expansion site of the Ona mine), Site A-2, and Site W-2.

164.    The Corps does not perform a quantitative analysis on impacts to surface waters for Site A-2 or Site W-2.

165.    The Corps rejects alternatives that avoid the use of phosphate fertilizer, determining that there are no feasible alternatives to the use of phosphate as a fertilizer, and that any proposals that would alter the current phosphate use process are "beyond the scope" of the Final AEIS and not considered.

166.    Likewise, the Corps rejects alternatives that involve importing rock from outside of Bone Valley, citing alleged logistical and cost impediments, yet concedes that the applicant has imported phosphate rock from outside of the phosphate district, including from Morocco and Peru.

43

167.    The Corps concludes that effects of three of the four projects on surface water resources would be significant without mitigation and not significant with mitigation.

168.    The Corps disregards functional alternatives that would avoid or minimize impacts to waters of the United States through operational or technological changes or project substitutes.  These alternatives include the potential to substitute dredging methods in place of dragline excavation, replacing phosphate ore with other fertilizer alternatives, or importing phosphate ore from outside of Bone Valley.

169.    The Corps does not include "infill parcels" in its Final AEIS review because it does not consider these land parcels to be similar actions to the proposed mines.  Like the mines in question, infill parcels are typically land parcels acquired and subsequently mined because of their proximity to an existing or planned future mine and beneficiation plant.

### Environmental Impacts

170.    The Corps asserts that the four proposed mines would not directly or indirectly have a significant effect on air quality, noise, climate change or sea level rise, floodplains, aesthetics, transportation, recreation, waste management, or land use.

171.    The Final AEIS identifies 17 federally listed species that have the potential to occur in the study area, including the Florida bonamia (*Bonamia grandiflora*), Florida goldenaster (*Chrysopsis floridana*), perforate reindeer lichen (*Cladonia perforata*), beautiful pawpaw (*Deeringothamnus pulchellus*), smalltooth sawfish (*Pristis pectinata*), American alligator (*Alligator mississippiensis*), eastern indigo snake (*Drymarchon couperi*), bluetail mole skink (*Eumeces egregius lividus*), sand skink (*Neoseps reynoldsi*),

Florida grasshopper sparrow (*Ammodramus savannarum floridanus*), Florida scrub jay (*Aphelocoma coerulescens*), wood stork (*Mycteria americana*), red-cockaded woodpecker (*Picoides borealis*), Audubon's crested caracara (*Polyborus plancus audubonii*), snail kite (*Rostrhamus sociabilis plumbeus*), Florida panther (*Puma concolor coryi*), and Florida manatee (*Trichechus manatus*).

172.    In addition to federally listed species, the gopher tortoise (*Gopherus Polyphemus*), a candidate for listing under the ESA, is commonly found in the study area, as are bald eagles (*Haliaeetus leucocephalus*), which are protected under the federal Bald and Golden Eagle Protection Act. Additionally, several state listed species have consistently been observed in the study area, including southeastern kestrel (*Falco sparverius paulus*), Florida sandhill crane (*Grus Canadensis pratensis*), gopher frog (*Rana (Lithobates) capito*), burrowing owl (*Athene cunicularia*), little blue heron (*Egretta caerulea*), snowy egret (*Egretta thula*), tricolored heron (*Egretta tricolor*), white ibis (*Eudocimus albus*), Florida mouse (*Podomys floridanus*), and Sherman's fox squirrel (*Sciurus niger shermani*).

173.    The Corps claims that species will relocate themselves.  Likewise, the Corps claims that species displaced by land clearing will somehow re-occupy mined areas after they are reclaimed.

174.    The Corps fails to acknowledge the fact that in some instances disturbed mined lands would border other existing or proposed mines; that some of the proposed projects are scheduled to be mined at the exact same time as each other, amplifying the harm and

leaving nowhere for species to relocate to; and that in all four projects, the time from mining to reclamation spans decades.

## C. THE SOUTH PASTURE EXTENSION MINE ENVIRONMENTAL ASSESSMENT

175.    The South Pasture Extension Mine is located in the Peace River watershed, which encompasses land that filters water into the Peace River and its tributaries.  The State of Florida has designated the Peace River watershed a "Priority Watershed," in part due to impacts to surface waters resulting from phosphate mining.  The EPA also considers the Peace River watershed to be a Priority Watershed, and it recognizes the Charlotte Harbor estuary, for which the Peace River is the primary source of freshwater, as an Aquatic Resource of National Importance.

176.    The South Pasture Extension Mine would expand the existing South Pasture Mine southward, giving the applicant 20 years to mine 7,513 acres in Hardee County, hydraulically transport the matrix to the existing South Pasture Mine beneficiation plant, and return sand and clay residuals to the tract.  The applicant claims that upon completion of mining operations, which would be decades from now, all lands disturbed by mining will be reclaimed.



177.   The project site contains 5,550.5 acres of uplands and 2,555.6 acres of wetlands. The uplands include forests, pastureland, and rangeland.  The wetlands include forested wetlands, herbaceous wetlands, intermittent streams, and surface waters.  The South Pasture Extension Mine site is bordered on the north by historic and ongoing mining, and on the west and south by the Ona Mine site, which the applicant proposes to mine actively during the same time frame.

178.   The Corps issued a public notice for the South Pasture Extension Mine application on June 1, 2012, the same day that it published a notice of availability for the Draft AEIS, evaluating environmental impacts for four proposed phosphate mines, including the South Pasture Extension Mine.  Based on surveys from 1998 to 2007, the Corps identifies in the public notice the following federally listed species as occurring in the South Pasture Extension Mine: eastern indigo snake, wood stork , and Audubon's crested caracara .  However, Florida panthers and red-cockaded woodpeckers have been observed on the adjacent Ona Mine site.

179.   In alignment with the other three proposed mining projects, the Corps maintains that mobile wildlife species will "relocate to undisturbed areas" during land clearing for the South Pasture Extension Mine without further explanation of how that would occur. The Corps also apparently fails to acknowledge the fact that disturbed, previously mined lands flank the northern border of the narrow strip of land that makes up the South Pasture Extension Mine or that the proposed Ona Mine makes up its entire western and southern boundary, with the two mines scheduled to be active at the exact same time.

180.    The Corps also maintains that "[w]ildlife species that are displaced by land clearing are expected to re-occupy mined areas after they are reclaimed" despite the anticipated 23-year lag time between mining and reclamation,  and a paucity of evidence suggesting that reclamation will restore habitat for the affected wildlife or that wildlife will return in the same abundance and diversity following mining.

181.    The Corps also believes that "[s]ome slow-moving wildlife species may not be able to relocate to undisturbed areas and, therefore, may be injured or killed during land clearing," but it then discounts such mortality by summarily concluding that "any losses would have a negligible effect on regional wildlife populations."

182.    On June 16, 2016, the Corps released a Supplemental Environmental Assessment, draft public interest review, and draft Clean Water Act Section 404(b)(1) Guidelines analysis for the South Pasture Extension Mine (collectively "Supplemental EA").  On November 14, 2016, the Corps issued a 404 permit for the South Pasture Extension Mine, authorizing impacts to 1,198.17 acres of wetlands, 3.75 acres of streams, 16.58 acres of surface waters, and 32,161 linear feet of streams.  The permit calls for the creation of 1,259.58 acres of on-site wetlands and 44.7 acres of off-site forested wetlands; the preservation of 396.23 acres of on-site wetlands; the enhancement of 123.52 acres of on-site wetlands; establishment of 18,402 linear feet of on-site streams; and preservation of 55,501 linear feet of on-site streams.

183.    The Corps does not analyze the effects of phosphate mining in 409 acres within the Payne Creek subwatershed, stating that it is already the most heavily mined subwatershed in the Lower Peace River watershed and that it is a relatively small

percentage of the overall subwatershed.

## D. THE RECORD OF DECISION AND STATEMENT OF FINDINGS FOR THE SOUTH PASTURE EXTENSION MINE

184.   On November 9, 2016, the Corps issued a Record of Decision and Statement of Findings on the South Pasture Extension Mine's Supplemental EA (ROD).

185.   The ROD defines the basic project purpose in nearly identical terms as the Final AEIS: "to extract phosphate ore."

186.   The ROD defines the overall project purpose in identical terms as the Final AEIS: to "extract phosphate ore from the mineral reserves in the [phosphate district] and to construct the associated infrastructure required to extract and process the phosphate ore at separation/beneficiation facilities, recognizing that the ore extracted must be within a practicable distance of a new or existing beneficiation plant."

187.   In defining the applicant's overall need for the South Pasture Extension Mine, the Corps quotes the Final AEIS, which describes the applicant's plans to expand mining operations onto the South Pasture Extension Mine and Wingate East Mine sites, and develop the Ona and DeSoto Mines to replace existing mines.

188.   In the section of the ROD on the project-specific need, the Corps quotes the applicant's statement that "[t]imely development of the South Pasture Extension to continue the operation of the South Pasture Plant is necessary for the applicant to continue supplying its customers in the United States and over 40 countries with phosphate fertilizers and feed supplements for another 20 years."

189.   As in the Final AEIS, the project-specific need in the ROD is almost entirely

described as the public's alleged need for phosphate-based fertilizer.

190.    The Corps claims that it independently reviewed and verified the information in the applicant's statements of need; however, the ROD appears to show only that the Corps reviewed the applicant's 2012 Form 10-K to determine the average annual production of the South Pasture Beneficiation Plant. The ROD does not demonstrate that the Corps independently reviewed the purported need for phosphate rock or fertilizer, nor that the Corps exercised independent judgment in accepting the applicant's statements of need.

191.    The Corps confirms that the South Pasture Extension Mine is not a "water dependent" project under 40 C.F.R. § 230.10(a)(3), meaning that the applicant must rebut the presumption that practicable alternatives to the project that do not involve wetlands are available.

192.    The ROD briefly describes the following alternatives: the no action alternative (no mining), the no action alternative (mining of uplands only), the preferred alternative, the Ona mine alternative, Wingate East mine alternative, and Pioneer tract alternative.

193.    The Corps excludes consideration of any alternatives or project locations that lie outside of a ten-mile radius of the South Pasture Beneficiation Plant because the applicant claims that ten miles is the maximum acceptable distance for transporting phosphate rock to a beneficiation plant. The Corps also does not consider any alternatives that involve the construction of a new beneficiation plant, despite the overall project purpose of extracting phosphate ore within a practicable distance of a "***new*** or existing beneficiation plant."

194.    The Corps dismisses the no action alternative (no mining) because it would not produce any phosphate rock.

195.    The Corps dismisses the no action alternative (mining of uplands only) because it would only produce 2.9 million metric tons (MMT) of phosphate rock, not the project-specific need of 33.7 MMT.  The ROD does not demonstrate that the Corps independently verified the accuracy of the 2.9 MMT figure.

196.    Despite finding that the Ona Mine alternative meets the overall project purpose and project specific need, the Corps dismisses the Ona Mine alternative as not complying with the applicant's mining development sequence, which proposes that the Ona Mine replace the production from the Four Corners Mine after the applicant depletes that mine's reserves.

197.    The Corps dismisses the Wingate East Mine alternative as not complying with the applicant's mining development sequence, which proposes that the Wingate East Mine will replace the production from the Wingate Mine after the applicant depletes it.

198.    The Corps dismisses the Pioneer Tract Mine alternative because the potential wetland acreage impact would be greater than the preferred alternative.

199.    The Corps also dismisses on-site/minimization alternatives for the South Pasture Extension Mine, including: (1) the upland mining with water crossings of waters of the United States alternative; (2) the Uniform Mitigation Assessment Methodology (UMAM) based avoidance alternative; (3) the preferred plus additional avoidance alternative; and 4) the maximum framework avoidance alternative.

200.    The Corps dismisses the upland mining with water crossings of waters of the

United States because it would produce 10.7 MMT of phosphate rock over a three-year

period, not the Corps-adopted, project-specific need of 33.7 MMT over a ten-year period.

The ROD does not demonstrate that the Corps independently verified the accuracy of the

10.7 MMT figure.

201.    The Corps dismisses the UMAM-based avoidance alternative because it adopts

the applicant's assertion that the clay-settling-area configuration would not comply with

state and local requirements. The ROD does not demonstrate that the Corps

independently verified the accuracy of applicant's statement.

202.    The Corps dismisses the applicant's "preferred plus additional avoidance"

alternative because it would produce 32.2 MMT of phosphate rock, which is slightly less

than the project-specific need of 33.7 MMT.  The ROD does not demonstrate that the

Corps independently verified the accuracy of the 32.2 MMT figure.

203.    The Corps dismisses the maximum framework avoidance alternative because it

would produce 25.8 MMT of phosphate rock, not the project-specific need of 33.7 MMT.

204.    After dismissing all alternatives as not practicable, the Corps maintains that the

applicant's preferred alternative is the least environmentally damaging practicable

alternative (LEDPA).

205.    With respect to its Section 404(b)(1) analysis of potential impacts, the Corps

relies on its Final AEIS to evaluate impacts on physical substrate; water circulation,

fluctuation, and salinity; suspended particulate/turbidity; contaminant availability; aquatic

ecosystems; disposal sites; special aquatic sites; and human use characteristics.

206.    However, in its Final AEIS, the Corps defers its Section 404(b)(1) analysis for the

individual applications to the project-specific RODs and statements of findings.

207.    The Corps relies on the Final AEIS in conducting its public interest review, which requires the Corps to weigh the cumulative and indirect impacts associated with the project.

208.    In the ROD, the Corps concedes that it did not consider the direct or indirect impacts of phosphogypsum stacks but claims that the "cumulative impacts" of phosphogypsum stacks were considered in the Final AEIS.  However, the cumulative impacts analysis in the Final AEIS does not contain an analysis of the impacts of phosphogypsum stacks.

209.    In the public interest review, the Corps concludes that impacts to wetlands would be "neutral as a result of mitigative action."  However, the ROD establishes that the South Pasture Extension Mine will impact 1198.17 acres of wetlands.

210.    The Corps also concludes in the public interest review that despite the environmental damage caused by the South Pasture Extension Mine, the project would have "minor" environmental benefits due to "long-term" benefits of reclamation. Similarly, the Corps concludes that the South Pasture Extension Mine would have a "minor" conservation benefit.

211.    The Corps relies on the Final AEIS to conclude that the project would have a minor beneficial economic impact.  The Corps does not appear to have independently verified applicant's claims regarding the alleged economic benefits of the South Pasture Extension Mine.

212.    In the public interest review, the Corps indicates that the South Pasture Extension

Mine would not have any effect on "food and fiber production."

213.   The Corps relies entirely upon the Final AEIS in describing the public and private need for the project in the public interest review.  The Corps also relies entirely upon the Final AEIS in concluding that impacts on water supply, water conservation, and groundwater resources would be "neutral" or "minor," and impacts on water quality would either be "minor" or "moderate."  It does not consider the potential impacts on water supplies or water quality from phosphogypsum stacks, such as the phosphogypsum stack at the New Wales plant that broke open and flowed into the Floridan aquifer.

214.   Additionally, the Corps relies on the June 9, 2014 biological opinion in the public interest review, which is inadequate for reasons set forth below.

215.   The Corps includes as attachment B to the ROD a "compensatory mitigation plan," which the applicant prepared.  Neither the ROD nor the compensatory mitigation plan contains a determination by the Corps regarding the appropriate time interval for distinguishing between temporary and permanent impacts.

216.   The compensatory mitigation plan provides for preservation of 396.23 acres of wetlands, enhancement of 123.5 acres of wetlands, and establishment of 1304.28 acres of wetlands.  Neither the compensatory mitigation plan nor the ROD demonstrate that the Corps considered wetland restoration as the preferred option for mitigation, as required by 40 C.F.R. § 230.94(c).

217.   The compensatory mitigation plan provides for 18,402 linear feet of stream establishment.  Neither the compensatory mitigation plan nor the ROD demonstrate that the Corps considered avoidance, rehabilitation, enhancement, or preservation, as required

by 40 C.F.R. § 230.94(c).

218.    The Corps denied multiple requests for a public hearing on the South Pasture

Extension Mine.

219.    The Corps did not issue a FONSI either with or after the Supplemental EA, nor

did it complete an EIS on the South Pasture Extension Mine.

## E. THE BIOLOGICAL OPINION

220.    The Service baldly discounts the impacts of phosphate mining as temporary,

allowing the destruction of 51,000 acres of habitat for imperiled, federally protected

species, including 7,512 acres at the South Pasture Extension Mine.

221.    The Corps initiated consultation with the Service on the South Pasture Extension

Mine on July 12, 2012, and the Service received a biological assessment for the South

Pasture Extension Mine on August 1, 2012.

222.    The Corps also sent its initial Section 7 consultation letters to the Service for the

Wingate East Mine in May 2012, DeSoto Mine in June 2012, and Ona Mine in August

2012.  The Service received a biological assessment on the DeSoto Mine in November

2014 and a biological assessment on the Ona Mine in April 2015.

223.    The Service issued a concurrence letter in May 2012 for the Wingate East Mine,

finding that the project was not likely to adversely affect the wood stork or Audubon's

crested caracara.  Also in May 2012, the Service issued Mosaic an incidental take permit

on the Wingate East Mine for the Florida scrub-jay and the eastern indigo snake through

a separate Section 10 process.

224.    On June 9, 2014, the Service transmitted a letter to the Corps stating it was a biological opinion on the effects of the South Pasture Extension Mine on Audubon's crested caracara, eastern indigo snake, and wood stork.  The letter also appears to be a concurrence letter on the Corps' determination regarding the Florida panther, Florida scrub jay, and Florida grasshopper sparrow.

225.    In the letter, the Service maintains that the South Pasture Extension Mine "may affect, but [is] not likely to adversely affect" the endangered Florida panther, the threatened Florida scrub jay, and the endangered grasshopper sparrow, and that it "may affect" the threatened Audubon's crested caracara, eastern indigo snake, and wood stork.

226.    The 2014 biological opinion defines the action area as the project area, which is 7,512.8 acres, plus some off-site areas for certain species.  The 2014 biological opinion states that the project's direct impacts include impacts to 4,930 upland acres and 1,487 wetland acres, as well as impacts to 0.9 acres of temporary wetland and surface water. To mitigate these impacts, the biological opinion reports that the applicant will:

- Conduct 400 acres of on-site mitigation;

- Create 1,568 acres of wetlands;

- Restore 122 acres of wetlands;

- Provide a conservation easement on 1,094 acres within the proposed preservation area where all mining disturbance will be avoided;

- Create an additional 1,789 acre conservation easement on mitigation wetlands;

- Grant conservation easements to 435 acres of offsite wetlands and 481 acres of off-site uplands; and

- Donate $150,000 to the Wildlife Foundation of Florida to finance surveys and monitoring for Audubon's crested caracaras.

227.    The Service fails to evaluate the cumulative impact to species from all four proposed phosphate mines (the South Pasture Extension Mine, Ona Mine, DeSoto Mine, and East Wingate Mine) in the biological opinion for the South Pasture Extension Mine.

228.    The Service also discounts the impacts of the South Pasture Extension Mine by relying on promises of reclamation but does not evaluate the specific ecological functions to be restored, or the types of vegetation, soils, and other microhabitat proposed to be provided through mitigation.

229.    The biological opinion also indicates that the Service failed to evaluate the purported success of reclamation techniques and broad claims that the listed species will return to reclaimed mined land.

230.    Aside from a species status and description, the biological opinion provides no other information or analysis for the Florida panther, Florida scrub jay, and Florida grasshopper sparrow.

231.    The biological opinion does not specifically analyze impacts on the eastern indigo snake, wood stork, and Audubon's crested caracara from habitat destruction caused by phosphate mining, instead dismissing habitat loss as a "temporary change" based on the applicant's promised reclamation and preservation measures.  There is no specific

discussion of the reclamation and preservation measures to be employed, and there is also

no independent evaluation of whether such measures have been proven successful.

232.    One study cited in the biological opinion to support a finding that eastern indigo

snakes are "likely to re-colonize" reclaimed mine sites found eastern indigo snakes at

only 3 of 62 study sites, all of which were reclaimed sites.  The study contains no

comparison of the species' presence on natural and reclaimed lands.

233.    The biological opinion also includes conflicting opinions about impacts to

species.  For instance, with regard Audubon's crested caracara, the biological opinion

states that the Service "do[es] not know if . . . [mining] disturbance will cause the

*temporary or permanent* abandonment of the nesting territory on the SPE or other

territories in the action area," but it later concludes without further analysis that

"[d]isturbance resulting from the proposed action may . . . caus[e] birds to *temporarily*

leave the area."

234.    The biological opinion defines the action area narrowly around the proposed mine

site, and it contains no analysis of the impacts of phosphogypsum stacks on listed species.

235.    Large portions of the 2014 biological opinion are verbatim or near-verbatim

restatements of the applicant's biological assessment, including the majority of the

species-impact analyses for the eastern indigo snake, wood stork, and Audubon's crested

caracara.  Likewise, large portions of the ITS in the 2014 biological opinion are verbatim

or near-verbatim restatements of the applicant's biological assessment.  The

characterization of habitat destruction as an insignificant, "temporary impact" is a

verbatim description from the applicant's biological assessment.

236.    In the ITS of the 2014 biological opinion, the Service authorizes take in the form of harassment of two caracara pairs (a total of four (4) caracaras) and take in the form of injury or death due to vehicle collision of one (1) caracara.

237.    The Service also authorizes take of six (6) eastern indigo snakes over a rolling five-year period.  This authorization appears to cover death or injury to eastern indigo snakes.  Although the 2014 biological opinion acknowledges that take of the eastern indigo snake would occur in the form of harassment, it does not specifically quantify how much take would be allowed.

238.    The Service also authorizes take in the form of injury or death to one (1) wood stork from vehicular collision over the course of the mining activities.  Although the Service acknowledges impacts to wood stork foraging habitat that could equate to harm or harassment, it does not set a cap on take in the form of harassment because "the loss/reduction of foraging value to the wood storks associated with these systems will be temporary."

239.    The ITS does not provide specific monitoring requirements in relation to its quantification of allowable take for the eastern indigo snake.  Instead it states, "The lack of practical methods of survey, in conjunction with wide-ranging activity and use of a variety of habitat types, makes it *difficult* to determine the exact number of indigo snakes that will be impacted by the proposed action."  The biological opinion offers no procedure for monitoring or recording eastern indigo snake harassment caused by mining activities other than "annual counts."  The Service concedes that the "extent of multiple

harassments of the same individual [snakes] cannot be determined without capturing and

marking the snakes" and then fails to consider or include such measures to monitor take.

240.    The Service includes the following "reasonable and prudent measures" in the

2014 biological opinion:

- Minimize disturbance and injury that may result from vehicular traffic and

  other mining activities;

- Reduce habitat fragmentation after reclamation;

- Fund surveys and monitoring of caracaras; and

- Report the progress of the action and its impact on species to the Service as

  specified in the ITS.

241.    The Service also sets out non-discretionary terms and conditions of the permit,

which include:

- A requirement that the Corps ensure the applicant abides by the permit

  conditions and report back to the Service;

- A mandatory speed limit of no more than 35 mile per hour at the mine site;

- Briefing of mining employees on listed species;

- Implementation of the Service's Standard Protection Measures for the Indigo

  Snake;

- Creation of a reclamation plan "that focuses on creating an interconnected

  mosaic of habitats that enable movement of fish and wildlife resources across

  the landscape," which will be reviewed and approved by state and federal

  officials before implementation;

- A donation from the applicant to Wildlife Foundation of Florida in the amount of $150,000 to finance surveys, monitoring, and "other associated activities"; and

- Reporting of dead, injured, or sick threatened or endangered species.

242.   The biological opinion appears to defer consideration of species-specific reclamation measures when it states that a reclamation plan must be "approved by state and federal officials before implementation," thus belying the "non-discretionary" nature of the biological opinion's terms and conditions as they apply to reclamation. The biological opinion does not otherwise require species-specific reclamation terms or conditions, despite relying on such reclamation in making its no jeopardy finding for the eastern indigo snake, wood stork, and Audubon's crested caracara.

***Eastern indigo snake***

243.   The eastern indigo snake *(Drymarchon couperi)* is the largest, non-venomous snake in North America, reaching lengths of up to 8.5 feet. It is uniformly lustrous-black, hence its name "indigo," except for a red or cream-colored patch on its chin, throat, and sometimes cheeks.

244.   The eastern indigo snake was listed as a threatened species under the ESA on January 31, 1978, due to habitat loss and overutilization.

245.   Eastern indigos are active, spending most of their time foraging for food and searching for mates. In fact, they are one of few snake species that are active during the day and inactive at night. Even more fascinating, there are reports of virgin or isolated

females laying fertile eggs.

246.    Because of its large home range—up to 805 acres—the eastern indigo snake

continues to be especially vulnerable to habitat loss, degradation, and fragmentation.

247.    The eastern indigo snake utilizes a mixture of upland and wetland habitats during

its life cycle, including flatwoods, dry prairie, tropical hardwood hammocks, edges of

freshwater marshes, dunes, and agricultural fields.

248.    In south Florida, agricultural sites created in former wetland areas are occupied by

eastern indigo snakes.  The introduction of agriculture and its associated canal systems

has resulted in an increase in rodents and other species of snakes that are prey for eastern

indigo snake.  A positive long-term prognosis for these populations is tied to the

continuation of agriculture at these sites.

249.    Eastern indigo snakes seek and utilize underground refugia, as well as other

animals' burrows and other holes or hollows.  The snakes have close, symbiotic

relationships with the gopher tortoises, which excavate burrows the eastern indigos use

for shelter.

250.    In July 2016, scientists published a peer-reviewed study revealing that the eastern

indigo snake is in fact two genetically and morphologically distinct species—the eastern

indigo snake (*Drymarchon couperi*) and the Gulf coast indigo snake (*Drymarchon

kolpobasileus*)—each more rare than the eastern indigo snake was previously considered

to be.[1]  The study also provided range maps for the new species delineation, which

revealed that the snakes present at the South Pasture Extension Mine site fall within the

range of the Gulf coast indigo snake, not the eastern indigo snake.

***Wood stork***

251.    The wood stork (*Mycteria americana*) is a large, long-legged, prehistoric-looking

wading bird.  It has a wingspan of nearly five and a half feet and stands several feet tall.

It uses its large beak to locate fish through tactilocation in shallow water.  To feed, the

bird wades through shallow water with its beak slightly open.  When it encounters prey, it

snaps its beak shut and swallows its meal.

252.    Due to the rapid loss and alteration of wetlands, the Service first listed the wood

stork as an endangered species under the ESA on February 28, 1984.[2]

253.    Wood storks use freshwater and estuarine wetlands for nesting, feeding, and

roosting.  For feeding, wood storks need wetlands that are capable of producing abundant

fish sized between  one and  ten inches, as well as small crustaceans, amphibians,

reptiles, mammals, birds, and arthropods.  Wood storks forage in a wide variety of

wetland types, including freshwater marshes, pools, hardwood and cypress swamps,

narrow tidal creeks, shallow tidal pools, stock ponds, shallow and seasonally flooded

roadsides, agricultural ditches, and managed impoundments.  Optimal habitat consists of

shallow water between 2 and 16 inches in depth with sparse vegetation.  Because wood

---

1 Kenneth Krysko et al., *A Cryptic New Species of Indigo Snake (Genus* Drymarchon*) from the Florida Platform of the United States*, 4138 ZOOTAXA 549 (2016).
2 The Service has since downlisted the wood stork to threatened status.

storks rely on access to drying wetlands to concentrate prey, they require wetlands with a diverse range of hydroperiods, or seasonal water-level patterns.

254.    Hydroperiods play an important role in the suitability of a wetland site for wood stork foraging, and many sites will only be suitable during part of the year when the natural hydrology makes prey easily accessible.  Specifically, wood storks rely on shallow water levels within wetlands to concentrate prey items during the nesting season. These wetlands must also exist within sufficient closeness to nesting sites (approximately 10.29 to 50 kilometers).

255.    Wood stork nesting habitat includes a variety of wooded habitat types such as mangroves, cypress, and various other live or dead shrubs or trees located in standing water or on islands surrounded by broad expanses of open water.  Wood storks nest colonially with other wood storks, as well as with other wading bird species.  These colonial nesting sites are used for many years as long as the colony is undisturbed and sufficient feeding habitat remains.  Wood storks will abandon nesting sites if the standing water surrounding them is drained.

256.    The primary cause of wood stork population declines is loss of wetland habitat and loss of wetland function, which results in reduced prey availability.  Studies indicate that about 35 percent of suitable wood stork foraging habitat has been lost since 1900. Loss of foraging wetlands continues to be the primary threat to the population of wood storks at the Corkscrew Sanctuary Colony near Naples, Collier County, Florida.

257.    This habitat loss is driven by the human alteration of wetlands and manipulation of wetland hydroperiods.  The manipulation of water to lower levels can decrease food

production for wood storks and facilitate raccoon predation.  Artificially high water

levels can slow regeneration of nesting trees.

### Audubon's crested caracara

258.    Audubon's crested caracara (*Polyborus plancus* or *Caracara cheriway*) is a large

raptor with an impressive dark brown crest, bright orange featherless face, heavy bill, and

unusually long legs.  Unlike many other raptors, caracaras have flat talons, which enable

them to run and walk for extended periods on the ground in search of prey and carrion.

However, caracaras are also powerful fliers, reaching speeds of up to 40 miles per hour

and soaring at great heights.

259.    Due largely to habitat loss, the Service listed the Audubon's crested caracara as

threatened under the ESA on July 6, 1987.

260.    Caracaras depend on dry or wet prairie areas with scattered cabbage palms, as

well as improved or semi-improved pasture.

261.    Habitat heterogeneity, including specific land cover types and small freshwater

wetlands, is important for caracara presence and survival.  For foraging, caracaras may

prefer open grasslands and other short vegetation structures, which aid them in spotting

prey and evading predators.  Caracaras also appear to require some wetland habitat, as

nearly 65 percent of their diet consists of wetland-dependent prey.  For nesting, caracaras

prefer cabbage palm trees, though nests have also been found in live oaks, cypress,

Australian pine, saw palmetto, and black gum.  Generally, nests will be between 13 and

59 feet off the ground.  Caracaras construct new nests each season and often return to the

same tree year after year.

262.    The caracara's decline is attributed primarily to habitat loss, as large areas of

native prairie and pasturelands in south-central Florida were converted to citrus

operations, tree farms, agriculture, and development.  This loss has continued to

accelerate in recent decades and will continue to threaten the caracara as land-use

conversions continue.

263.    Caracaras are also threatened by vehicle collisions on roads because they prefer

easily attainable food sources like carrion from roadkills.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Corps' Violations of the Clean Water Act and the Administrative Procedure Act)**

264.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth herein.

265.    This claim is brought against the Corps and is raised by all Plaintiffs.

266.    The Corps violated its mandatory duty under the Clean Water Act, the 404

Guidelines, and LEDPA regulations, and consequently abused its discretion and acted

arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2), in permitting the

South Pasture Extension Mine SAJ-1993-01395 because, *inter alia*:

   a.   The LEDPA adopted by the Corps is inadequate under the Section

        404(b)(1) Guidelines because other practicable, less-damaging alternatives

        are available;

   b.   The Corps failed to minimize and eliminate all avoidable environmental

        impacts associated with the LEDPA, including the filling of waters of the

United States and direct, indirect, and cumulative impacts to habitat for endangered, threatened, and rare species;

c.  The LEDPA adopted by the Corps will result in unnecessary and avoidable environmental impacts to the Peace River watershed and the surrounding areas;

d.  The LEDPA adopted by the Corps will result in impacts to endangered, threatened, or rare species, including, but not limited to, the Audubon's crested caracara, eastern indigo snake, and wood stork;

e.  The Corps' analysis in support of the LEDPA is flawed and inadequate because in narrowly drawing the project's purpose, the Corps fails to adequately consider alternatives that (a) avoid the use of phosphate fertilizer; (b) involve importing rock from outside of the phosphate district; or (c) involve mining uplands only;

f.  The Corps did not rebut the presumption set forth in 40 C.F.R. § 230.10(a)(3) that practicable alternatives that do not involve wetlands are available; and

g.  The Corps failed to independently verify the veracity of the claims and/or studies presented by the applicant regarding the feasibility of alternatives.

267.  The Corps violated its mandatory duty under the Clean Water Act and the Corps' Public Interest Review regulation (33 C.F.R. § 320.4), and consequently abused its discretion, acted arbitrarily and capriciously, and not in accordance with law, thus violating the APA, 5 U.S.C. § 706(2) because, *inter alia*, the Corps:

a.  Failed to analyze, evaluate, and weigh each of the public interest factors listed in 33 C.F.R. § 320.4;

b.  Did not adequately analyze the impacts of the project on the Peace River watershed and surrounding areas;

c.  Did not adequately analyze the practicability of reasonable alternative locations and methods to accomplish the objective of the project, as required by 33 C.F.R. § 320.4(a)(2);

d.  Did not adequately analyze the effects of the project on general environmental concerns and human welfare, including its impacts on air quality and human health;

e.  Improperly considered broad economic factors and purported project benefits beyond the scope of the Corps' statutory and regulatory mandates, and beyond the scope of the analysis of impacts and alternatives;

f.  Failed to adequately assess the cumulative impacts of all stages of fertilizer production;

g.  Failed to adequately analyze  impacts of the project on flood control and downstream erosion resulting from changes to river and stream banks and the floodplain; and

h.  Failed to independently verify the veracity of the claims and/or studies presented by the applicant in connection with the Public Interest Review analysis.

268.   The Corps violated its mandatory duty under the Clean Water Act, the Corps'

implementing regulations, and the Section 404 Guidelines, and consequently abused its

discretion, acted arbitrarily and capriciously, and not in accordance with law, thus

violating the APA, 5 U.S.C. § 706(2), in issuing the permit number SAJ-1993-01395 by:

a.   Failing to ensure that the project would not cause or contribute to

significant degradation of waters of the United States, including the Peace

River watershed and its tributaries, through adverse impacts to human

health or welfare, water supplies, fish, and wildlife;

b.   Failing to properly define the scope of the project purpose and need;

c.   Failing to fully analyze and address all of the project's cumulative effects

on fish, wildlife, water quality and productivity of the aquatic ecosystem;

d.   Failing to fully analyze and address the secondary effects of the filling of

the waters of the United States associated with the project;

e.   Failing to ensure that the project will not jeopardize the continued

existence of any federally listed species as required by 40 C.F.R.

§ 230.10(b)(3);

f.   Failing to provide a comprehensive compensatory mitigation plan that: 1)

contains the required elements described in 40 C.F.R. §§ 230.91-230.98;

2) offsets the losses resulting from unavoidable impacts on waters of the

United States, as required by 40 C.F.R. § 230.93; and 3) determines the

appropriate time intervals between temporary and permanent impact to

waters of the United States;

g.   Failing to take adequate steps to minimize potential adverse impacts of

discharge on aquatic ecosystems; and

    h.   Failing to independently verify the veracity of the claims and/or studies

presented by the applicant in the permit review process.

269.   As a result of these detailed failings, the Corps acted arbitrarily and capriciously,

abused its discretion, and was not in accordance with law as required by Clean Water

Act, the Corps' and EPA's implementing regulations, and the APA, and is subject to

judicial review under the APA. 5 U.S.C. §§ 701-706, 706(2).

270.   The Corps' violations have caused and will continue to cause plaintiffs injuries as

described in above.

**SECOND CLAIM FOR RELIEF**

**(Corps' Violations of the National Environmental Policy Act**

**and the Administrative Procedure Act)**

271.   Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

272.   The Corps performed a major federal action for the purpose of NEPA by issuing

Clean Water Act permit number SAJ-1993-01395. *See* 42 U.S.C. § 4332(2)(C).  This

action was a final agency action under the APA, 5 U.S.C. § 704.

273.   The Corps violated NEPA and its implementing regulations, abused its discretion,

and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2), in its

actions as they relate to the South Pasture Extension Supplemental EA and ROD, the

Final AEIS, and permit number SAJ-1993-01395.

274.   Specifically, the Corps failed to adequately addresses serious environmental

issues raised by the Corps' decisions to extend the permit for the South Pasture Extension Mine, including by:

(a)     Failing to take a hard look at the significant direct, indirect, and cumulative environmental effects of its actions in permitting the South Pasture Extension, including by failing to meaningfully assess the environmental impacts of its action as it relates to other connected permit applications, both pending and reasonably foreseeable, and failing to meaningfully assess the environmental impacts of its action as it relates to ongoing and reasonably foreseeable activities in Bone Valley;

(b)     Failing to properly identify and assess the basic and overall purpose and need for the project generally and specifically as it relates to the South Pasture Extension Mine;

(c)     Improperly narrowing the analyses performed through the Final AEIS and, subsequently, through the South Pasture Extension Mine Supplemental EA;

(d)     Failing to properly identify and assess reasonable alternatives to the action, and avoid, minimize, or mitigate the adverse effects of these actions on the quality of the human environment;

(e)     Failing to take a hard look at the significant harm to threatened and endangered species and their critical habitat from the action, including by failing to conduct any meaningful analysis of the substantial adverse impacts that will result from the activity through reduced opportunities for

viewing birds and other wildlife, including the Florida panther, wood

stork, eastern indigo snake, and Audubon's crested caracara;

(f)　Failing to supplement its NEPA review with significant new information

relevant to environmental concerns and bearing on the action and its

impacts as it relates to the federally threatened eastern indigo snake;

(g)　Failing to prepare a site-specific environmental impact statement for the

South Pasture Extension Mine permit;

(i)　Failing to encourage and facilitate public involvement in these decisions,

which are of substantial environmental controversy, including, but not

limited to, by failing to adequately respond to requests that the agency

hold or sponsor public hearings, as requested by several interested

parties—including Plaintiffs, and failing to hold or sponsor such hearings;

and

(j)　Otherwise disregarding the requirements of NEPA and its implementing

regulations, including, but not limited to, failing to follow procedural

requirements related to the issuance of ROD and FONSI decisions.

275.　The Corps' decision to prepare and its preparation of a general, areawide EIS on

phosphate mining in Bone Valley does not supersede or excuse the inadequacy of the

site-specific environmental analysis that it conducted on the South Pasture Extension

Mine proposal.

276.　As a result of these errors, the Corps failed to promote efforts that will prevent or

eliminate damage to the environment; failed to use all practicable means to foster and

promote the general welfare; failed to avoid preventable risk to the public health and

safety; failed to create and maintain conditions under which humans and nature can exist

in productive harmony; and failed to enhance long-term productivity in Bone Valley.

277.    The NEPA review conducted by the Corps in connection with its decision to issue

permit number SAJ-1993-01395 is inadequate and flawed, and the Corps' reliance on it

was and is arbitrary and capricious, an abuse of discretion, and otherwise not in

accordance with the law.

### THIRD CLAIM FOR RELIEF

**(The Service's Violations of the Endangered Species Act**

**and the Administrative Procedure Act)**

278.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

279.    The Service's biological opinion is arbitrary and capricious, and contrary to the

consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R.

§ 402.14, and is thus violation of the APA, 5 U.S.C. § 706(2)(A).

280.    Specifically, the Service failed to: (1) review all relevant information; (2) properly

consider the direct and indirect effects of the action; (3) adequately assess the cumulative

effects on the listed species; and (4) specify the level of take that may occur with a

meaningful trigger to reinitiate consultation.

281.    The Service's biological opinion is contrary to the consultation requirements of

Section 7(a)(2) of the ESA and therefore violates the APA because it:

(a)     Improperly restricts the action area and inaccurately describes the

environmental baseline;

(b)     Improperly limits the scope of the agency action and subsequent analysis

of the effects of the agency action to the fill of wetlands;

(c)     Fails to consider all relevant information or information otherwise

available;

(d)     Fails to analyze the cumulative impacts on listed species in the action area;

(e)     Fails to specify the level of take that may occur and provide an adequate

trigger for re-initiation of consultation; and

(f)     Relies on insufficient, unspecified, unproven, and unenforceable

mitigation measures.

282.    The Service's proffered Reasonable and Prudent Measures are also inadequate to

minimize the incidental take of wood storks, Audubon's crested caracara, and eastern

indigo snake at the project site.

283.    The biological opinion's Reasonable and Prudent Measures do not contain

mitigation measures with specific defined conservation goals, action measures, or an

implementation schedule to ensure that wood stork, Audubon's crested caracara, and

eastern indigo snake conservation measures are met.

284.    The Service failed to specify the amount or extent of take that will occur or

provide a surrogate ecological condition that has some connection to the taking of the

species, as the ESA requires. 50 C.F.R. § 402.14(i).

285.    The Service failed to provide a meaningful trigger for the reinitiation of

consultation. *See* 16 U.S.C. § 1536 (a)(2), (b)(4), (o)(2); 50 C.F.R. § 402.14(i); Final ESA

Section 7 Consultation Handbook, 4-47, 4-48 (March 1998).

286.    The Service failed to reinitiate consultation based on new information that reveals

potential effects to the eastern indigo snake in a manner or to an extent not previously

considered, 50 C.F.R. § 402.16, specifically, that the eastern indigo snake is actually two

genetically distinct species, and the species located in the action area is the Gulf coast

indigo snake (*Drymarchon kolpobasileus*).

287.    The Service's failure to "meaningfully analyze" the risks to these species and the

key issues is arbitrary and capricious and requires the Service to reinitiate formal

consultation and prepare a new biological opinion.

## FOURTH CLAIM FOR RELIEF

### (The Service's Violation of the Endangered Species Act

### by determining not likely to adversely affect and concurrence)

288.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

289.    The Service and Corps violated Section 7(a)(2) of the ESA and implementing

regulations, and the APA, 5 U.S.C. § 706(2)(A), in finding that the South Pasture

Extension Mine is not likely to adversely affect the Florida panther, Florida scrub jay,

red-cockaded woodpecker, and Florida grasshopper sparrow.

## FIFTH CLAIM FOR RELIEF

### (The Corps' Violation of the Endangered Species Act)

290.    Plaintiffs re-allege and incorporate by reference all the allegations set forth in this

Complaint, as though fully set forth below.

76

291.    The Corps violated Section 7(a)(2) of the ESA and implementing regulations by failing to reinitiate consultation based on new information that the eastern indigo snake is actually two genetically distinct species, and the species located at the mine site is the newly identified Gulf coast indigo snake. 50 C.F.R. § 402.16.

292.    The Corps violated Section 7(a)(2) of the ESA by relying on the Service's flawed biological opinion to determine that its permitting decision is not likely to adversely affect the Florida panther, Florida scrub jay, red-cockaded woodpecker, and Florida grasshopper sparrow.

293.    The Corps violated Section 7(a)(2) of the ESA by relying on the Service's flawed biological opinion to determine that its permitting decision will not jeopardize the eastern indigo snake, wood stork, Audubon's crested caracara, Florida panther, Florida scrub jay, red-cockaded woodpecker, and Florida grasshopper sparrow.

294.    The Corps is also violating Section 7(d) of the ESA by permitting applicant to operate its dredge and fill activities before a valid biological opinion is prepared and implemented.

295.    Although the Corps has formally consulted with the Service, section 7(d) is in effect because the process has not been completed lawfully with the issuance of a valid biological opinion.  The prohibition against the irretrievable and irreversible commitment of resources in Section 7(d) applies to the issuance of the Corps permit and the ongoing filling of wetlands pending completion of a valid consultation, and adoption and implementation of a biological opinion.

296.    The Corps is in further violation of the ESA for failing to initiate and conclude

Section 7 consultation in the AEIS process.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter Judgment for Plaintiffs and provide the following relief:

(1)    Declare that the Corps' decisions to issue a Clean Water Act permit for the South Pasture Extension Mine, permit number SAJ-2008-00615, violated the Clean Water Act, NEPA, the ESA, and the APA;

(2)    Declare that the Service's biological opinion is arbitrary, capricious, and contrary to the consultation requirements of ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14, and in violation of the APA, 5 U.S.C. § 706(2)(A);

(3)    Declare that the Corps' reliance on the Service's biological opinion is arbitrary and capricious and violates section 7(a)(2) of the ESA;

(4)    Declare that the NEPA review conducted by the Corps in approving Clean Water Act permit number SAJ-2008-00615 is arbitrary, capricious, and in violation of the law;

(5)    Order the Corps to rescind Clean Water Act permit number SAJ-2008-00615;

(6)    Order the Service to withdraw the biological opinion, rescind its incidental take statement, reinitiate consultation with the Corps in accordance with the ESA and APA, and prepare a biological opinion that complies with the mandates of the ESA;

(7)     Preliminarily and permanently enjoin the Corps from authorizing any

further action under the permit until the Corps fully complies with the

requirements of the Clean Water Act, NEPA, the ESA, and the APA,

including providing an opportunity for public hearing;

(8)     Award plaintiffs their costs and reasonable attorneys' fees pursuant to the

Equal Access to Justice Act, 28 U.S.C. § 2412, Fed. R. Civ. P. 54(d),  and

the ESA, 16 U.S.C. § 1540(g)(4); and

(9)     Award plaintiffs any other relief that is just and proper.


**DATED:**  March 15, 2017.


                              Respectfully submitted,


                              _/s/ Jaclyn Lopez_____
                              JACLYN LOPEZ, Trial Counsel
                              FL Bar No. 96445
                              Center for Biological Diversity
                              P.O. Box 2155
                              St. Petersburg, FL 33731
                              Tel: (727) 490-9190
                              Fax: (520) 623-9797
                              jlopez@biologicaldiversity.org

                              _/s/ Hannah M.M. Connor_____
                              HANNAH M.M. CONNOR
                              FL Bar No. 125378
                              Center for Biological Diversity
                              P.O. Box 2155
                              St. Petersburg, FL 33731
                              Tel: (202) 681-1676
                              Fax: (520) 623-9797
                              hconnor@biologicaldiversity.org

_____ */s/ Elise Pautler Bennett*_____
ELISE PAUTLER BENNETT
FL Bar No. 106573
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 755-6950
Fax: (520) 623-9797
ebennett@biologicaldiversity.org

_____ */s/ John Peter Rose*_____
JOHN PETER ROSE
CA Bar No. 285819 (*special admission pending*)
Center for Biological Diversity
1212 Broadway, Suite #800
Oakland, CA 94612
Tel: (510) 844-7100
Fax: (510) 844-7150
jrose@biologicaldiversity.org

# Docket / Tab No: 46

Federal Defendants' Answer to Complaint

05/22/2017

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

_____

|  |  |  |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; | ) | |
| MANASOTA-88, INC; PEOPLE FOR | ) | |
| PROTECTING PEACE RIVER; and | ) | |
| SUNCOAST WATERKEEPER, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civ. No. 8:17-cv-00618-SDM-MAP |
| | ) | |
| U.S. ARMY CORPS OF ENGINEERS; | ) | |
| LT. GEN. TODD T. SEMONITE, in his | ) | |
| official capacity as Commanding General and | ) | |
| Chief of Engineers of the U.S. Army Corps of | ) | |
| Engineers; COL. JASON A. KIRK, in his | ) | |
| official capacity as District Commander of the | ) | |
| U.S. Army Corps of Engineers; U.S. | ) | |
| DEPARTMENT OF THE INTERIOR; | ) | |
| RYAN ZINKE, in his official capacity as | ) | |
| Secretary of the U.S. Department of the Interior; | ) | |
| U.S. FISH AND WILDLIFE SERVICE; and | ) | |
| JIM KURTH, in his official capacity as | ) | |
| Acting Director of U.S. Fish and Wildlife | ) | |
| Service, | ) | |
| | ) | |
| *Federal Defendants,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MOSAIC FERTILIZER, LLC, | ) | |
| | ) | |
| *Intervenor.* | ) | |
| | ) | |

_____

**FEDERAL DEFENDANTS' ANSWER TO PLAINTIFFS' COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

**I. INTRODUCTION**

Defendants U.S. Army Corps of Engineers ("Corps"), Lt. Gen. Todd T. Semonite, in his

official capacity as Commanding General and Chief of Engineers of the U.S. Army Corps of

Engineers; Col. Jason A. Kirk, in his official capacity as District Commander of the U.S. Army

Corps of Engineers; U.S. Department of the Interior, Ryan Zinke, in his official capacity as

Secretary of the U.S. Department of the Interior, U.S. Fish and Wildlife Service, and Jim Kurth,

in his official capacity as Acting Director of U.S. Fish and Wildlife Service (collectively, the

"Federal Defendants") hereby respond to the correspondingly numbered paragraphs of the

Plaintiffs' Complaint for Declaratory and Injunctive Relief (the "Complaint") filed by Plaintiffs

Center for Biological Diversity, Manasota-88, Inc., People for Protecting Peace River, and

Suncoast Waterkeeper (collectively, "Plaintiffs") on March 15, 2017 (ECF No. 1), as follows:

   1.  With respect to the allegations in the first sentence of Paragraph 1, Federal

Defendants admit that the Corps issued a Clean Water Act Section 404 Department of Army

Permit, Number SAJ-1993-01395, which authorizes the discharge of dredged or fill material into

1,218.5 acres of waters of the United States within a 20-year construction window for the

approximately 7,513-acre South Pasture Extension phosphate mine. Federal Defendants also

admit that the project is located in the Peace River watershed, within the 1.32 million-acre

Central Florida Phosphate District, an area that some historical documents refer to as "Bone

Valley." The remaining allegations are Plaintiffs' characterization of their case and legal

conclusions to which no response is required. The allegations in the first sentence of Paragraph 1

also purport to characterize the Corps' National Environmental Policy Act ("NEPA") analysis,

which speaks for itself and is the best evidence of its contents. Federal Defendants deny any

allegation inconsistent with the analysis' plain language, meaning, or context. To the extent a

response is required, Federal Defendants deny the remaining allegations in the first sentence of

Paragraph 1. The allegations in the second sentence of Paragraph 1 are legal conclusions to

which no response is necessary. To the extent a response is required, Federal Defendants deny the allegations in the second sentence of Paragraph 1.

2.        With respect to the allegations in Paragraph 2, Federal Defendants admit that Florida's ecological resources include rural locales, grassy prairies and wetlands, and diverse wildlife. Federal Defendants further admit that panthers, wood storks, Eastern indigo snakes, are among the wildlife known to occur in certain areas of Florida. The remaining allegations in Paragraph 2 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 2, and on that basis deny them.

3.        The allegations in Paragraph 3 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3, and on that basis deny them.

4.        The allegations in Paragraph 4 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4, and on that basis deny them.  The allegations in Paragraph 4 also are Plaintiffs' characterization of their case to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 4.

5.        The allegations in Paragraph 5 purport to characterize federal statutes, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statutes' plain language, meaning, or context.

6.        The allegations in Paragraph 6 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 6.

7.      The allegations in Paragraph 7 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 7.

8.      The allegations in Paragraph 8 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 8.

9.      The allegations in Paragraph 9 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 9. Federal Defendants deny that Plaintiffs are entitled to the relief sought or to any relief whatsoever.

## II. PARTIES

10.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10, and on that basis deny them.

11.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and on that basis deny them.

12.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and on that basis deny them.

13.      Federal Defendants deny the allegations in Paragraph 13.

14.      Federal Defendants deny the allegations in Paragraph 14.

15.      Federal Defendants deny the allegations in Paragraph 15.

16.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and on that basis deny them.

17.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and on that basis deny them.

18.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and on that basis deny them.

19.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and on that basis deny them.

20.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and on that basis deny them.

21.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21, and on that basis deny them.

22.      Federal Defendants deny the allegations in Paragraph 22.

23.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and on that basis deny them.

24.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24, and on that basis deny them.

25.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and on that basis deny them.

26.      Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26, and on that basis deny them. Federal Defendants aver that none of the animals specifically named in the second sentence of Paragraph 26 are listed as "endangered" species under the Endangered Species Act ("ESA"), and that there is only one endangered plant species located in Hardee County, but that plant species is not found on the South Pasture Extension project site.

27.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27, and on that basis deny them.

28.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and on that basis deny them.

29.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29, and on that basis deny them.

30.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and on that basis deny them.

31.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and on that basis deny them.

32.     Federal Defendants deny the allegations in Paragraph 32.

33.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33, and on that basis deny them.

34.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and on that basis deny them.

35.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35, and on that basis deny them.

36.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, and on that basis deny them.

37.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, and on that basis deny them.

38.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and on that basis deny them.

39.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and on that basis deny them.

40.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and on that basis deny them.

41.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 41, and on that basis deny them. In response to the allegations in the second sentence of Paragraph 41, Federal Defendants admit that the State of Florida has designated as a Florida wild and scenic river that portion of the Myakka River located between State Road 780 in Sarasota County and the Sarasota-Charlotte County line. In response to the third sentence of Paragraph 41, Federal Defendants admit that the Manatee River and Peace River supply public drinking water. The remaining allegations in the second and third sentences of Paragraph 41 are Plaintiffs' characterization of their case to which no response is required. To the extent a response is required, Federal Defendants deny the remaining allegations in the second and third sentences of Paragraph 41.

42.     Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42, and on that basis deny them.

43.     Federal Defendants deny the allegations in Paragraph 43.

44.     Federal Defendants deny the allegations in Paragraph 44.

45.     Federal Defendants admit the first sentence of Paragraph 45. The allegations in the second sentence of Paragraph 45 purport to characterize a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

46.     In response to the allegations in Paragraph 46, Federal Defendants admit that Lieutenant General Todd T. Semonite is Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers, and that Colonel Jason A. Kirk is the Commander and District Engineer of the U.S. Army Corps of Engineers, Jacksonville District. The remaining allegations in Paragraph 46 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the remaining allegations in Paragraph 46.

47.     Federal Defendants admit the allegations in Paragraph 47.

48.     Federal Defendants admit the allegations in the first sentence of Paragraph 48. The allegations in the second and third sentences of Paragraph 48 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations.

49.     In response to the allegations in Paragraph 49, Federal Defendants admit that the Service is a federal agency within the Department of the Interior charged with implementing and ensuring compliance with the Endangered Species Act ("ESA") for non-marine species. The remaining allegations in Paragraph 49 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the remaining allegations in Paragraph 49.

50.     Federal Defendants admit the allegations in the first sentence of Paragraph 50. The allegations in the second and third sentences of Paragraph 50 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations.

51.     The allegations in Paragraph 51 are legal conclusions to which no response is
required. To the extent a response is required, Federal Defendants deny the allegations.

52.     In response to the allegations in Paragraph 52, Federal Defendants admit that the
Corps and Service are agencies of the federal government. The remaining allegations in
Paragraph 52 are Plaintiffs' characterization of their case and legal conclusions to which no
response is required. To the extent a response is required, Federal Defendants deny the remaining
allegations in Paragraph 52.

### III. JURISDICTION AND VENUE

53.     The allegations in Paragraph 53 are Plaintiffs' characterization of their case to
which no response is required. To the extent a response is required, Federal Defendants deny the
allegations in Paragraph 53.

54.     The allegations in Paragraph 54 are Plaintiffs' legal conclusions to which no
response is required. To the extent a response is required, Federal Defendants deny the
allegations in Paragraph 54.

55.     The allegations in Paragraph 55 are Plaintiffs' legal conclusions to which no
response is required. To the extent a response is required, Federal Defendants deny the
allegations in Paragraph 55.

56.     In response to the allegations in Paragraph 56, Federal Defendants admit that they
received Plaintiffs' letter dated December 20, 2016 with the reference line: "Sixty-Day Notice of
Endangered Species Act Violations Concerning Threatened and Endangered Species in the
Central Florida Phosphate District and South Pasture Phosphate Mine Extension Project Area."
The remaining allegations in Paragraph 56 are Plaintiffs' characterization of their case and legal

conclusions to which no response is required. To the extent a response is required, Federal

Defendants deny the allegations in Paragraph 56.

57.      In response to the allegations in the first sentence of Paragraph 57, Federal Defendants

admit that venue is proper in this judicial district and that the Federal Defendants are agencies of

the United States. The remaining allegations in the first sentence of Paragraph 57 are Plaintiffs'

characterization of their case and legal conclusions to which no response is required. To the

extent a response is required, Federal Defendants deny the remaining allegations in the first

sentence of Paragraph 57. Due to vagueness and ambiguity Federal Defendants are without

knowledge or information sufficient to form a belief as to the truth of the allegations in the

second sentence of Paragraph 57, and on that basis deny them.

58.      The allegations in Paragraph 58 are Plaintiffs' legal conclusions to which no

response is required. To the extent a response is required, Federal Defendants deny the

allegations in Paragraph 58.

## IV. STATUTORY AND REGULATORY FRAMEWORKS

## A. CLEAN WATER ACT

59.      The allegations in Paragraph 59 purport to characterize and quote federal statutes,

which speak for themselves and are the best evidence of their contents. Federal Defendants deny

any allegation inconsistent with the federal statutes' plain language, meaning, or context.

60.      The allegations in Paragraph 60 purport to characterize and quote a federal

statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny

any allegation inconsistent with the federal statute's plain language, meaning, or context.

61.     The allegations in Paragraph 61 purport to characterize federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

62.     The allegations in the first sentence of Paragraph 62 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context. The allegations in the second sentence of Paragraph 62 purport to characterize a federal statute and federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulations' plain language, meaning, or context.

63.     The allegations in Paragraph 63 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 63.

64.     The allegations in Paragraph 64 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

65.     The allegations in Paragraph 65 purport to characterize and quote portions of a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

66.     The allegations in Paragraph 66 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants

deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

67.     The allegations in Paragraph 67 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

68.     The allegations in Paragraph 68 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

69.     The allegations in Paragraph 69 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

70.     The allegations in Paragraph 70 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

71.     The allegations in Paragraph 71 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

72.     The allegations in Paragraph 72 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

**B. NATIONAL ENVIRONMENTAL POLICY ACT**

73.     The allegations in Paragraph 73 purport to characterize and quote a federal statute and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulation's plain language, meaning, or context.

74.     The allegations in Paragraph 74 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

75.     The allegations in Paragraph 75 purport to characterize and quote a federal statute and federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulations' plain language, meaning, or context.

76.     The allegations in the first sentence of Paragraph 76 are Plaintiffs' legal conclusions to which no response is required. The allegations in the second sentence of Paragraph 76 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

77.     The allegations in Paragraph 77 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 77. The allegations in Paragraph 77 also purport to characterize a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

78.     The allegations in Paragraph 78 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. The allegations in Paragraph 78 also purport to characterize federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

79.     The allegations in Paragraph 79 purport to characterize federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

80.     The allegations in Paragraph 80 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

81.     The allegations in Paragraph 81 purport to characterize federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

82.     The allegations in Paragraph 82 purport to characterize federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

83.     The allegations in Paragraph 83 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

84.     The allegations in Paragraph 84 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

85.     The allegations in Paragraph 85 purport to characterize and quote federal statutes and regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statutes and regulations' plain language, meaning, or context.

86.     The allegations in Paragraph 86 are Plaintiffs' legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 86. The allegations in Paragraph 86 also purport to characterize federal statutes and regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statutes and regulations' plain language, meaning, or context.

87.     The allegations in Paragraph 87 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants

deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

88.      The allegations in Paragraph 88 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

89.      The allegations in Paragraph 89 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

90.      The allegations in Paragraph 90 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

91.      The allegations in Paragraph 91 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

92.      The allegations in Paragraph 92 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

93.     The allegations in Paragraph 93 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

94.     The allegations in Paragraph 94 purport to characterize and quote a Federal Register notice, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Federal Register notice's plain language, meaning, or context.

95.     The allegations in Paragraph 95 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

96.     The allegations in Paragraph 96 are Plaintiffs' legal conclusions to which no response is required. The allegations in the second and third sentences of Paragraph 96 also purport to characterize an unspecified "body of law under NEPA" and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the unspecified body of law and federal regulation's plain language, meaning, or context.

97.     The allegations in Paragraph 97 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

98.     The allegations in Paragraph 98 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 98 also purport to characterize a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

99.     The allegations in Paragraph 99 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

100.     The allegations in Paragraph 100 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 100 also purport to characterize and quote federal case law, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the cases' plain language, meaning, or context.

101.     The allegations in Paragraph 101 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

102.     The allegations in Paragraph 102 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

103.     The allegations in Paragraph 103 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 103 also purport to characterize a federal

statute and regulations, which speaks for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and regulations' plain language, meaning, or context

## C. ENDANGERED SPECIES ACT

104.    The allegations in Paragraph 104 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 104 also purport to characterize and quote a court decision and federal statute, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the court decision and federal statute's plain language, meaning, or context.

105.    The allegations in Paragraph 105 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 105 also purport to characterize a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

106.    The allegations in Paragraph 106 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 106 also purport to characterize and quote federal statutes, federal regulations, and a Senate Report, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statutes, federal regulations, and Senate Report's plain language, meaning, or context.

107.    The allegations in Paragraph 107 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

108.     The allegations in Paragraph 108 purport to characterize and quote a federal statute and federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulations' plain language, meaning, or context.

109.     The allegations in Paragraph 109 purport to characterize and quote federal regulations, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulations' plain language, meaning, or context.

110.     The allegations in Paragraph 110 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

111.     The allegations in Paragraph 111 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

112.     The allegations in Paragraph 112 purport to quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

113.     The allegations in Paragraph 113 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

114.     The allegations in Paragraph 114 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

115.     The allegations in Paragraph 115 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

116.     The allegations in Paragraph 116 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

117.     The allegations in Paragraph 117 purport to characterize and quote a federal regulation and federal statute, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal regulation and federal statute's plain language, meaning, or context.

118.     The allegations in the first sentence of Paragraph 118 are Plaintiffs' legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in the first sentence of Paragraph 118. The allegations in the second sentence of Paragraph 118 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. The allegations in the third sentence of Paragraph 118 purport to characterize and quote a federal regulation, which speaks for itself and

is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulation's plain language, meaning, or context.

119.   The allegations in Paragraph 119 purport to characterize and quote a federal statute and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the federal statute and federal regulation's plain language, meaning, or context.

120.   The allegations in Paragraph 120 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

121.   The allegations in Paragraph 121 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

122.   The allegations in the first sentence of Paragraph 122 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context. The allegations in the second sentence of Paragraph 122 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in the second sentence of Paragraph 122.

123.   The allegations in Paragraph 123 purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants

deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

124.    The allegations in Paragraph 124 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

125.    The allegations in the first and second sentences of Paragraph 125 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context. The allegations in the third sentence of Paragraph 125 are Plaintiffs' legal conclusions to which no response is required. The allegations in the third sentence of Paragraph 125 also purport to characterize and quote a federal regulation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal regulation's plain language, meaning, or context.

126.    The allegations in Paragraph 126 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 126 also purport to characterize a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

**D. ADMINISTRATIVE PROCEDURE ACT**

127.    The allegations in Paragraph 127 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 127 also purport to characterize a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

128.    The allegations in Paragraph 128 purport to characterize and quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

129.    The allegations in Paragraph 129 purport to quote a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

130.    The allegations in Paragraph 130 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 130 also purport to characterize a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

131.    The allegations in Paragraph 131 are Plaintiffs' legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in the second sentence of Paragraph 131.

132.    The allegations in Paragraph 132 are Plaintiffs' legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 132. Federal Defendants aver that the Corps issued a Record of Decision for the South Pasture Extension Department of Army permit that is supported, in part, by the Final Areawide Environmental Impact Statement.

133.    The allegations in Paragraph 133 are Plaintiffs' legal conclusions to which no response is required. The allegations in Paragraph 133 also purport to characterize a federal statute, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the federal statute's plain language, meaning, or context.

## V. FACTUAL AND PROCEDURAL BACKGROUND

134.    The allegations in the first sentence of Paragraph 134 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 134, and on that basis deny them. The allegations in the second and third sentences purport to characterize uncited statutes which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegations inconsistent with the plain language, meaning, or context of those uncited statutes. The remaining allegations in the first, second, third, and fourth sentences of Paragraph 134 are Plaintiffs' characterization of their case and legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the remaining allegations in the first, second, third, and fourth sentences of Paragraph 134.

### A. PHOSPHATE MINING IN FLORIDA

135.    The allegations in Paragraph 135 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135, and on that basis deny them. Federal Defendants aver that for phosphate mining operations in the Central Florida Phosphate District, prior to clearing each mining unit, the permittee typically conducts pre-clearing biological surveys and other ecological management and monitoring actions required by permits, installs erosion and sediment controls, installs monitoring wells and piezometers, and installs necessary infrastructure including the ditch and berm system that protects adjacent areas.

136.    In response to the first sentence of Paragraph 136, Federal Defendants admit that a dragline is a very large excavator used by phosphate mining operations to conduct earthwork movement to support the mining operations, and deny all remaining allegations. In response to

the second sentence of Paragraph 136, Federal Defendants admit that it is possible for certain draglines to mine approximately 15 acres in one month, and deny all remaining allegations. The allegations in the third and fourth sentences of Paragraph 136 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the third and fourth sentences of Paragraph 136, and on that basis deny them.

137.    Federal Defendants admit that the allegations in Paragraph 137 generally describe part of the matrix excavation and conveyance practices in the Central Florida Phosphate District, and deny any remaining allegations.

138.    Federal Defendants admit the allegations in Paragraph 138 generally describe a part of the matrix excavation and conveyance practices in the Central Florida Phosphate District, and deny any remaining allegations.

139.    The allegations in Paragraph 139 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139, and on that basis deny them.

140.    Federal Defendants admit the allegations in the first sentence of Paragraph 140 insofar as they generally describe the phosphate mine clay settling areas in the Central Florida Phosphate District, and deny any remaining allegations. The allegations in the second and third sentences of Paragraph 140 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140, and on that basis deny them. Federal Defendants further deny the allegations in the second and third sentences of Paragraph 140 to the extent they relate to current practices in the Central Florida Phosphate District.

141.    In response to the allegations in the first sentence of Paragraph 141, Federal Defendants admit that some phosphate ore may be transported offsite to a fertilizer plant and converted to phosphoric acid, that one process for the conversion is to react phosphate rock with sulfuric acid to produce the phosphoric acid, and that phosphoric acid may be used in synthetic fertilizer, and deny all remaining allegations. In response to the allegations in the second sentence of Paragraph 141, Federal Defendants admit that a byproduct of the conversion of phosphate ore to phosphoric acid is phosphogypsum, which is radioactive, and deny all remaining allegations. The allegations in the third and fourth sentences of Paragraph 141 also purport to characterize unspecified EPA requirements, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the unspecified EPA requirements' plain language, meaning, or context. Federal Defendants admit the fifth sentence of Paragraph 141. The allegations in the sixth sentence of Paragraph 141 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of Paragraph 141, and on that basis deny them.

142.    Federal Defendants deny the allegations in Paragraph 142.

143.    The allegations in the first sentence of Paragraph 143 are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis deny them. The allegations in the first sentence of Paragraph 143 are also legal conclusions to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in the first sentence of Paragraph 143. The allegations in the second sentence of Paragraph 143 purports to characterize a settlement agreement, which speaks for itself and is the best evidence of its contents. Federal

Defendants deny any allegation inconsistent with the settlement agreement's plain language, meaning, or context.

144.    The allegations in Paragraph 144 purports to characterize an unattributed news report, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the news report's plain language, meaning, or context.

145.    In response to the allegations in Paragraph 145, Federal Defendants admit that the permittee's facilities in central Florida include, but are not limited to, the Bartow, New Wales, and Riverview facilities. Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 145, and on that basis deny them. Federal Defendants aver that the permitted project does not require that the phosphate rock generated through beneficiation be transported out of the area to any particular fertilizer plant.

146.    Federal Defendants admit the allegations in Paragraph 146.

## B. THE AREAWIDE ENVIRONMENTAL IMPACT STATEMENT

*Project Description*

147.    Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147, and on that basis deny them.

148.    In response to the allegations in Paragraph 148, Federal Defendants admit that the Corps published a "Notice of Intent To Prepare a Draft Areawide Environmental Impact Statement for Phosphate Mining Affecting Waters of the United States in the Central Florida Phosphate District (CFPD)" on February 18, 2011, and later published a Draft Areawide Environmental Impact Statement. The remaining allegations in the first and second sentences of Paragraph 148 purport to characterize a Notice of Intent and Draft Areawide Environmental Impact Statement, which speak for themselves and are the best evidence of their contents.

Federal Defendants deny any allegation inconsistent with the Notice of Intent and Draft Areawide Environmental Impact Statement's plain language, meaning, or context. In response to the third sentence of Paragraph 148, the Corps admits that after publication of the Draft Areawide Environmental Impact Statement, the Corps held two public meetings in June 2012, and deny the remaining allegations.

149.    Federal Defendants admit the allegations in Paragraph 149.

150.    Federal Defendants admit the first, second, third, and fourth sentences of Paragraph 150. Federal Defendants deny the fifth sentence of Paragraph 150. Federal Defendants aver that the State of Florida has designated as a Florida wild and scenic river that portion of the Myakka River located between State Road 780 in Sarasota County and the Sarasota-Charlotte County line.

151.    The allegations in Paragraph 151 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context

152.    Federal Defendants admit the allegations in Paragraph 152.

153.    The allegations in Paragraph 153 purport to characterize the Draft Areawide Environmental Impact Statement and Final Areawide Environmental Impact Statement, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the Draft Areawide Environmental Impact Statement and Final Areawide Environmental Impact Statement's plain language, meaning, or context.

*Phosphogypsum*

154.    In response to allegations in Paragraph 154, Federal Defendants admit that there are phosphogypsum stacks located in the Central Florida Phosphate District. The remaining allegations are vague and ambiguous, such that Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations, and on that basis deny them.

155.    Federal Defendants admit that the Corps determined the four proposed phosphate mines have independent utility from the existing fertilizer plants in the Central Florida Phosphate District, and deny the remaining allegations in Paragraph 155.

156.    Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156, and on that basis deny them.

157.    The allegations in Paragraph 157 purport to characterize the Corps' analysis in the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

158.    The allegations in the first sentence of Paragraph 158 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context. Federal Defendants deny the allegations in the second sentence of Paragraph 158.

159.    The allegations in Paragraph 159 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

160. The allegations in Paragraph 160 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

161. Federal Defendants deny the allegations in Paragraph 161.

***Project Purpose & Alternatives Analysis***

162. The allegations in Paragraph 162 purport to characterize and quote the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

163. The allegations in Paragraph 163 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

164. The allegations in Paragraph 164 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

165. The allegations in Paragraph 165 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

166.    The allegations in Paragraph 166 purport to characterize the Final Areawide

Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

167.    The allegations in Paragraph 167 purport to characterize the Final Areawide

Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

168.    The allegations in Paragraph 168 purport to characterize the Final Areawide

Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

169.    The allegations in Paragraph 169 purport to characterize the Final Areawide

Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

*Environmental Impacts*

170.    The allegations in Paragraph 170 purport to characterize the Final Areawide

Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental

Impact Statement's plain language, meaning, or context.

171.    The allegations in Paragraph 171 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

172.    In response to the allegations of the first sentence of Paragraph 172, Federal Defendants admit that the gopher tortoise (Gopherus polyphemus), which is both a state-listed species and a candidate for listing under the ESA, has been observed in the study area during past surveys. Federal Defendants also admit that the bald eagle, which is protected under the Federal Bald and Golden Eagle Protection Act, has also been observed in the study area during past surveys. In response to the allegations of the second sentence of Paragraph 172, Federal Defendants admit that other state-listed species that have been observed in the Central Florida Phosphate District during past surveys include the southeastern American kestrel (*Falco sparverius paulus*), Florida sandhill crane (*Grus canadensis pratensis*), gopher frog (*Rana capito*), burrowing owl (*Athene cunicularia*), little blue heron (*Egretta caerulea*), snowy egret (*Egretta thula*), tricolored heron (*Egretta tricolor*), white ibis (*Eudocimus albus*), Florida mouse (*Podomys floridanus*), and Sherman's fox squirrel (*Sciurus niger shermani*). Federal Defendants deny the remaining allegations in Paragraph 172.

173.    The allegations in Paragraph 173 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the Final Areawide Environmental Impact Statement's plain language, meaning, or context.

174.     The allegations in Paragraph 174 are Plaintiffs' characterization of their case to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 174.

**C. THE SOUTH PASTURE EXTENSION MINE ENVIRONMENTAL ASSESSMENT**

175.     Federal Defendants admit the first sentence of Paragraph 175. The allegations in the second sentence of Paragraph 175 purport to characterize the State of Florida's unspecified designation, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the unspecified designation's plain language, meaning, or context. The allegations in the third sentence of Paragraph 175 purport to characterize an unspecified EPA document, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the unspecified EPA document's plain language, meaning, or context.

176.     In response to the allegations in the first sentence of Paragraph 176, Federal Defendants admit that the Department of Army Permit provides a 20-year construction window for the approximately 7,513-acre South Pasture Extension phosphate mine, which is located south of the existing South Pasture mine, and that the permittee will hydraulically transport the matrix to the existing South Pasture mine beneficiation plant, and deny all remaining allegations. Federal Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 176, and on that basis deny them.

177.     Federal Defendants deny the allegations in the first and fourth sentences of Paragraph 177. Federal Defendants admit the allegations in the second and third sentences of Paragraph 177.

178.     In response to the allegations in Paragraph 178, Federal Defendants admit that the

Corps issued a Public Notice for the South Pasture Extension application on June 1, 2012, and

that the Environmental Protection Agency issued Notice of Availability for the Draft Areawide

Environmental Impact Statement on June 1, 2012. The remaining allegations in the first and

second sentences of Paragraph 178 purport to characterize a Public Notice and Notice of

Availability, which speak for themselves and are the best evidence of their contents. Federal

Defendants deny any allegation inconsistent with the Public Notice and Notice of Availability's

plain language, meaning, or context. Federal Defendants deny the allegations in the third

sentence of Paragraph 178.

179.     The allegations in Paragraph 179 are Plaintiffs' characterization of their case to

which no response is required. The allegations in the first sentence of Paragraph 179 purport to

quote an unspecified document, which speaks for itself and is the best evidence of its contents.

To the extent a response is required, Federal Defendants deny the allegations in Paragraph 179.

180.     The allegations in Paragraph 180 purport to quote an unspecified document,

which speaks for itself and is the best evidence of its contents. Federal Defendants deny any

allegation inconsistent with the document's plain language, meaning, or context.

181.     The allegations in Paragraph 181 purport to quote an unspecified document,

which speaks for itself and is the best evidence of its contents. Federal Defendants deny any

allegation inconsistent with the document's plain language, meaning, or context.

182.     In response to the allegations in the first sentence of Paragraph 182, Federal

Defendants admit that the Corps released a Supplemental Environmental Assessment, Draft

Clean Water Act Section 404(b)(1) Guidelines Analysis, and Draft Public Interest Review for

Department of the Army (DA) Permit Application SAJ-1993-01395 ("Supplemental EA") on

June 16, 2016. The remaining allegations in the first sentence of Paragraph 182 purport to

characterize the Corps' Supplemental EA, which speaks for itself and is the best evidence of its

contents. Federal Defendants deny any allegation inconsistent with the Supplemental EA's plain

language, meaning, or context. In response to the allegations in the second and third sentences of

Paragraph 182, Federal Defendants admit that the Corps issued Department of Army Permit

Number SAJ-1993-01395 (SP-JPF) ("Permit") on November 15, 2016. The remaining

allegations in the second and third sentences of Paragraph 182 purport to characterize the Permit,

which speaks for itself and is the best evidence of its contents. Federal Defendants deny any

allegation inconsistent with the Permit's plain language, meaning, or context.

183.    The allegations in Paragraph 183 purport to characterize an unspecified

document, which speaks for itself and is the best evidence of its contents. Federal Defendants

deny any allegation inconsistent with the document's plain language, meaning, or context.

Federal Defendants deny the allegations in Paragraph 183.

**D. THE RECORD OF DECISION AND STATEMENT OF FINDINGS FOR THE SOUTH PASTURE EXTENSION MINE**

184.    In response to the allegations in Paragraph 184, Federal Defendants admit that the

Corps issued a Record of Decision and Statement of Findings for Department of the Army (DA)

Permit Application SAJ-1993-01395 (the "ROD"), and deny the remaining allegations.  Federal

Defendants aver that the ROD was issued November 10, 2016, and was supported not only by

the Supplemental EA, but also the Final Areawide Environmental Impact Statement and the

Addendum dated July 2013.

185.    The allegations in Paragraph 185 purport to characterize and quote the ROD,

which speaks for itself and is the best evidence of its contents. Federal Defendants deny any

allegation inconsistent with the ROD's plain language, meaning, or context.

186.     The allegations in Paragraph 186 purport to characterize and quote the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

187.     The allegations in Paragraph 187 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

188.     The allegations in Paragraph 188 purport to characterize and quote the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

189.     The allegations in Paragraph 189 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

190.     The allegations in Paragraph 190 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

191.     The allegations in Paragraph 191 contain Plaintiffs' conclusions of law to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 191. The allegations in Paragraph 191 also purport to characterize and quote the ROD and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the ROD and federal regulation's plain language, meaning, or context.

192.    The allegations in Paragraph 192 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

193.    The allegations in Paragraph 193 purport to characterize and quote the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

194.    The allegations in Paragraph 194 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

195.    The allegations in Paragraph 195 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

196.    The allegations in Paragraph 196 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

197.    The allegations in Paragraph 197 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

198.    The allegations in Paragraph 198 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

199.     The allegations in Paragraph 199 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

200.     The allegations in Paragraph 200 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

201.     The allegations in Paragraph 201 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

202.     The allegations in Paragraph 202 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

203.     The allegations in Paragraph 203 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

204.     The allegations in Paragraph 204 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

205.     The allegations in Paragraph 205 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

206.     The allegations in Paragraph 206 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with Final Areawide Environmental Impact Statement's plain language, meaning, or context.

207.    The allegations in Paragraph 207 are legal conclusions to which no response is necessary. The allegations in Paragraph 207 also purport to characterize the public interest review in the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the public interest review's plain language, meaning, or context.

208.    The allegations in the first sentence of Paragraph 208 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context. The allegations in the second sentence of Paragraph 208 purport to characterize the Final Areawide Environmental Impact Statement, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with Final Areawide Environmental Impact Statement's plain language, meaning, or context.

209.    The allegations in Paragraph 209 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

210.    The allegations in Paragraph 210 characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

211.    The allegations in Paragraph 211 purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation

inconsistent with the ROD's plain language, meaning, or context. Federal Defendants deny the allegations in the second sentence of Paragraph 211.

212.    The allegations in Paragraph 212 characterize and quote the public interest review in the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the public interest review's plain language, meaning, or context.

213.    The allegations in Paragraph 213 purport to characterize and quote the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

214.    The allegations in Paragraph 214 are Plaintiffs' characterization of their case and legal conclusions to which no response is necessary. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 214. The allegations in Paragraph 214 also purport to characterize the ROD, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

215.    The allegations in Paragraph 215 purport to characterize and quote the ROD, including the attached compensatory mitigation plan, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the ROD's plain language, meaning, or context.

216.    The allegations in the first sentence of Paragraph 216 purport to characterize the compensatory mitigation plan, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with compensatory mitigation plan's plain language, meaning, or context. The allegations in the second sentence of Paragraph 216 are

Plaintiffs' characterization of their case and legal conclusions to which no response is necessary. To the extent a response is required, Federal Defendants deny the allegations in the second sentence of Paragraph 216. The allegations in the second sentence of Paragraph 216 also purport to characterize the compensatory mitigation plan, the ROD, and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the compensatory mitigation plan, the ROD, and the federal regulation's plain language, meaning, or context.

217.    The allegations in the first sentence of Paragraph 217 purport to characterize the compensatory mitigation plan, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with compensatory mitigation plan's plain language, meaning, or context. The allegations in the second sentence of Paragraph 217 are Plaintiffs' characterization of their case and legal conclusions to which no response is necessary. To the extent a response is required, Federal Defendants deny the allegations in the second sentence of Paragraph 217. The allegations in the second sentence of Paragraph 217 also purport to characterize the compensatory mitigation plan, the ROD, and a federal regulation, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the compensatory mitigation plan, the ROD, and the federal regulation's plain language, meaning, or context.

218.    Federal Defendants admit the allegations in Paragraph 218.

219.    Federal Defendants deny the allegations of Paragraph 219.

## E. THE BIOLOGICAL OPINION

220.    The allegations in Paragraph 220 purport to characterize the 2014 biological

opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny

any allegation inconsistent with the biological opinion's plain language, meaning, or context.

221.    Federal Defendants admit the allegations in Paragraph 221.

222.    Federal Defendants admit the allegations in Paragraph 222.

223.    Federal Defendants admit the allegations in Paragraph 223.

224.     In response to the allegations in the first sentence of Paragraph 224, Federal

Defendants admit that the Service transmitted a letter to the Corps on June 9, 2014. The

remaining allegations in the first sentence, and all of the allegations in the second sentence,

purport to characterize that letter, which speaks for itself and is the best evidence of its contents.

Federal Defendants deny any allegation inconsistent with the letter's plain language, meaning, or

context.

225.    The allegations in Paragraph 225 purport to characterize and quote a letter, which

speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation

inconsistent with the letter's plain language, meaning, or context.

226.    The allegations in Paragraph 226 purport to characterize the 2014 biological

opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny

any allegation inconsistent with the biological opinion's plain language, meaning, or context.

227.    The allegations in Paragraph 227 purport to characterize the 2014 biological

opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny

any allegation inconsistent with the biological opinion's plain language, meaning, or context.

228.     The allegations in Paragraph 228 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

229.     The allegations in Paragraph 229 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

230.     The allegations in Paragraph 230 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

231.     The allegations in Paragraph 231 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

232.     The allegations in Paragraph 232 purport to characterize a study cited in the biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the study's plain language, meaning, or context.

233.     The allegations in Paragraph 233 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

234.    The allegations in Paragraph 234 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

235.    The allegations in Paragraph 235 purport to characterize the 2014 biological opinion, including an incidental take statement, and a biological assessment, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the 2014 biological opinion, incidental take statement, and biological assessment's plain language, meaning, or context.

236.    The allegations in Paragraph 236 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

237.    The allegations in Paragraph 237 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

238.    The allegations in Paragraph 238 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the biological opinion's plain language, meaning, or context.

239.    The allegations in Paragraph 239 purport to characterize the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with biological opinion's plain language, meaning, or context.

240.    The allegations in Paragraph 240 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal

Defendants deny any allegation inconsistent with biological opinion's plain language, meaning, or context.

241.    The allegations in Paragraph 241 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with biological opinion's plain language, meaning, or context.

242.    The allegations in Paragraph 242 purport to characterize and quote the 2014 biological opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with biological opinion's plain language, meaning, or context.

### Eastern indigo snake

243.     Federal Defendants admit the allegations in Paragraph 243.

244.    The allegations in Paragraph 244, purport to characterize a Service rule related to the eastern indigo snake, which speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the rule's plain language, meaning, or context.

245.    Federal Defendants admit the allegations in the first and second sentences of Paragraph 245. In response to the allegations in the third sentence, Federal Defendants admit that there are reports of virgin or isolated female eastern indigo snakes laying eggs. Federal Defendants deny the remaining allegations in the third sentence of Paragraph 245.

246.    In response to the allegations in Paragraph 246, Federal Defendants admit the home range of male eastern indigo snakes is up to 805 acres, and that the eastern indigo snake is vulnerable to habitat loss, degradation, and fragmentation. Federal Defendants deny the remaining allegations in Paragraph 246.

247.     Federal Defendants admit the allegations in Paragraph 247.

248.     Federal Defendants admit the allegations in the first and second sentences of Paragraph 248. In response to the allegations in the third sentence of Paragraph 248, Federal Defendants aver that a positive long-term prognosis for eastern indigo snake populations is tied to a mosaic of land uses that include agricultural land. Federal Defendants deny the remaining allegations in the third sentence of Paragraph 248.

249.     Federal Defendants admit the allegations in the first sentence of Paragraph 249. Federal Defendants admit the allegations in the second sentence of Paragraph 249 but aver that the relationship with gopher tortoises becomes stronger going from south to north, due to lower temperatures.

250.     The allegations in Paragraph 250, including the associated footnote 1, purport to characterize the referenced study and related maps, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent the study and related maps' plain language, meaning, or context.

***Wood stork***

251.     Federal Defendants admit the allegations in Paragraph 251.

252.     The allegations in Paragraph 252, including footnote 2, purport to characterize Fish and Wildlife Service rules related to the wood stork, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the rules' plain language, meaning, or context.

253.     Federal Defendants admit the allegations in Paragraph 253.

254.     Federal Defendants admit the allegations in Paragraph 254.

255.     Federal Defendants admit the allegations in Paragraph 255.

256.     Federal Defendants admit the allegations in the first and third sentences of Paragraph 256. The allegations in the second sentence of Paragraph 256 purport to characterize uncited studies, which speak for themselves and are the best evidence of their contents. Federal Defendants deny any allegation inconsistent with the studies' plain language, meaning, or context.

257.     Federal Defendants admit the allegations in the first and third sentences of Paragraph 257. In response to the allegations in the second sentence of Paragraph 257, Federal Defendants admit that the manipulation of water to lower levels can decrease food production for wood storks and facilitate raccoon predation on nesting wood stork colonies. Federal Defendants deny the remaining allegations in the second sentence.

### *Audubon's crested caracara*

258.      Federal Defendants admit the allegations in Paragraph 258.

259.     The allegations in Paragraph 259, purport to characterize a Service rule related to the crested caracara, which rule speaks for itself and is the best evidence of its contents. Federal Defendants deny any allegation inconsistent with the rule's plain language, meaning, or context.

260.     Federal Defendants admit the allegations in Paragraph 260.

261.     Federal Defendants admit the allegations in Paragraph 261.

262.     Federal Defendants admit the allegations in Paragraph 262.

263.     Federal Defendants admit the allegations in Paragraph 263.

## VI. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Corps' Alleged Violations of the Clean Water Act and the Administrative Procedure Act)

264.   Federal Defendants reallege and incorporate by reference all the responses set forth in this Answer, as though fully set forth below.

265.   The allegations in Paragraph 265 are Plaintiffs' characterization of their case to which no response is required. To the extent a response is required, Federal Defendants deny the allegations in Paragraph 265.

266.   Federal Defendants deny the allegations in Paragraph 266, including all subparagraphs (a) through (g).

267.   Federal Defendants deny the allegations in Paragraph 267, including all subparagraphs (a) through (h).

268.   Federal Defendants deny the allegations in Paragraph 268, including all subparagraphs (a) through (h).

269.   Federal Defendants deny the allegations in Paragraph 269.

270.   Federal Defendants deny the allegations in Paragraph 270.

## SECOND CLAIM FOR RELIEF

### (Corps' Alleged Violations of the National Environmental Policy Act and the Administrative Procedure Act)

271.   Federal Defendants reallege and incorporate by reference all the responses set forth in this Answer, as though fully set forth below.

272.   With respect to the allegations in Paragraph 272, Federal Defendants admit that the Corps issued Clean Water Act Section 404 Department of Army Permit, Number SAJ-1993-01395, and deny all remaining allegations.

273.    Federal Defendants deny the allegations in Paragraph 273.

274.    Federal Defendants deny the allegations in Paragraph 274, including all

subparagraphs (a) through (j).

275.    Federal Defendants deny the allegations in Paragraph 275.

276.    Federal Defendants deny the allegations in Paragraph 276.

277.    Federal Defendants deny the allegations in Paragraph 277.

## THIRD CLAIM FOR RELIEF

### (The Service's Alleged Violations of the Endangered Species Act
### and the Administrative Procedure Act)

278.    Federal Defendants reallege and incorporate by reference all the responses set

forth in this Answer, as though fully set forth below.

279.    Federal Defendants deny the allegations in Paragraph 279.

280.    Federal Defendants deny the allegations in Paragraph 280.

281.    Federal Defendants deny the allegations in Paragraph 281, including all

subparagraphs (a) through (f).

282.    Federal Defendants deny the allegations in Paragraph 282.

283.    The allegations in Paragraph 283 purport to characterize the 2014 biological

opinion, which speaks for itself and is the best evidence of its contents. Federal Defendants deny

any allegation inconsistent with biological opinion's plain language, meaning, or context.

284.    Federal Defendants deny the allegations in Paragraph 284.

285.    Federal Defendants deny the allegations in Paragraph 285.

286.    Federal Defendants deny the allegations in Paragraph 286.

287.    Federal Defendants deny the allegations in Paragraph 287.

## FOURTH CLAIM FOR RELIEF

### (The Service's Alleged Violation of the Endangered Species Act)

288.   Federal Defendants reallege and incorporate by reference all the responses set forth in this Answer, as though fully set forth below.

289.   Federal Defendants deny the allegations in Paragraph 289.

## FIFTH CLAIM FOR RELIEF

### (The Corps' Alleged Violation of the Endangered Species Act)

290.   Federal Defendants reallege and incorporate by reference all the responses set forth in this Answer, as though fully set forth below.

291.   Federal Defendants deny the allegations in Paragraph 291.

292.   Federal Defendants deny the allegations in Paragraph 292.

293.   Federal Defendants deny the allegations in Paragraph 293.

294.   Federal Defendants deny the allegations in Paragraph 294.

295.   Federal Defendants deny the allegations in Paragraph 295.

296.   Federal Defendants deny the allegations in Paragraph 296.

## VII. PRAYER FOR RELIEF

Federal Defendants deny the allegations in Plaintiffs' "Prayer for Relief," including all subparagraphs (1) through (9). Federal Defendants further deny that Plaintiffs are entitled to the relief sought or to any relief whatsoever. Federal Defendants aver that the Department of Army Permit Number SAJ-2008-00615, which is repeatedly referenced in Plaintiffs' Prayer for Relief, was issued to CEMEX Construction Materials of Florida, LLC in December 2012 for the construction of a sand and limestone mine operation known as "Hogan Island Quarry" in Collier County, Florida. Federal Defendants further aver that, in the Complaint, Plaintiffs fail to state

any facts relevant to Department of Army Permit Number SAJ-2008-00615, which is the subject

of pending litigation in the United States District Court for the Southern District of Florida, Case

Number 2:13-cv-14477.

## GENERAL DENIAL

To the extent any allegations have not been specifically addressed in the preceding

paragraphs, the Federal Defendants hereby deny such allegations.

## DEFENSES

1.      Plaintiffs fail to state a claim upon which relief may be granted.

2.      Federal Defendants' actions were not arbitrary, capricious, or contrary to law.

3.      Plaintiffs are barred from raising issues that they did not raise in comments during

the administrative process.

4.      Plaintiffs' claims should be dismissed to the extent they are based on an erroneous

factual premise.

5.      The actions challenged by Plaintiffs did not violate the Endangered Species Act,

the Clean Water Act, the National Environmental Policy Act, the Administrative Procedure Act,

or any other applicable law, regulation, or rule.

6.      The Court lacks subject-matter jurisdiction over some or all of Plaintiffs' claims.

7.      The Complaint does not describe the claims with sufficient particularity to allow

Federal Defendants to ascertain what other defenses may exist at this time, and therefore Federal

Defendants reserve the right to assert all defenses which may pertain to the Complaint once it

ascertains the precise nature of the claims in the future.

WHEREFORE, Federal Defendants ask that the Complaint be dismissed with prejudice that each of Plaintiffs' requests for relief be denied in their entirety, and that Federal Defendants be awarded any additional relief the Court deems just and proper.

Dated: May 22, 2017                                  Respectfully submitted,

                                                     W. STEPHEN MULDROW
                                                     Acting United States Attorney

                                                     JEFFREY H. WOOD
                                                     Acting Assistant Attorney General
                                                     Environment & Natural Resources Division

                                                     /s/ _Mark Arthur Brown_____
                                                     MARK ARTHUR BROWN (FL Bar No. 0999504)
                                                     Senior Trial Attorney
                                                     Wildlife & Marine Resources Section
                                                     U.S. Department of Justice
                                                     Environment and Natural Resources Division
                                                     P.O. Box 7611
                                                     Washington, D.C.  20044-7611
                                                     mark.brown@usdoj.gov
                                                     Telephone: (202) 305-0204 | (202) 305-0432
                                                     Facsimile: (202) 305-0275

                                                     PAUL CIRINO
                                                     Trial Attorney
                                                     Environmental Defense Section
                                                     U.S. Department of Justice
                                                     Environment and Natural Resources Division
                                                     P.O. Box 7611
                                                     Washington, D.C. 20044-7611
                                                     paul.cirino@usdoj.gov
                                                     Telephone: (202) 514-1542
                                                     Facsimile: (202) 514-8865

                                                     PETER KRYN DYKEMA
                                                     Senior Trial Attorney
                                                     Natural Resources Section
                                                     U.S. Department of Justice
                                                     Environment and Natural Resources Division
                                                     P.O. Box 7611
                                                     Washington, DC 20044-7611
                                                     peter.dykema@usdoj.gov

Telephone: (202) 305-0436
Facsimile: (202) 305-0506

*Counsel for Federal Defendants*


Of Counsel:

Michael Stevens
Attorney-Adviser
Office of the Regional Solicitor
Southeast Region
75 Ted Turner Drive SW, Suite 304
Atlanta, Georgia  30303
Telephone: (404) 331-5617
Facsimile: (404) 730-2682
mike.stevens@sol.doi.gov

Rachel D. Gray
Assistant District Counsel
U.S. Army Corps of Engineers
701 San Marco Boulevard
Jacksonville, Florida  32207
Telephone: (904) 232-3713
Facsimile: (904) 232-1954
rachel.d.gray@usace.army.mil

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.  Counsel of record currently identified on the Mailing Information list to receive e mail notices for this case are served via Notices of Electronic Filing generated by CM/ECF.

/s/ Paul Cirino
PAUL CIRINO
Trial Attorney
Environmental Defense Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
paul.cirino@usdoj.gov
Telephone: (202) 514-1542
Facsimile: (202) 514-8865

# Docket / Tab No: 47

Defendant-Intervenors' Answer to Complaint

05/22/2017

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA**

**Tampa Division**

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

      Plaintiffs,

   v.

U.S. ARMY CORPS OF ENGINEERS, et al.,     Case No. 8:17-cv-00618-SDM

      Defendants,

MOSAIC FERTILIZER, LLC

      Defendant-Intervenor.

**ANSWER OF DEFENDANT-INTERVENOR MOSAIC FERTILIZER, LLC**

    Defendant-Intervenor Mosaic Fertilizer, LLC ("Mosaic"), by counsel, as and for its Answer and Defenses to Plaintiffs' Complaint for Declaratory and Injunctive Relief filed on March 15, 2017, ECF No. 1, states as follows and, unless specifically answered otherwise, denies each and every allegation of the Complaint:

**I. INTRODUCTION**

    1.    Mosaic denies that the Clean Water Act (CWA) section 404 permit for the South Pasture Extension Mine is permit number SAJ-1993-01395—the correct number is SAJ-1993-01395 (SP-JPF).  Mosaic further denies that Mosaic intends to "strip mine" 7,513 acres at the South Pasture Extension Site.  While the entire site is 7,513 acres, the actual area that will be mined is smaller.  Mosaic further denies that any of the actions or decisions referenced in Paragraph 1 were in violation of the CWA, the Endangered Species Act (ESA),

the National Environmental Policy Act (NEPA), or the Administrative Procedure Act (APA). The remaining allegations in Paragraph 1 are characterizations of Plaintiffs' case and conclusions of law to which no response is required.  To the extent a response may be required, Mosaic denies the allegations.

2.      The allegations in Paragraph 2 contain general, non-scientific observations regarding the environment and therefore are too vague and ambiguous to permit a meaningful response, so Mosaic denies the allegations on that basis.

3.      Mosaic denies the allegations in Paragraph 3.

4.      Mosaic denies the allegations in Paragraph 4.

5.      The allegations purport to characterize the CWA, NEPA, and ESA, which speak for themselves and are the best evidence of their content and legal import.   Any allegation that is inconsistent with the CWA, NEPA, and the ESA is denied.

6.      The allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required.  To the extent a response may be required, Mosaic denies the allegations.

7.      Mosaic denies the allegations in Paragraph 7.

8.      Mosaic denies the allegations in Paragraph 8.

9.      To the extent the permit referenced in Paragraph 9 is intended to be the CWA section 404 Permit for South Pasture Extension, Mosaic denies that the permit number is SAJ-2008-00615—the correct permit number is SAJ-1993-01395 (SP-JPF).  The remaining allegations in Paragraph 9 are characterizations of Plaintiffs' case and conclusions of law to which no response is required.  To the extent a response may be required, Mosaic denies the

allegations.

## II.  PARTIES

10.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

11.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

12.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

13.    Mosaic denies the allegations in Paragraph 13.

14.    Mosaic denies the allegations in Paragraph 14.

15.    Mosaic denies the allegations in Paragraph 15.

16.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 16 and the allegations in the second sentence regarding ManaSota-88's corporate purpose, and on that basis denies the allegations.  Mosaic denies that water quality or wildlife habitat in Manatee and Sarasota Counties will be adversely affected by Mosaic's planned mining activity in Bone Valley.

17.    Mosaic denies the allegations in Paragraph 17.

18.    Mosaic denies the allegations in Paragraph 18.

19.    Mosaic denies the allegations in Paragraph 19.

20.    Mosaic denies the allegations in the first sentence of Paragraph 20.  Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in the second sentence, and on that basis denies the allegations.  Mosaic denies

the allegations in the third sentence of Paragraph 20.

21.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

22.     Mosaic denies the allegations in Paragraph 22.

23.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

24.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

25.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

26.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

27.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 27, and on that basis denies the allegations.  Mosaic denies the allegations in the second sentence of Paragraph 27.

28.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

29.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

30.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

31.     Mosaic is without information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations, and on that basis denies the allegations.

32.     Mosaic denies the allegations in Paragraph 32.

33.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

34.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

35.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

36.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

37.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

38.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

39.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

40.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in the first and second sentences of Paragraph 40, and on that basis denies the allegations.  The allegations in the third sentence are too vague and ambiguous to permit a meaningful response, and Mosaic denies the allegations on that basis.

41.     Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 41, and on that basis

denies the allegations.  Mosaic admits that a portion of the Myakka River in Sarasota County

is a designated Wild and Scenic River, although Mosaic notes that it does not propose to

conduct phosphate mining in Sarasota County.  Except as specifically admitted, Mosaic

denies the allegations in the second sentence of Paragraph 41.  The allegations in the third

sentence are too vague and ambiguous to permit a meaningful response, and Mosaic denies

the allegations on that basis.

42.     Mosaic is without information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations, and on that basis denies the allegations.

43.     Mosaic is without information or knowledge sufficient to form a belief as to

the truth or falsity of the first clause of the first sentence of Paragraph 43, and on that basis

denies the allegations.   Mosaic denies the remainder of the allegations in Paragraph 43.

44.     Mosaic denies the allegations in Paragraph 44.

45.     Mosaic admits that the U.S. Army Corps of Engineers ("Corps") is a federal

agency within the U.S. Department of the Army, a military branch of the U.S. Department of

Defense.  The remaining allegations are conclusions of law to which no response is required;

to the extent a response may be required, the allegations are denied.

46.     Mosaic admits that Lieutenant General Todd T. Semonite is the Commanding

General and Chief of Engineers for the Corps, that Colonel Jason A. Kirk is the Commander

and District Engineer for the Corps' Jacksonville District.  The remaining allegations either

purport to characterize certain statutory provisions, 5 U.S.C. § 702, 33 U.S.C. § 1365, and 16

U.S.C. § 1540(g), which speak for themselves and are the best evidence of their content and

legal import, or are conclusions of law to which no response is required.  To the extent a

response may be required, the allegations are denied.

47. Mosaic admits that the U.S. Department of Interior ("DOI") is a federal agency. The remaining allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required; to the extent a response may be required, the allegations are denied.

48. Mosaic admits that Ryan Zinke is the Secretary of Interior. The remaining allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied.

49. Mosaic admits that the U.S. Fish and Wildlife Service ("FWS") is a federal agency within DOI. The remaining allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied.

50. Mosaic admits that Jim Kurth is the Acting Director of FWS. The remaining allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied.

51. The allegations purport to characterize certain statutory provisions, 5 U.S.C. § 702 and 16 U.S.C. § 1540(g), which speak for themselves and are the best evidence of their content and legal import. Any allegation that is inconsistent with the provisions is denied.

52. The allegations in the first sentence of Paragraph 52 are conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied. The remaining allegations are characterizations of Plaintiffs' case and conclusions of law to which no response is required, and to the extent a response may be

7

required, the allegations are denied.

### III.  JURISDICTION AND VENUE

53.     The allegations are conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied.

54.     The allegations in the first sentence of Paragraph 54 are conclusions of law regarding jurisdiction to which no response is required, and to the extent a response may be required, the allegations are denied.  The allegations in the second sentence of Paragraph 54 state conclusions of law regarding the relief requested to which no response is required; to the extent a response may be required, the allegations are denied.

55.     The allegations are conclusions of law regarding jurisdiction to which no response is required, and to the extent a response may be required, the allegations are denied.

56.     The allegations in Paragraph 56 are conclusions of law to which no response is required, and to the extent a response may be required, the allegations are denied.

57.     The allegations in the first sentence of Paragraph 57 constitute conclusions of law to which no response is required.  Mosaic admits only that proposed mining operations at the South Pasture Extension mine would occur exclusively in Hardee County.  Except as specifically admitted, Mosaic denies the allegations of Paragraph 57.

58.     The allegations purport to characterize certain statutory provisions, 5 U.S.C. § 702 and 16 U.S.C. § 1540(g), which speak for themselves and are the best evidence of their contents and legal import.  Any allegation that is inconsistent with the provisions is denied.

## IV.  STATUTORY AND REGULATORY FRAMEWORKS

### A.      CLEAN WATER ACT

59.     The allegations purport to characterize certain provisions of the CWA, which speaks for itself and is the best evidence of its content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the CWA is denied.

60.     The allegations purport to characterize certain provisions of the CWA, which speaks for itself and is the best evidence of its content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the CWA is denied.

61.     The allegations purport to characterize certain provisions of the regulations codified at 33 C.F.R. Parts 320-330 and 40 C.F.R. §§ 230.1-230.98, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

62.     The allegations purport to characterize certain provisions of the regulations codified at 33 C.F.R. Part 325 and § 404 of the CWA, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations and CWA is denied.

63.     Mosaic denies the allegations in Paragraph 63.

64.     The allegations purport to characterize certain provisions of regulations

codified at 33 C.F.R. § 320.4(b)(1), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

65.   The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. § 320.4(b)(2), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

66.   The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. § 320.4(b)(4), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

67.   The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. § 320.4(a), which speak for themselves and are the best evidence of their contents, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

68.   The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. § 320.4(c), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

69.   The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. Part 230 and 33 C.F.R. § 320.4, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no

response is required.  Any allegation that is inconsistent with the regulations is denied.

70.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 230.1(c), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

71.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 230.10, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

72.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 230.10, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

**B.     NATIONAL ENVIRONMENTAL POLICY ACT**

73.    The allegations purport to characterize certain provisions of NEPA, 42 U.S.C. § 4321, and regulations codified at 40 C.F.R. § 1500.1, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

74.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1500.1, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any

11

allegation that is inconsistent with the regulation is denied.

75.    The allegations purport to characterize certain provisions of NEPA, 42 U.S.C. § 4342, and regulations codified at 40 C.F.R. §§ 1500, *et seq.* and 33 C.F.R. Part 325, App. B, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

76.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1508.18(a), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

77.    The allegations purport to characterize certain provisions of NEPA and regulations codified at 40 C.F.R. § 1508.28, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

78.    The allegations purport to characterize certain provisions of NEPA and regulations codified at 40 C.F.R. § 1501.4, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

79.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. §§ 1501.4, 1508.9(a)(1), 1508.13 and 33 C.F.R. Part 325, App. B § 7, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with

the regulations is denied.

80.     The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. §§ 1508.14 and 1508.27, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

81.     The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1508.27(b)(4) and (5), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

82.     The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1508.27(b), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

83.     The allegations purport to characterize certain provisions of NEPA, 42 U.S.C. § 4332(C)(i)-(v), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA is denied.

84.     The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. §§ 1502.13 and 1508.9(b), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

85.     The allegations purport to characterize certain provisions of NEPA, 42 U.S.C.

§§ 4332(E) and 4331(b), and regulations codified at 40 C.F.R. §§ 1502.2(d) and 1502.14(a) and (c), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

86.    The allegations purport to characterize certain provisions of the CWA, 33 U.S.C. § 1251(a), and regulations codified at 40 C.F.R. § 1508.14, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the CWA or the regulations is denied.

87.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1502.16(b), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

88.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1508.8(b), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

89.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1508.8, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

90.    The allegations purport to characterize certain provisions of regulations

codified at 33 C.F.R. Part 325, App. B § 7(b)(1), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

91.    The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. Part 325, App. B § 7(b)(2), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

92.    The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. Part 325, App. B § 7(b)(2)(ii), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

93.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. §§ 1508.7, 1508.25(a) and (c), and 1708.7, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

94.    The allegations purport to characterize certain provisions of the Issuance of Nationwide Permits, 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the Issuance of Nationwide Permits is denied.

95.    The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. § 330.2(i), which speak for themselves and are the best evidence of

their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

96.    The allegations purport to characterize certain provisions of NEPA and regulations codified at 40 C.F.R. § 1508.8(b), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the regulations is denied.

97.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1505.2 and 33 C.F.R. Part 325, App. B § 18, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

98.    The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1506.1(a), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

99.    The allegations purport to characterize certain provisions of regulations codified at 33 C.F.R. Part 325, App. B § 11 and 33 C.F.R. § 327.4(b) and (c), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.   Any allegation that is inconsistent with the regulations is denied.

100.    The allegations purport to characterize NEPA and *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) and *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 352 (1989), which speak for themselves and are the best evidence of their content or legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with NEPA or the Supreme Court's decisions is denied.

101.   The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. §§ 1502.14(f) and 1502.16(h), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

102.   The allegations purport to characterize certain provisions of regulations codified at 40 C.F.R. § 1502.9(c)(1)-(2), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

103.   The allegations purport to characterize certain provisions of NEPA, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with NEPA is denied.

C.   **ENDANGERED SPECIES ACT**

104.   The allegations purport to characterize *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) and certain provisions of the ESA, 16 U.S.C. §§ 1531(b) and 1531(c)(1), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the Supreme Court's decision is denied.

105.   Mosaic admits that the Departments of the Interior and Commerce have

delegated their obligations under the ESA to FWS and the National Marine Fisheries Service, respectively.

106.   The allegations purport to characterize legislative history of the ESA, certain provisions of the ESA, 16 U.S.C. §§ 1538(a)(1), 1532(19), and regulations codified at 50 C.F.R. §§ 17.21, 17.31, and 17.3, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the ESA or the regulations is denied.

107.   The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1533(f)(1), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA is denied.

108.   The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. §§ 1536(a)(2), and regulations codified at 50 C.F.R. Part 402, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the regulations is denied.

109.   The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. §§ 402.13(a) and 402.14(a), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

110.   The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. §§ 402.14(c)(1)-(6) and (d), which speak for themselves and are the

best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

111.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

112.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

113.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

114.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

115.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

116.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.02, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

117.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1536(a)(2), and regulations codified at 50 C.F.R. § 402.14(g)(1)-(4), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the regulations is denied.

118.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1536(d), and regulations codified at 50 C.F.R. § 402.09, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the regulations is denied.

119.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1536(b)(3)(A), and regulations codified at 50 C.F.R. § 402.14(h)(1)-(3), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the regulations is denied.

120.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.14(i), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.

Any allegation that is inconsistent with the regulations is denied.

121.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.14(i), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

122.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.15, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the regulations is denied.

123.    The allegations purport to characterize certain provisions of the regulations codified at 50 C.F.R. § 402.16(a)-(d), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required. Any allegation that is inconsistent with the regulations is denied.

124.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1536(b)(4) and (o)(2), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA is denied.

125.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. §§ 1536(a)(1), 1532(3), and regulations codified at 50 C.F.R. § 402.15(a), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA or the regulations is denied.

126.    The allegations purport to characterize certain provisions of the ESA, 16 U.S.C. § 1539, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the ESA is denied.

### D.    ADMINISTRATIVE PROCEDURE ACT

127.    The allegations purport to characterize certain provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

128.    The allegations purport to characterize certain provisions of the APA, 5 U.S.C. § 706, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

129.    The allegations purport to characterize certain provisions of the APA, 5 U.S.C. § 706, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

130.    The allegations purport to characterize certain provisions of the APA, 5 U.S.C. § 704, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

131.    The allegations purport to characterize certain provisions of the APA, 5

U.S.C. § 704, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

132.    The allegations purport to characterize certain provisions of the APA, 5 U.S.C. § 706(1), which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

133.    The allegations purport to characterize certain provisions of the APA, 5 U.S.C. § 704, which speak for themselves and are the best evidence of their content and legal import, or are conclusions of law to which no response is required.  Any allegation that is inconsistent with the APA is denied.

## V.  FACTUAL AND PROCEDURAL BACKGROUND

134.    Mosaic denies that the permit number issued by the Corps for the South Pasture Extension Mine is SAJ-1993-01395—the correct number is SAJ-1993-01395 (SP-JPF).  Mosaic admits that proposed mining operations at the South Pasture Extension mine would occur in Hardee County.  Mosaic denies that the Corps or the Service failed in any way to meet its legal obligations with respect to the issuance of permit number SAJ-1993-01395 (SP-JPF), and denies all remaining allegations in Paragraph 134.

### A.    PHOSPHATE MINING IN FLORIDA

135.    Mosaic admits that it mines phosphate ore in Florida and that the phosphate rock is usually found 15-50 feet beneath the ground in a mixture of phosphate pebbles, sand and clay.  Except as specifically admitted, Mosaic denies the remaining allegations in

Paragraph 135.

136.    Mosaic admits only that it uses dragline technology to excavate phosphate at some of its mines.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 136.

137.    Mosaic admits that, following excavation, the phosphate "matrix," composed of the phosphate, sand, and clay, is transferred through pipelines to a processing facility, referred to as a beneficiation plant, where the phosphate rock is separated from the sand and clay in the matrix.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 137.

138.    Mosaic admits that the sand is returned by pipeline to the mine area for use in land reclamation.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 138.

139.    The allegations in Paragraph 139 purport to characterize legal obligations with respect to preservation, mitigation, and reclamation, so no response is required.  To the extent any response is required, Mosaic denies the allegations in Paragraph 139.

140.    Mosaic admits that the clay particles are pumped through pipelines into storage ponds, referred to as "clay settling areas" where these particles sink to the bottom. Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 140.

141.    Mosaic admits that phosphate ore is transported offsite and used to manufacture phosphoric acid, used in the manufacture of fertilizers and animal feed supplements and that phosphogypsum is a byproduct of this process.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 141.

142.    Mosaic admits that its phosphate mining operations occur in the Central Florida Phosphate District.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 142.

143.    Mosaic admits to reaching a settlement agreement with EPA on September 30, 2015 to resolve claims about how the company managed certain onsite waste materials at its fertilizer manufacturing facilities in Florida and Louisiana.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 143.

144.    Mosaic admits to a water loss incident contained on site at the New Wales facility in August, 2016.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 144.

145.    Mosaic admits that the New Wales, Riverview, and Bartow fertilizer manufacturing facilities are located in the Central Florida Phosphate District and produce phosphate fertilizers.  Mosaic denies that the New Wales, Riverview, and Bartow fertilizer manufacturing facilities are the exclusive destinations for phosphate ore produced by the South Pasture Extension Mine, or that the destinations for all phosphate ore produced by the South Pasture Mine are within the Central Florida Phosphate District.  Mosaic also denies that phosphogypsum will be generated by the South Pasture Extension Mine.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 145.

146.    Mosaic admits that the phosphogypsum stacks have generally been built on unused or mined-out land.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 146.

B.      THE AREAWIDE ENVIRONMENTAL IMPACT STATEMENT

*Project Description*

147.    Mosaic admits that it plans to mine various parcels within the Central Florida Phosphate District over the next several decades.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 147.

148.    Mosaic admits the allegations contained in the first sentence of Paragraph 148. The allegations in the second sentence of Paragraph 148 purport to characterize certain provisions of the Draft Areawide Environmental Impact Statement for Phosphate Mining Affecting Waters of the United States in the Central Florida Phosphate District ("AEIS"), which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Draft AEIS is denied.  Mosaic admits that the Corps hosted two public meetings on the Draft AEIS in June 2012.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 148.

149.    Mosaic admits that the area characterized as the Central Florida Phosphate District includes portions of the Hillsborough, Withlacoochee, Alafia, Little Manatee, Manatee, Myakka, and Peace River watersheds, but specifically denies that phosphate mining has historically occurred or is occurring in all of those watersheds and states that the proposed and reasonably foreseeable actions contemplated in the AEIS occur in only the Peace River and Myakka Watersheds.  Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 149.

150.    Mosaic admits that the Corps issued a Clean Water Act Section 404 Permit for the South Pasture Extension Mine to authorize a 7,513-acre expansion of the South Pasture

Mine in Hardee County, in the Peace River watershed, and that it has filed applications seeking governmental authorizations for the proposed DeSoto Mine, Ona Mine, and Wingate East Mine. Mosaic admits that a portion of the Myakka River located wholly within Sarasota County has been designated a Wild and Scenic River and admits the maps on pages 39-40 were taken from the final AEIS. Mosaic denies the remaining allegations of Paragraph 150.

151.    Mosaic admits the allegations contained in Paragraph 151.

152.    Mosaic admits the allegations contained in Paragraph 152.

153.    The allegations in Paragraph 153 purport to characterize certain provisions of the Draft and Final AEIS, which speak for themselves and are the best evidence of their content and legal import. Any allegation that is inconsistent with the Draft or Final AEIS is denied.

*Phosphogypsum*

154.    Mosaic admits that there are phosphogypsum stacks in the Central Florida Phosphate District. Mosaic denies the remaining allegations in Paragraph 154.

155.    The allegations in the second clause of the single sentence of Paragraph 155 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import. Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 155, and on that basis denies the allegations.

156.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 156, and on that basis denies the allegations.

27

157.     Mosaic admits the allegations contained in Paragraph 157.

158.     The allegations in the first sentence of Paragraph 158 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied. Mosaic denies the allegations in the second sentence of Paragraph 158.

159.     The allegations in Paragraph 159 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

160.     The allegations in Paragraph 160 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

161.     The allegations in Paragraph 161 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

***Project Purpose & Alternatives Analysis***

162.     The allegations in Paragraph 162 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

163.     The allegations in Paragraph 163 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

164.     The allegations in Paragraph 164 purport to characterize certain provisions of

the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

165.    The allegations in Paragraph 165 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

166.    The allegations in Paragraph 166 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

167.    The allegations in Paragraph 167 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

168.    The allegations in Paragraph 168 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

169.    The allegations in Paragraph 169 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

*Environmental Impacts*

170.    The allegations in Paragraph 170 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

171.    The allegations in Paragraph 171 purport to characterize certain provisions of

the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

172.    The allegations in Paragraph 172 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

173.    The allegations in Paragraph 173 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the Final AEIS is denied.

174.    Mosaic denies the allegations in Paragraph 174.

## C.    THE SOUTH PASTURE EXTENSION MINE ENVIRONMENTAL ASSESSMENT

175.    Mosaic admits that the South Pasture Extension Mine is located in the Peace River watershed.  Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the remaining allegations, and on that basis denies the allegations.

176.    Mosaic admits that the Corps issued a Clean Water Act Section 404 Permit number SAJ-1993-01395 (SP-JPF) for the South Pasture Extension Mine to  expand the existing South Pasture Mine southward to encompass an additional 7,513 acres in Hardee County, some of which will be mined and some of which will be avoided and/or preserved, and authorizing a 20-year construction window.  Mosaic also admits the map on page 47 was taken from the final AEIS, and that upon completion of mining operations all mined lands will be reclaimed in accordance with the 404 Permit and State of Florida and local government approvals for the South Pasture Extension Mine.

177.    Mosaic admits that the uplands on the project site include forests, pastureland,

and rangeland, and that the jurisdictional areas on the site include forested wetlands, herbaceous wetlands, intermittent streams, and surface waters such as cattle ponds. Mosaic also admits that the South Pasture Extension Mine site is bordered on the north by the currently operating South Pasture Mine, and on the west and south by the proposed Ona Mine site, which Mosaic proposes to begin mining during the life of the South Pasture Extension mine. Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 177.

178.    Mosaic admits that the Corps issued a public notice for the South Pasture Extension Mine application on June 1, 2012, on the same day that it published a notice of availability for the Draft AEIS. Mosaic also admits that, in the 2012 South Pasture Extension public notice, the Corps stated that eastern indigo snake, wood stork, and Audubon's crested caracara had been confirmed onsite. Except as specifically admitted, Mosaic denies the remaining allegations in Paragraph 178.

179.    Mosaic denies the allegations in Paragraph 179.

180.    Mosaic denies the allegations in Paragraph 180.

181.    Mosaic denies the allegations in Paragraph 181.

182.    The allegations in Paragraph 182 purport to characterize certain provisions of the Supplemental EA and the 404 permit number SAJ-1993-01395 (SP-JPF), which speak for themselves and are the best evidence of their content and legal import. Any allegation that is inconsistent with the Supplemental EA or the permit is denied.

183.    The allegations in Paragraph 183 purport to characterize certain provisions of the Final AEIS, which speaks for itself and is the best evidence of its contents. Any

allegation that is inconsistent with the Final AEIS is denied.

**D.    THE RECORD OF DECISION AND STATEMENT OF FINDINGS FOR THE SOUTH PASTURE EXTENSION MINE**

184.    Mosaic admits the allegations contained in Paragraph 184.

185.    The allegations in Paragraph 185 purport to characterize certain provisions of the Record of Decision ("ROD"), which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the ROD is denied.

186.    The allegations in Paragraph 186 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

187.    The allegations in Paragraph 187 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

188.    The allegations in Paragraph 188 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

189.    The allegations in Paragraph 189 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

190.    The allegations in Paragraph 190 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

191.    The allegations in Paragraph 191 purport to characterize certain provisions of

the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

192.    The allegations in Paragraph 192 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

193.    The allegations in Paragraph 193 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

194.    The allegations in Paragraph 194 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

195.    The allegations in Paragraph 195 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

196.    The allegations in Paragraph 196 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

197.    The allegations in Paragraph 197 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

198.    The allegations in Paragraph 198 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import.

Any allegation that is inconsistent with the ROD is denied.

199.     The allegations in Paragraph 199 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

200.     The allegations in Paragraph 200 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

201.     The allegations in Paragraph 201 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

202.     The allegations in Paragraph 202 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

203.     The allegations in Paragraph 203 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

204.     The allegations in Paragraph 204 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

205.     The allegations in Paragraph 205 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

206.   The allegations in Paragraph 206 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

207.   The allegations in Paragraph 207 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

208.   The allegations in Paragraph 208 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

209.   The allegations in Paragraph 209 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

210.   The allegations in Paragraph 210 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

211.   The allegations in Paragraph 211 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

212.   The allegations in Paragraph 212 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

213.   The allegations in Paragraph 213 purport to characterize certain provisions of

the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

214.    The allegations in Paragraph 214 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

215.    The allegations in Paragraph 215 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

216.    The allegations in Paragraph 216 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

217.    The allegations in Paragraph 217 purport to characterize certain provisions of the ROD, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the ROD is denied.

218.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

219.    Mosaic denies the allegations in Paragraph 219.

**E.      THE BIOLOGICAL OPINION**

220.    Mosaic denies the allegations in Paragraph 220.

221.    The allegations in Paragraph 221 purport to characterize correspondence between the Corps and FWS, which speaks for itself and is the best evidence of its content and legal import. Any allegation that is inconsistent with the correspondence is denied.

222.    The allegations in Paragraph 222 purport to characterize correspondence between the Corps and FWS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the correspondence is denied.

223.    The allegations in Paragraph 223 purport to characterize correspondence between the Corps and FWS, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the correspondence is denied.

224.    The allegations in Paragraph 224 purport to characterize certain provisions of the 2014 Biological Opinion (BO), which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

225.    The allegations in Paragraph 225 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

226.    The allegations in Paragraph 226 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

227.    Mosaic denies the allegations in Paragraph 227.

228.    Mosaic denies the allegations in Paragraph 228.

229.    Mosaic denies the allegations in Paragraph 229.

230.    Mosaic denies the allegations in Paragraph 230.

231.    Mosaic denies the allegations in Paragraph 231.

232.    The allegations in Paragraph 232 purport to characterize certain provisions of a study cited in the BO, which speaks for itself and is the best evidence of its content and

legal import.  Any allegation that is inconsistent with the study is denied.

233.    The allegations in Paragraph 233 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

234.    The allegations in Paragraph 234 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content or legal import.  Any allegation that is inconsistent with the BO is denied.

235.    The allegations in Paragraph 235 purport to characterize certain provisions of the Biological Assessment ("BA") and BO, which speak for themselves and are the best evidence of their content and legal import.  Any allegation that is inconsistent with the BA or BO is denied.

236.    The allegations in Paragraph 236 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

237.    The allegations in Paragraph 237 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

238.    The allegations in Paragraph 238 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

239.    The allegations in Paragraph 239 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any

allegation that is inconsistent with the BO is denied.

240.    The allegations in Paragraph 240 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

241.    The allegations in Paragraph 241 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

242.    The allegations in Paragraph 242 purport to characterize certain provisions of the BO, which speaks for itself and is the best evidence of its content and legal import.  Any allegation that is inconsistent with the BO is denied.

***Eastern Indigo Snake***

243.    Mosaic admits the allegations in Paragraph 243.

244.    Mosaic admits the allegations in Paragraph 244.

245.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

246.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

247.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

248.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

249.    Mosaic is without information or knowledge sufficient to form a belief as to

the truth or falsity of the allegations, and on that basis denies the allegations.

250.    The allegations in Paragraph 250 purport to characterize certain provisions of a 2016 indigo snake study, which speaks for itself and is the best evidence of its contents. Any allegation that is inconsistent with the study is denied.

***Wood Stork***

251.    Mosaic admits the allegations in Paragraph 251.

252.    Mosaic admits the allegations in Paragraph 252.

253.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

254.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

255.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

256.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

257.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

***Audubon's Crested Caracara***

258.    Mosaic admits the allegations in Paragraph 258.

259.    Mosaic admits the allegations in Paragraph 259.

260.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

261.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

262.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

263.    Mosaic is without information or knowledge sufficient to form a belief as to the truth or falsity of the allegations, and on that basis denies the allegations.

## VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Corps' Violations of the Clean Water Act and the Administrative Procedure Act)**

264.    Mosaic incorporates by reference its answers to Paragraphs 1 through 263 as set forth above.

265.    Paragraph 265 purports to describe the Plaintiffs' claims, therefore no response is required.  To the extent a response is required, Mosaic denies the allegations in Paragraph 265.

266.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 266 is deemed to contain allegations of fact, Mosaic denies those allegations.

  a.    Mosaic denies the allegations in Paragraph 266(a).

  b.    Mosaic denies the allegations in Paragraph 266(b).

  c.    Mosaic denies the allegations in Paragraph 266(c).

  d.    Mosaic denies the allegations in Paragraph 266(d).

  e.    Mosaic denies the allegations in Paragraph 266(e).

  f.    Mosaic denies the allegations in Paragraph 266(f).

g.      Mosaic denies the allegations in Paragraph 266(g).

267.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 267 is deemed to contain allegations of fact, Mosaic denies those allegations.

a.      Mosaic denies the allegations in Paragraph 267(a).

b.      Mosaic denies the allegations in Paragraph 267(b).

c.      Mosaic denies the allegations in Paragraph 267(c).

d.      Mosaic denies the allegations in Paragraph 267(d).

e.      Mosaic denies the allegations in Paragraph 267(e).

f.      Mosaic denies the allegations in Paragraph 267(f).

g.      Mosaic denies the allegations in Paragraph 267(g).

h.      Mosaic denies the allegations in Paragraph 267(h).

268.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 268 is deemed to contain allegations of fact, Mosaic denies those allegations.

a.      Mosaic denies the allegations in Paragraph 268(a).

b.      Mosaic denies the allegations in Paragraph 268(b).

c.      Mosaic denies the allegations in Paragraph 268(c).

d.      Mosaic denies the allegations in Paragraph 268(d).

e.      Mosaic denies the allegations in Paragraph 268(e).

f.      Mosaic denies the allegations in Paragraph 268(f).

g.      Mosaic denies the allegations in Paragraph 268(g).

     h.     Mosaic denies the allegations in Paragraph 268(h).

269.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 269 is deemed to contain allegations of fact, Mosaic denies those allegations.

270.    Mosaic denies the allegations in Paragraph 270.

## **SECOND CLAIM FOR RELIEF**

### **(Corps' Violations of the National Environmental Policy Act**
### **and the Administrative Procedure Act)**

271.    Mosaic incorporates by reference its answers to Paragraphs 1 through 270 as set forth above.

272.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 272 is deemed to contain allegations of fact, Mosaic denies those allegations.

273.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 273 is deemed to contain allegations of fact, Mosaic denies those allegations.

274.    Mosaic denies the allegations in Paragraph 274.

     a.     Mosaic denies the allegations in Paragraph 274(a).

     b.     Mosaic denies the allegations in Paragraph 274(b).

     c.     Mosaic denies the allegations in Paragraph 274(c).

     d.     Mosaic denies the allegations in Paragraph 274(d).

     e.     Mosaic denies the allegations in Paragraph 274(e).

     f.     Mosaic denies the allegations in Paragraph 274(f).

      g.     Mosaic denies the allegations in Paragraph 274(g).

      i.     Mosaic denies the allegations in Paragraph 274(i).[1]

      j.     Mosaic denies the allegations in Paragraph 274(j).

275.    Mosaic denies the allegations in Paragraph 275.

276.    Mosaic denies the allegations in Paragraph 276.

277.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 277 is deemed to contain allegations of fact, Mosaic denies those allegations.

### THIRD CLAIM FOR RELIEF

**(The Service's Violations of the Endangered Species Act
and the Administrative Procedure Act)**

278.    Mosaic incorporates by reference its answers to Paragraphs 1 through 277 as set forth above.

279.    The allegations are conclusions of law to which no response is required.

280.    Mosaic denies the allegations in Paragraph 280.

281.    The allegations are conclusions of law to which no response is required.

      a.     Mosaic denies the allegations in Paragraph 281(a).

      b.     Mosaic denies the allegations in Paragraph 281(b).

      c.     Mosaic denies the allegations in Paragraph 281(c).

      d.     Mosaic denies the allegations in Paragraph 281(d).

      e.     Mosaic denies the allegations in Paragraph 281(e).

      f.     Mosaic denies the allegations in Paragraph 281(f).

---

[1] The numbering of paragraphs in this section of Plaintiffs' complaint skips the letter "h."

282.    Mosaic denies the allegations in Paragraph 282.

283.    Mosaic denies the allegations in Paragraph 283.

284.    Mosaic denies the allegations in Paragraph 284.

285.    Mosaic denies the allegations in Paragraph 285.

286.    Mosaic denies the allegations in Paragraph 286.

287.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 287 is deemed to contain allegations of fact, Mosaic denies those allegations.

## FOURTH CLAIM FOR RELIEF

### (The Service's Violation of the Endangered Species Act by determining not likely to adversely affect and concurrence)[2]

288.    Mosaic incorporates by reference its answers to Paragraphs 1 through 287 as set forth above.

289.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 289 is deemed to contain allegations of fact, Mosaic denies those allegations.

## FIFTH CLAIM FOR RELIEF

### (The Corps' Violation of the Endangered Species Act)

290.    Mosaic incorporates by reference its answers to Paragraphs 1 through 289 as set forth above.

291.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 291 is deemed to contain allegations of fact, Mosaic denies those allegations.

---

[2] The language in the parenthetical is exactly as it appears in the Plaintiffs' complaint.

292.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 292 is deemed to contain allegations of fact, Mosaic denies those allegations.

293.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 293 is deemed to contain allegations of fact, Mosaic denies those allegations.

294.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 294 is deemed to contain allegations of fact, Mosaic denies those allegations.

295.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 295 is deemed to contain allegations of fact, Mosaic denies those allegations.

296.    The allegations are conclusions of law to which no response is required.  To the extent Paragraph 296 is deemed to contain allegations of fact, Mosaic denies those allegations.

## VII.  PRAYER FOR RELIEF

The remainder of the Complaint consists of Plaintiffs' request for relief, to which no response is required. To the extent a response may be required, Mosaic denies that Plaintiffs are entitled to the relief requested, or to any relief.

## GENERAL DENIAL

Mosaic denies any allegations of the Complaint, whether express or implied, that are not specifically admitted, denied or qualified herein.

46

## DEFENSES

1.      Plaintiffs' claims are barred, in whole or in part, because they fail to state a claim upon which relief can be granted.

2.      Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing.

3.      Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver to the extent Plaintiffs' claims rest on contentions that were not raised with the agencies during the administrative process.

4.      Any defenses pleaded by other defendants and not specifically pleaded by Mosaic are incorporated herein to the extent they do not conflict with the defenses expressly stated above.

5.      Mosaic hereby gives notice that it intends to rely on any other defense that may become available or appear during the proceedings of this case.

## RESERVATION OF RIGHTS

Mosaic respectfully reserves the right to amend this Answer to assert any additional affirmative defenses that it deems necessary to its defense of the Complaint during or upon conclusion of its investigation and discovery of Plaintiffs' claims.

DATE:  May 22, 2017

Respectfully submitted,

 /s/ Jamie Zysk Isani

Jamie Zysk Isani (Fla. Bar No. 728861)
jisani@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500

*Trial Counsel for Movant-Intervenor Mosaic Fertilizer, LLC*

George P. Sibley, III (Va. Bar No. 48773)
gsibley@hunton.com
Jonathan L. Caulder (Va. Bar No. 89062)
jcaulder@hunton.com
HUNTON & WILLIAMS LLP
951 E. Byrd St.
Richmond, VA 23221
Telephone: 804-788-8200

Deidre G. Duncan (D.C. Bar No. 461548)
dduncan@hunton.com
Andrew J. Turner (D.C. Bar No. 471179)
aturner@hunton.com
Kerry L. McGrath (D.C. Bar No. 997277)
kmcgrath@hunton.com
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone: (202) 955-1500

*Counsel for Movant-Intervenor Mosaic Fertilizer, LLC*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of May, 2017, I electronically filed the

foregoing Mosaic Fertilizer, LLC's Answer with the Clerk of the Court by using the

CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.


   /s/ Jamie Zysk Isani
Jamie Zysk Isani