No. 18-10541

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,
*Plaintiffs-Appellants,*

v.

**U.S. ARMY CORPS OF ENGINEERS**, *et al.*,
*Defendants-Appellees,*

and

**MOSAIC FERTILIZER, LLC.**
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CIV. NO. 8:17-CV-00618
HON. STEVEN D. MERRYDAY, CHIEF JUDGE, PRESIDING

**UNOPPOSED MOTION TO CORRECT PLAINTIFFS-
APPELLANTS' REPLY BRIEF**

Jaclyn M. Lopez
Hannah Mary Margaret Connor
Elise Pautler Bennett
Rachael Curran
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*Center for Biological Diversity, et al. v U.S. Army Corps of Engineers, et al.*, No. 18-10541 (filed Dec. 27, 2018)

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, the following listed attorneys, persons, associations of persons, firms, partnerships or corporations may have an interest in the outcome of this appeal:

Beelaert, Jeffrey S., United States Department of Justice – Counsel for Defendants/Appellees

Bennett, Elise Pautler, Center for Biological Diversity – Counsel for Plaintiffs/Appellants

Brown, Mark, United States Department of Justice – Counsel for Defendants/Appellees

Carfora, Debra, United States Department of Justice – Counsel for Defendants/Appellees

Caulder, Jonathan, Hunton & Williams, LLP – Counsel for Intervenor – Defendant/Appellee

Center for Biological Diversity – Plaintiff/Appellant

Cirino, Paul, United States Department of Justice – Counsel for

Defendants/Appellees

Connor, Hannah Mary Margaret, Center for Biological Diversity –

Counsel for Plaintiffs/Appellants

Curran, Rachael, Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

Duncan, Deidre, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Dykema, Peter, United States Department of Justice – Counsel for

Defendant/Appellee

Esper, Mark, United States Secretary of the Army – Related to

Defendant/Appellee

FMRP Inc. – Related to Intervenor-Defendant/Appellee Mosaic

Fertilizer, LLC

Grant, Eric, United States Department of Justice – Counsel for

Defendants/Appellees

Gray, Rachel, Assistant District Counsel, United States Army Corps of

Engineers – Counsel for Defendants/Appellees

Hopping Green & Sams, P.A. – Counsel for Intervenor –

Defendant/Appellee

Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Inkelas, Daniel, United States Army Corps of Engineers –

Counsel for Defendant/Appellee

Isani, Jamie, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Kirk, Jason A., District Commander, United States Army Corps of

Engineers – Defendant/ Appellee

Kurth, Jim, Deputy Director of Operations, United States Fish and

Wildlife Service – Defendant/ Appellee

Lopez, Jaclyn M., Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

ManaSota-88, Inc. – Plaintiff/Appellant

McGrath, Kerry, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Merryday, Honorable Steven D. – Trial Judge

Mosaic Fertilizer, LLC – Intervenor – Defendant/Appellee

Mosaic Global Holdings, Inc. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

Mosaic Global Operations, Inc. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

People for Protecting Peace River, Inc. – Plaintiff/Appellant

Phosphate Acquisitions Partners, LP. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

PRP-GP LLC – related to Intervenor-Defendant/Appellee Mosaic

Fertilizer, LLC

Riley, Timothy, Hopping Green & Sams, P.A. – Counsel for Intervenor –

Defendant/Appellee

Rose, John Peter – Counsel for Plaintiffs/Appellants

Savage, Amelia, Hopping Green & Sams, P.A. – Counsel for Intervenor–

Defendant/Appellee

Semonite, Todd, Commanding General and Chief of Engineers, United

States Army Corps of Engineers – Defendant/ Appellee

Sessions, Jefferson, United States Attorney General – Counsel for

Defendants/Appellees

Sheehan, Greg, Principle Deputy Director, United States Fish and

Wildlife Service – Defendant/ Appellee

Sibley, George, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Speights, Helen, United States Department of the Interior –

Counsel for Defendants/Appellees

Stephens, Susan, Hopping Green & Sams, P.A. – Counsel for

Intervenor – Defendant/Appellee

Stevens, Michael, United States Department of the Interior –

Counsel for Defendants/Appellees

Suncoast Waterkeeper – Plaintiff/Appellant

The Mosaic Company (MOS) – Parent Corporation of Intervenor –

Defendant/Appellee

Turner, Andrew, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

United States of America– Defendant/Appellee

United States Army Corps of Engineers – Defendant/Appellee

United States Department of the Army – Related to Defendant/Appellee

United States Department of the Interior – Defendant/ Appellee

United States Department of Justice –

Counsel for Defendants/Appellees

United States Fish and Wildlife Service – Defendant/ Appellee

Wood, Jeffrey H., Acting Assistant Attorney General, United States

Department of Justice – Counsel for Defendants/Appellees

Zinke, Ryan, Secretary, United States Department of the Interior –

Defendant/ Appellee

ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 27 and Eleventh

Circuit Rule 27-1(c)(3), Plaintiffs-Appellees, Center for Biological

Diversity, ManaSota-88, People for Protecting Peace River, and

Suncoast Waterkeeper (hereinafter, Conservationists) respectfully

request that this Court grant leave for Conservationists to correct their

reply brief for the following reasons.

On page 20 of Conservationists' opening brief, Counsel for

Conservationists accidentally mischaracterized an action of this Court;

specifically, that this Court had affirmed a lower court's decision when

it had instead vacated and remanded the judgments and orders of the

lower court and affirmed a later decision by that same court after this

Court remanded the cited decision. Opening Br. at 20 ("[T]his Court

affirmed the Southern District of Florida's finding that the Corps erred

in issuing a section 404 permit when it failed to consider the growth-

inducing effects of a mine on a nearby area. *Sierra Club v. Flowers*, 423

F. Supp. 2d 1273, 1320 (S.D. Fla. 2006), *vacated in part, remanded in

part*, 526 F.3d 1353 (11th Cir. 2008)").

On June 8, 2018, Defendants-Appellees filed their brief and pointed out that this Court vacated *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273 (S.D. Fla. 2006). Corps Br. at 31.

Counsel for Conservationists intended to address the issue in its reply brief with a footnote to explain that Conservationists had mistakenly stated this Court affirmed *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273 (S.D. Fla. 2006); that this Court vacated and remanded that decision in *Sierra Club v. Flowers*, 526 F.3d 1353 (11th Cir. 2008); and that this Court upheld the lower court's decision after it applied the correct legal standard upon remand. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1270–74 (S.D. Fla. 2009), *aff'd* by *Sierra Club v. Van Antwerp*, 326 Fed. Appx. 100, 2010 U.S. App. LEXIS 1456** (11th Cir. Jan. 21, 2010).

Unfortunately, Counsel for Conservationists inadvertently omitted this information in its reply brief to the Court.

Counsel for Conservationists consulted opposing counsel on this Unopposed Motion to Correct Plaintiffs-Appellants' Reply Brief, and counsel for Defendants-Appellees and Intervenor-Defendant-Appellee have no objection to the relief sought. Also, while the parties cited

*Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254 (S.D. Fla. 2009) and

*Sierra Club v. Van Antwerp*, 326 Fed. Appx. 100, 2010 U.S. App. LEXIS

1456** (11th Cir. Jan. 21, 2010) in the briefs to the lower court, the

parties did not cite them in the briefs submitted to this Court, therefore,

they constitute supplemental authorities and a separate notice of

supplemental authorities has been submitted to the circuit court by

letter in conformance with FRAP 28(j).

## CONCLUSION

Conservationists respectfully request this Court grant this

unopposed motion and allow Conservationists to correct their reply brief

with the attached reply brief that corrects the aforementioned error in

footnote 1 on page 2, and makes minor edits to some parentheticals in

order to comply with the Court's word limit.

Respectfully submitted,

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez
Florida Bar No. 96445
Hannah Mary Margaret Connor
Florida Bar No. 125378
Elise Pautler Bennett
Florida Bar No. 106573
Rachael Curran
Florida Bar No. 1002221

CENTER FOR BIOLOGICAL
DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
jlopez@biologicaldiversity.org
ebennett@biologicaldiversity.org
hconnor@biologicaldiversity.org
rcurran@biologicaldiversity.org
Tel: (727) 490-9190
Fax: (510) 844-7150

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing Motion complies with the type-volume limitations and typeface requirements of FED. R. APP. P. 27(d). Specifically, this motion is printed in proportionally spaced, 14-point Century Schoolbook font in compliance with FED. R. APP. P. 27(d)(1)(E) and with the exception of footnotes and indented quotations, it is printed with double-spacing and one-inch margins in compliance with FED. R. APP. P. 27(d)(1)(D). Excluding the accompanying documents required by FED. R. APP. P. 27(a)(2)(B) and 11th Cir. R. 27-1(3), and the items that are exempted under Fed. R. App. P. 32(f), this motion contains a total of 487 words to meet the type-volume limitation of FED. R. APP. P. 27(d)(2)(A). This certificate was prepared in reliance on the word-processing system (Microsoft Word) used in this motion.

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of December 2018, I filed the foregoing UNOPPOSED MOTION TO CORRECT PLAINTIFFS-APPELLANTS' REPLY BRIEF electronically through the Court's CM/ECF system, which caused all parties and counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez

No. 18-10541

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

**CENTER FOR BIOLOGICAL DIVERSITY**, *et al.*,
*Plaintiffs-Appellants,*

v.

**U.S. ARMY CORPS OF ENGINEERS**, *et al.*,
*Defendants-Appellees,*

and

**MOSAIC FERTILIZER, LLC.**
*Intervenor-Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION
CIV. NO. 8:17-CV-00618
HON. STEVEN D. MERRYDAY, CHIEF JUDGE, PRESIDING

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

Jaclyn M. Lopez
Hannah Mary Margaret Connor
Elise Pautler Bennett
Rachael Curran
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731
Tel: (727) 490-9190

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

*Center for Biological Diversity, et al. v U.S. Army Corps of Engineers, et al.*, No. 18-10541 (filed Feb. 12, 2018)

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, the following listed attorneys, persons, associations of persons, firms, partnerships or corporations may have an interest in the outcome of this appeal:

Beelaert, Jeffrey S., United States Department of Justice – Counsel for Defendants/Appellees

Bennett, Elise Pautler, Center for Biological Diversity – Counsel for Plaintiffs/Appellants

Brown, Mark, United States Department of Justice – Counsel for Defendants/Appellees

Carfora, Debra, United States Department of Justice – Counsel for Defendants/Appellees

Caulder, Jonathan, Hunton & Williams, LLP – Counsel for Intervenor – Defendant/Appellee

Center for Biological Diversity – Plaintiff/Appellant

Cirino, Paul, United States Department of Justice – Counsel for

Defendants/Appellees

Connor, Hannah Mary Margaret, Center for Biological Diversity –

Counsel for Plaintiffs/Appellants

Curran, Rachael, Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

Duncan, Deidre, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Dykema, Peter, United States Department of Justice – Counsel for

Defendant/Appellee

Esper, Mark, United States Secretary of the Army – Related to

Defendant/Appellee

FMRP Inc. – Related to Intervenor-Defendant/Appellee Mosaic

Fertilizer, LLC

Grant, Eric, United States Department of Justice – Counsel for

Defendants/Appellees

Gray, Rachel, Assistant District Counsel, United States Army Corps of

Engineers – Counsel for Defendants/Appellees

Hopping Green & Sams, P.A. – Counsel for Intervenor –

Defendant/Appellee

Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Inkelas, Daniel, United States Army Corps of Engineers –

Counsel for Defendant/Appellee

Isani, Jamie, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Kirk, Jason A., District Commander, United States Army Corps of

Engineers – Defendant/ Appellee

Kurth, Jim, Deputy Director of Operations, United States Fish and

Wildlife Service – Defendant/ Appellee

Lopez, Jaclyn M., Center for Biological Diversity – Counsel for

Plaintiffs/Appellants

ManaSota-88, Inc. – Plaintiff/Appellant

McGrath, Kerry, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Merryday, Honorable Steven D. – Trial Judge

Mosaic Fertilizer, LLC – Intervenor – Defendant/Appellee

Mosaic Global Holdings, Inc. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

Mosaic Global Operations, Inc. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

People for Protecting Peace River, Inc. – Plaintiff/Appellant

Phosphate Acquisitions Partners, LP. – related to Intervenor-

Defendant/Appellee Mosaic Fertilizer, LLC

PRP-GP LLC – related to Intervenor-Defendant/Appellee Mosaic

Fertilizer, LLC

Riley, Timothy, Hopping Green & Sams, P.A. – Counsel for Intervenor –

Defendant/Appellee

Rose, John Peter – Counsel for Plaintiffs/Appellants

Savage, Amelia, Hopping Green & Sams, P.A. – Counsel for Intervenor–

Defendant/Appellee

Semonite, Todd, Commanding General and Chief of Engineers, United

States Army Corps of Engineers – Defendant/ Appellee

Sessions, Jefferson, United States Attorney General – Counsel for

Defendants/Appellees

Sheehan, Greg, Principle Deputy Director, United States Fish and

Wildlife Service – Defendant/ Appellee

Sibley, George, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

Speights, Helen, United States Department of the Interior –

Counsel for Defendants/Appellees

Stephens, Susan, Hopping Green & Sams, P.A. – Counsel for

Intervenor – Defendant/Appellee

Stevens, Michael, United States Department of the Interior –

Counsel for Defendants/Appellees

Suncoast Waterkeeper – Plaintiff/Appellant

The Mosaic Company (MOS) – Parent Corporation of Intervenor –

Defendant/Appellee

Turner, Andrew, Hunton & Williams, LLP – Counsel for Intervenor –

Defendant/Appellee

United States of America– Defendant/Appellee

United States Army Corps of Engineers – Defendant/Appellee

United States Department of the Army – Related to Defendant/Appellee

United States Department of the Interior – Defendant/ Appellee

United States Department of Justice –

Counsel for Defendants/Appellees

United States Fish and Wildlife Service – Defendant/ Appellee

Wood, Jeffrey H., Acting Assistant Attorney General, United States

Department of Justice – Counsel for Defendants/Appellees

Zinke, Ryan, Secretary, United States Department of the Interior –

Defendant/ Appellee

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................... C-1

TABLE OF AUTHORITIES .................................................... iii

ACRONYMS AND ABBREVIATIONS ....................................................viii

ARGUMENT ........................................................................1

    I.    The Corps' Decision to Ignore the Indirect and
Cumulative Effects of Mosaic's Fertilizer Plants is
Arbitrary and Capricious and Violates the National
Environmental Policy Act ........................................................1

        A.    Mosaic's fertilizer plants and phosphogypsum are
foreseeable "downstream effects" of its phosphate
mines ................................................................3

                1.    Phosphogypsum waste is a foreseeable effect
of Mosaic's phosphate mining ...............................3

                2.    Mosaic's phosphate mines do not have
independent utility from its fertilizer plants .......6

        B.    The Corps listed, but did not analyze, the cumulative
effects of fertilizer plants ............................................13

    II.    The Corps' Approval of the SPE Mine Without a Mine-
Specific Environmental Impact Statement Violates NEPA
and the APA  ........................................................15

A. The Corps Did Not Follow NEPA's Clear Procedural Requirements ............................................................. 15

B. The Corps Did Not Take a "Hard Look" at the Environmental Consequences of Approving the SPE Mine.............................................................................. 20

III. The Corps' Failure to Consult on the Suite of Permits Authorizing Phosphate Mining in the Central Florida Phosphate District Violated the Endangered Species Act and APA ......................................................... 26

CONCLUSION .................................................................... 33

CERTIFICATE OF COMPLIANCE......................................... 35

CERTIFICATE OF SERVICE................................................ 36

# TABLE OF AUTHORITIES

**Cases**

*Bowles v. Seminole Rock & Sand Co.,*
    325 U.S. 410 (1945).................................................................17

*Calvert Cliffs' Coordinating Comm'n v. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971)............................................25

*Christensen v. Harris County,*
    529 U.S. 576 (2000).................................................................17

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015)..............................................29

*Department of Transportation v. Public Citizen,*
    541 U.S. 752 (2004)....................................................... 4, 6, 16

*Fed. Power Comm'n v. Idaho Power Co.,*
    344 U.S. 17 (1952) ..................................................................19

*Fla. Key Deer v. Paulison,*
    533 F.3d 1133 (11th Cir. 2008).............................................28

*Fla. Key Deer v. Stickney,*
    864 F. Supp. 1222 (S.D. Fla. 1994)......................................31

*Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs,*
    401 F. Supp. 2d 1298 (S.D. Fla. 2005)............................. 6, 12

*Forest Guardians v. Forsgren,*
    478 F.3d 1149 (10th Cir. 2007).............................................29

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976).............................................................7, 17

*Lane Cty. Audubon Soc'y v. Jamison,*
    958 F.2d 290 (9th Cir. 1992).................................................29

*Marsh v. Or. Nat. Res. Council,*
490 U.S. 360 (1989).....................................................................*passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,*
463 U.S. 29 (1983) .......................................................22, 25

*Nat. Wildlife Fed'n v. Marsh,*
721 F.2d 767 (11th Cir. 1983)....................................................24

*Nat'l Audubon Soc'y v. Dep't of the Navy,*
422 F.3d 174 (4th Cir. 2005).....................................................19

*North Buckhead Civic Ass'n v. Skinner,*
903 F.2d 1533 (11th Cir. 1990)..................................................25

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,*
556 F.3d 177 (4th Cir. 2009).......................................................9

*Pac. Rivers Council v. Thomas,*
30 F.3d 1050 (9th Cir. 1994).....................................................29

*Perez v. Mortgage Bankers Ass'n,*
135 S. Ct. 1199 (2015) .............................................................17

*Preserve Endangered Area of Cobb's History, Inc. v. U.S. Army
Corps of Eng'rs*, 87 F.3d 1242 (11th Cir. 1996)........................7, 9, 10

*Robertson v. Methow Valley Citizens Council,*
490 U.S. 332 (1989)........................................... 16, 18, 19, 23

*Save Our Sonoran, Inc. v. Flowers,*
408 F.3d 1113 (9th Cir. 2005)......................................................5

*Sierra Club v. Flowers,*
526 F.3d 1353, 1364 (11th Cir. 2008)..........................................2

*Sierra Club v. Van Antwerp,*
709 F. Supp. 2d 1254 (S.D. Fla. 2009)..........................................2

*Sierra Club v. Van Antwerp,*

362 F. App'x 100, 2010 U.S. App. LEXIS 1456** (11th Cir. 2010)……………………………………………………………2

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ..........................................3, 4

Sierra Club v. Mainella,
    459 F. Supp. 2d 76 (D.D.C. 2006) ...........................................4

*Sierra Club v. Strock*,
    495 F. Supp. 2d 1188 (S.D. Fla. 2007)...........................19, 24

*Simmons v. Block*,
    782 F.2d 1545 (11th Cir. 1986).............................................19

*Stinson v. United States*,
    508 U.S. 36 (1993) .................................................................17

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994)...............................................................17

*Village of Los Ranchos de Albuquerque v. Barnhart*,
    906 F.2d 1477 (9th Circuit 1990) ...............................29, 30

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
    222 F.3d 1105 (9th Cir. 2000)..........................................9, 30

*Winnebago Tribe of Neb. v. Ray*,
    621 F.2d 269 (8th Cir. 1980)...................................................9

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) (Ginsburg, J., dissenting) .......................16

## Statutes

16 U.S.C. § 1536 ......................................................................32

16 U.S.C. § 1536(a)(2)................................................26, 27, 32

16 U.S.C. § 1536(b) ....................................................... 32

33 U.S.C. § 1251 .............................................................. 5

33 U.S.C. § 1311(a) .......................................................... 5

42 U.S.C. § 4332(C) ........................................................ 14


**Regulations**

33 C.F.R. § 230.13(b) ..................................................... 20

33 C.F.R. § 320.4(a)(1) .................................................... 5

33 C.F.R. pt. 325, App. B § 7 ........................................ 8

33 C.F.R. pt. 325, App. B § 7(b) .................................. 12

33 C.F.R. pt. 325, App. B § 7(b)(3) ...................... 8, 12

40 C.F.R. § 1500.1(b) ................................................... 25

40 C.F.R. § 1500.2(b) ................................................... 23

40 C.F.R. § 1500.3 ......................................................... 18

40 C.F.R. § 1502.1 .................................................. 22, 25

40 C.F.R. § 1502.14 ....................................................... 19

40 C.F.R. § 1502.15–16 ................................................ 19

40 C.F.R. § 1502.16 ....................................................... 22

40 C.F.R. § 1502.16(b) .................................................... 3

40 C.F.R. § 1502.9 ......................................................... 20

40 C.F.R. § 1505.2 ......................................................... 16

40 C.F.R. § 1508.20 ....................................................... 19

40 C.F.R. § 1508.25(a) ..................................................... 7

40 C.F.R. § 1508.25(a)(3) ................................................ 15

40 C.F.R. § 1508.7 ......................................................... 22

40 C.F.R. § 1508.8 ................................................... 22, 24

40 C.F.R. § 1508.9 ................................................... 16, 18

40 C.F.R. § 230.10 .................................................... 5, 7

50 C.F.R. § 402.02 ........................................ 29, 30, 31, 32

50 C.F.R. § 402.02(c) ..................................................... 28

50 C.F.R. § 402.06 ......................................................... 31

50 C.F.R. § 402.14 ................................................... 27, 32

67 Fed. Reg. 2020 (Jan. 15, 2002) .................................. 7, 8, 9

82 Fed. Reg. 1860 (Jan. 6, 2017) ......................................... 8

# ACRONYMS AND ABBREVIATIONS

AEIS            Areawide Environmental Impact Statement

APA             Administrative Procedure Act

CEQ             Council on Environmental Quality

CFPD            Central Florida Phosphate District

Corps           U.S. Army Corps of Engineers

EA              Environmental Assessment

EIS             Environmental Impact Statement

ESA             Endangered Species Act

FEMA            Federal Emergency Management Agency

FERC            Federal Energy Regulatory Commission

FONSI           Finding of No Significant Impact

NEPA            National Environmental Policy Act

ROD             Record of Decision

Service         U.S. Fish and Wildlife Service

SPE Mine        South Pasture Extension Mine

**ARGUMENT**

Federal Appellee (the Corps) unlawfully used its Clean Water Act authority to greenlight more than 51,000 acres of phosphate mines. It ignored their significant environmental impacts, which include the production of untold tons of the radioactive waste phosphogypsum, and the destruction of thousands of acres of wetlands, streams, and uplands that some of the nation's most imperiled wildlife rely upon for their very survival. Appellants (Conservationists) respectfully request this Court reverse the ruling and judgment of the district court and remand the matter with instructions.

## I. The Corps' Decision to Ignore the Indirect and Cumulative Effects of Mosaic's Fertilizer Plants is Arbitrary and Capricious and Violates the National Environmental Policy Act.

Conservationists have met their burden to show the Corps violated the National Environmental Policy Act (NEPA) and Administrative Procedure Act (APA) by unlawfully ignoring the indirect and cumulative impacts of Intervenor-Appellee Mosaic's (Mosaic)

fertilizer plants.[1] The record demonstrates that Mosaic's fertilizer plants and its phosphogypsum stacks are the reasonably foreseeable, downstream consequence of authorizing Mosaic's phosphate mines, which will "maintain[ ] uninterrupted a long-term supply of phosphate rock to meet the fertilizer demand of the Applicant's customers." AR_0287124; AR_0175527 (Phosphogypsum is "part of the mining waste stream and an associated potential environmental impact."). Mosaic stores radioactive phosphogypsum from its fertilizer plants in massive stacks throughout Florida, atop aquifers and adjacent to surface waters, AR_0236150, and has a history of unlawfully

_____

[1] In its opening brief, Conservationists mistakenly stated this Court vacated and affirmed *Sierra Club v. Flowers*, 423 F. Supp. 2d 1273 (S.D. Fla. 2006). Opening Br. at 20. This Court vacated the lower court's judgments and orders and remanded it for the district court to use the appropriate legal standard in evaluating the Clean Water Act and NEPA claims. *Id., vacated by, remanded by Sierra Club v. Flowers*, 526 F.3d 1353, 1364 (11th Cir. 2008). On remand, the lower court determined that the Corps acted arbitrarily and capriciously in its NEPA analysis, and granted summary judgment in favor of plaintiffs' Clean Water Act and NEPA claims. *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1270–74 (S.D. Fla. 2009). This Court then affirmed that judgment, finding that because the Corps' decision to issue the Clean Water Act permit was arbitrary and capricious, it need not address the NEPA issues. *Sierra Club v. Van Antwerp*, 326 Fed. Appx. 100, 2010 U.S. App. LEXIS 1456**, **19 fn 5 (11th Cir. Jan. 21, 2010).

discharging this pollution into U.S. waters. AR_0292514–15; AR_0250492. The Corps' decision to ignore the indirect and cumulative effects of fertilizer plants when it authorized phosphate mining was arbitrary and capricious.

A. <u>Mosaic's fertilizer plants and phosphogypsum are foreseeable "downstream effects" of its phosphate mines.</u>

1. *Phosphogypsum waste is a foreseeable effect of Mosaic's phosphate mining.*

The D.C. Circuit Court of Appeals in *Sabal Trail* held that the Federal Energy Regulatory Commission (FERC) failed to discharge its duty to evaluate the reasonably foreseeable "downstream effects" of authorizing natural gas pipelines when it ignored the fact that power plants would use the natural gas to create electricity, which would emit greenhouse gases. *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (*Sabal Trail*); 40 C.F.R. § 1502.16(b). Like FERC in *Sabal Trail*, the Corps here failed to provide any meaningful analysis of the foreseeable downstream effects (fertilizer production and phosphogypsum) of the activity it authorized (phosphate mining). All phosphate mined by Mosaic "will be going somewhere," 867 F.3d at 1371, and the record shows the destination is Mosaic's fertilizer plants. Mosaic Br. at 10 (explaining that "[m]ost phosphate rock, once it has

3

been mined and beneficiated . . . is sent by truck, rail or vessel to offsite fertilizer plants"); AR_0250287 (same); AR_0250573 (same).

The court in *Sabal Trail* found that it was not only reasonably foreseeable that the power plants would use the gas to make electricity, but that it was the project's entire purpose. 867 F.3d at 1372. Here, the purpose and need for the South Pasture Extension mine (SPE Mine) was to "enable the South Pasture Mine and Plant to continue providing beneficiated rock to the Plant City Concentrates Facility," one of Mosaic's fertilizer plants. AR_0263661; AR_026395. The Corps also identified the "need" for the Areawide Environmental Impact Statement (AEIS) as: "to continue supplying [Mosaic's] customers in the United States and over 40 counties with phosphate fertilizers and feed supplements." AR_0287124.

The Corps and Mosaic rely on *Public Citizen* to explain away the Corps' NEPA noncompliance. *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) (*Public Citizen*). The D.C. Circuit in *Sabal Trail* helpfully distinguished *Public Citizen*, explaining that "Congress broadly instructed the agency to consider" public benefits against adverse effects, and therefore, "[b]ecause FERC could deny a pipeline

certificate on the ground that the pipeline would be too harmful to the environment, the agency is a 'legally relevant cause' of the direct and indirect environmental effects of pipelines it approves." *Sabal Trail*, 867 F.3d at 1373. "*Public Citizen* thus did not excuse FERC from considering these indirect effects." *Id.*; *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 105 (D.D.C. 2006) ("The holding in *Public Citizen* extends only to those situations where an agency has 'no ability' because of lack of 'statutory authority' to address the impact").

Like FERC in *Sabal Trail*, the Corps here is statutorily required to analyze the public interest and possible adverse effects when it authorizes the discharge of pollutants into waters of the U.S. 33 U.S.C. §§ 1251, 1311(a). Congress enacted the Clean Water Act to restore and maintain the "chemical, physical and biological integrity" of our nation's waters. *Id.* § 1251. The Corps may not issue a permit to degrade U.S. waters if there is an environmentally preferable alternative, an aquatic ecosystem would be significantly degraded, impact minimization and mitigation are insufficient, or an endangered species would be jeopardized. *Id.* § 1311(a); 40 C.F.R. § 230.10; *see also* 33 C.F.R. § 320.4(a)(1). Therefore, like FERC in *Sabal Trail*, the Corps here had

the authority and duty to analyze the indirect and cumulative impacts of the activity it authorized, which include the environmental consequences of fertilizer plants and phosphogypsum stacks. *See also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005) ("[I]t is the impact of the permit on the environment at large that determines the Corps' NEPA responsibility."). Unlike the Department of Transportation in *Public Citizen*, which lacked discretion to prevent cross-border operations, the Corps here has the "ability to prevent a certain effect" because of its "statutory authority over the relevant actions." *Public Citizen*, 541 U.S. at 770. In authorizing the degradation of U.S. waters, the Corps should have analyzed the impact of fueling fertilizer plants with mined phosphate rock, which will add acidic radioactive waste to phosphogypsum stacks that sit atop the Floridan aquifer and adjacent to surface streams and wetlands. AR_0292515.

### 2. *Mosaic's phosphate mines do not have independent utility from its fertilizer plants.*

Whether fertilizer plants and phosphogypsum have independent utility from phosphate mines is irrelevant to the question of whether the Corps was required to analyze their indirect and cumulative effects. The indirect effects of an action must be addressed even if they have

"independent utility." *Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Appellees raise independent utility as a red herring in an attempt to excuse the Corps' failure to consider these indirect impacts.

The definition of "independent utility" is not found in the statute or in Council on Environmental Quality (CEQ) regulations, rather it evolved from caselaw analyzing whether certain federal projects could stand alone and therefore be "unconnected single actions." 40 C.F.R. § 1508.25(a); *Kleppe v. Sierra Club*, 427 U.S. 390 (1976). The concept of independent utility comes from NEPA's prohibition on unlawful segmentation or "artificially dividing a major federal action into smaller components, each without a 'significant impact.'" *Preserve Endangered Area of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996) (internal quotation marks omitted) (*PEACH*). The Corps has incorporated the independent utility concept into its permit application review process for Nationwide Permits.[2] 33 C.F.R. 330.2(i);

_____

[2] The Corps authorized the challenged permit under its individual permit authority, not its Nationwide Permit authority.

67 Fed. Reg. 2020, 2094 (Jan. 15, 2002). However, Conservationists do not argue that the Corps unlawfully segmented a major federal action, rather they argue that the Corps failed to consider the foreseeable consequences, i.e. the indirect effects, of authorizing a major federal action.

To the extent the dispute turns on whether Mosaic's fertilizer plants have independent utility from Mosaic's phosphate mines, the Parties disagree on which test is applicable.[3] Regardless, every test requires that the agency determine that the project *would be*, rather than *could be*, constructed absent other projects in the area. The Corps' and Mosaic's arguments therefore fail because they rely upon record evidence that shows only that Mosaic's fertilizer plants *could*, hypothetically, have independent utility of its phosphate mines.

---

[3] Mosaic argues 33 C.F.R. pt. 325, App. B § 7 provides the relevant test for independent utility. Mosaic Br. at 12–13, 16. The Corps argues 33 C.F.R. pt. 325, App. B § 7(b)(3) is inapplicable, Corps Br. at 28, and that 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002) controls. Corps Br. at 27. Mosaic also relies on a 2017 Corps regulation that post-dates the Corps' decisions at issue here, Mosaic Br. at 16, but parrots the regulation cited by the Corps. 82 Fed. Reg. 1860, 2006 (Jan. 6, 2017).

For example, the Corps argues that "[a] project has 'independent utility' if it *can* 'be constructed absent the construction of other projects in the project area,'" Corps Br. at 27, citing 67 Fed. Reg. 2020, 2094 (Jan. 15, 2002). First, these regulations relate to Nationwide Permits, not the suite of individual permits that are at issue here. Furthermore, the Corps misrepresents its own regulation, which actually reads: "A project is considered to have independent utility if it *would be* constructed absent the construction of other projects in the project area." 67 Fed. Reg. at 2094 (emphasis added). This small, but critical distinction—*would* instead of *can* or *could*—is at the heart of the Corps' unlawful analysis. The question is not whether Mosaic *could* supply its fertilizer plants with imported rock or whether Mosaic *could* have other uses for its mined phosphate that do not involve its fertilizer plants, but whether Mosaic *would*, given the actual, non-hypothetical circumstances, do those things. The answer, the record shows, is "no."

For this reason, the Corps' and Mosaic's reliance on *PEACH* is misplaced.[4] In *PEACH*, this Court concluded the Corps was not

---

[4] The other cases Mosaic and the Corps offer to support their independent utility argument are unavailing because they are factually

arbitrary and capricious in finding that a road had independent utility because the Corps analyzed the relevant Federal Highway Administration (FHA) guidelines, which included an independent utility test specific only to road projects. 87 F.3d at 1247–48.

Even if something like the FHA independent utility test were applicable here, the *PEACH* Court found that "an inquiry into independent utility reveals whether the project *is indeed* a separate project." *Id.* at 1247 (internal quotation marks omitted) (emphasis added). In *PEACH*, the Court concluded the Corps had required the applicant to demonstrate the project had independent utility, which it did with more than fifty exhibits. *Id.* at 1248. The Court found the record showed the road "*will* take residents" across the county, and that "the highway *would be* fully operational even if no other roads were built." *Id.* This is in stark contrast to what the Corps did in the present

---

distinguishable, *i.e.* the agency action involved upland elements of a single project that had not yet happened, *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir. 2000); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009), or the agency's authority to regulate was limited by the statute it was operating under, *Winnebago Tribe of Neb. v. Ray*, 621 F.2d 269 (8th Cir. 1980).

matter. Neither the Corps nor Mosaic have pointed to any evidence in the administrative record showing the Corps made Mosaic demonstrate its mines have independent utility from its fertilizer plants, or that Mosaic's fertilizer plants operate without phosphate from the mines the Corps authorized.

At best, the Corps and Mosaic can only show that the fertilizer plants hypothetically *could be* fed by sources other than Mosaic's mines. Corps Br. at 28 ("[F]ertilizer plants could 'continue operations *independently* of the proposed mines because the mineral processing plants are *not necessarily* dependent on the mines.'") (citing AR_0250315); Corps Br. at 29 ("[F]oreign-sourced phosphate ore 'could possibly be used to supply the processing facilities.'") (citing AR_0250393); Corps Br. at 29–30 ("Hardee mine served as 'the sole rock supply' for a fertilizer plant, but that does not mean that the plant could not import phosphate ore in the future.") (citing AR_0081965).[5] The

_____

[5] Without record support, the Corps argues that Mosaic's phosphate mines have independent utility from Mosaic's fertilizer plants because "[f]ertilizer plants are not the only consumers of phosphate ore," Corps Br. at 28. Likewise, Mosaic provides no record support for its claim that its mines have independent utility from its fertilizer plants because

likelihood that this hypothetical would ever become reality is undercut by the Corps' own admissions that Mosaic likely will not import phosphate. Corps Br. at 30 ("If it imported phosphate ore, Mosaic may not be able to compete in some markets."); AR_0139465–70 (explaining that importing phosphate rock is unprofitable and fertilizer production may fail without locally mined phosphate); AR_0250391 (excluding any NEPA alternative that relies on importing phosphate rock to feed Mosaic's fertilizer plants). These scenarios fall far short of satisfying any independent utility test, which requires a finding that the project *would* have independent utility (not that it hypothetically could). To interpret a regulation to allow a hypothetical without bounds, as the Corps has done here, would render the entire test ineffectual.

Finally, if this Court finds 33 C.F.R. Part 325, App. B § 7(b), provides the correct test for independent utility, it should also find that "the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a

_____

they "receive phosphate rock from many different sources," Mosaic Br. at 11.

proposal," 33 C.F.R. Part 325, App. B § 7(b)(3), and that because the Corps used a broader scope of analysis to identify the need, purpose, and beneficial impacts of the SPE Mine—i.e. the benefits of fertilizer—while using a narrower scope of analysis for the negative indirect and cumulative impacts of fertilizer plants, such "stacking of the deck" is categorically prohibited. *Fla. Wildlife Fed'n*, 401 F. Supp. 2d at 1327.

B. <u>The Corps listed, but did not analyze, the cumulative effects of fertilizer plants.</u>

The Corps did not analyze the cumulative effects of fertilizer plants or phosphogypsum stacks. The Corps claims it "analyzed cumulative impacts on groundwater resources on a regional level and captured the effects of non-mining activities such as fertilizer processing facilities," Corps Br. at 22–23, and "impacts to ecological resources from regional land-use changes, including non-mining actions," Corps Br. at 23, insinuating these citations to the administrative record show the Corps analyzed the cumulative effects of phosphogypsum; but they do not. Mosaic's briefing suffers the same deficiency. Mosaic Br. at 29.

In the section of its briefing on the "future" cumulative effects the Corps analyzed, the Corps points to a single document in the

administrative record for support of its argument that the Corps

analyzed the cumulative effects of fertilizer plants and phosphogypsum,

stating, "No new gypsum stacks are proposed for future mining" and

that the only active stack in the project area has a National Pollution

Discharge Elimination System permit. Corps Br. at 24. This is plainly

not an analysis. Mosaic sends "most" of the phosphate it mines to its

fertilizer plants, Mosaic Br. at 10, and its fertilizer plants generate five

tons of phosphogypsum for every one ton of fertilizer. Corps Br. at 9, the

Corps. At the very least, the Corps should have asked Mosaic how much

additional phosphogypsum it would produce when it authorized the

mining of more than 51,000 acres over 36 years. AR_250308–13. Even if

"[n]o new gypsum stacks are proposed for future mining," it is not

disputed that Mosaic intends to turn the vast majority of the phosphate

it mines into fertilizer at one of its nearby fertilizer plants. The Corps

should have analyzed those basic details, but the administrative record

shows that it did not.

## II. The Corps' Approval of the SPE Mine Without a Mine-Specific Environmental Impact Statement Violates NEPA and the APA.

Congress mandated that all major federal actions "significantly affecting the quality of the human environment" require a detailed environmental impact statement (EIS) that analyzes and mitigates against the effects of *that action*. 42 U.S.C. § 4332(C). It is undisputed that the Corps' approval of the SPE Mine is a major federal action, and that this major federal action will significantly affect the quality of the human environment. Order at 5 ("The parties agree that the SPE mine . . . significantly impacts the environment and requires an EIS."). The Parties dispute whether the Corps gathered and analyzed the necessary information to accurately assess—and, therefore, minimize the environmental harm from—the direct, indirect, and cumulative effects of this action on the human environment, and whether it complied with NEPA's procedural mandates in so doing. As the record definitively demonstrates, it did not.

### A. The Corps Did Not Follow NEPA's Clear Procedural Requirements.

The Corps and Mosaic respond to Conservationists' argument that it was procedurally improper for the Corps to finalize an AEIS without

a record of decision (ROD) and then produce an environmental assessment (EA) without a Finding of No Significant Impact (FONSI) by contending that the SPE Mine approval process *practically* complies with NEPA's procedural requirements because NEPA allows the Corps to tier to a broader, here "areawide," EIS analysis. *See* Corps Br. at 35 (citing 40 C.F.R. § 1508.25(a)(3)). This argument misses the point. Conservationists do not dispute that a regulatory mechanism exists to support tiering one NEPA document to another; rather, they argue that the Corps must comply with the express procedural language established by the CEQ in its binding NEPA regulations when doing so.

NEPA and its implementing regulations establish a specific procedural framework that an agency must follow in analyzing the environmental effects of its actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("NEPA itself does not mandate particular results, but simply prescribes the necessary process."). Under that framework, if an agency prepares an EA, that EA must be followed by either a FONSI or an EIS. 40 C.F.R. § 1508.9; *Winter v. NRDC, Inc.*, 555 U.S. 7, 44 n. 1 (2008) (Ginsburg, J., dissenting) ("An EA is used 'for determining whether to prepare' an EIS." (citing *Public Citizen*, 541

U.S. at 757)). An EIS, in turn, must be followed by an ROD. 40 C.F.R. § 1505.2. NEPA provides no exemption from this process, even when an agency opts to tier from an earlier, final EIS in its NEPA review process.

The Corps and Mosaic attempt to circumvent these unambiguous procedural requirements by asserting that the Corps did, at some point, prepare an ROD. *See* Corps Br. at 38–39; Mosaic Br. at 31–32. Merely referencing isolated pieces of an established procedural process is not the same as directly complying with the requirements of that process. Indeed, this gloss, if accepted, would not only render portions of these regulations superfluous, but it would also "invite litigation" and throw an otherwise predictable and long-established NEPA review process into a state of public confusion. *Kleppe*, 427 U.S. at 406.

As the Supreme Court has long advised, an agency's interpretation of controlling regulations cannot be sustained if it is "plainly erroneous or inconsistent with the regulation." *Stinson v. United States*, 508 U.S. 36, 45 (1993) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). For example, in *Christensen v.*

*Harris County*, the Supreme Court declined to give deference to an agency's interpretation of an unambiguous regulation, instructively observing that to defer to the agency's interpretation would "be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation." 529 U.S. 576, 588 (2000); *see also Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199, 1208 (2015) (*Christensen* held that "the agency interpretation at issue was substantively invalid because it conflicted with the text of the regulation the agency purported to interpret."). The same analysis and conclusion applies to the Corps' inconsistent interpretation and application of unambiguous regulatory language in this instance.

Ignoring the requirement that an EA be followed by an EIS or FONSI would render meaningless CEQ's explicit regulatory command that an EA be a "concise public document" that "serves to . . . determin[e] whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9; *see also id.* § 1500.3 (establishing that the CEQ regulations are binding on all federal agencies); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 372 (1989) ("CEQ regulations . . . are entitled to substantial deference."

(citations omitted)) (*Marsh*). Affirming the broad construction would turn this regulation—as well as an EA's understood role in the NEPA review process—on its head, which, in turn, would undermine the dual purposes of NEPA. *See Robertson*, 490 U.S. at 349 (finding that NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed federal actions *and* ensuring relevant information is made available to members of the public so they may participate in the process). Neither these regulations, nor the Court's review of their construction, are so flexible.

The Corps could have complied with NEPA's underlying regulations by preparing a site-specific (rather than areawide) or supplemental EIS, which would ensure that the Corps and the public were provided with an informed, up-to-date analysis concerning the environmental impacts, including new and changed effects, particular to the SPE Mine before it was approved. *See* Opening Br. at 46–47 (listing new and changed circumstances). Here, the Court must review the Corps' actions against the language in the regulations, and, finding error, remand the action back to the agency for further proceedings. *See Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952); *Sierra*

*Club v. Strock*, 495 F. Supp. 2d 1188, 1198 (S.D. Fla. 2007); *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986).

B. <u>The Corps Did Not Take a "Hard Look" at the Environmental Consequences of Approving the SPE Mine.</u>

While the Corps may be able to tier from a previous analysis, doing so does not excuse it from taking the "hard look" at potential environmental consequences that NEPA requires. *Robertson*, 490 U.S. at 350; 40 C.F.R. § 1502.15–16; *id.* §§ 1502.14, 1508.20; *see also Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 187 (4th Cir. 2005). The administrative record does not support the Corps' and Mosaic's claims that the Corps fulfilled this mandate in approving the SPE Mine.

Pursuant to NEPA, an agency "*shall* prepare supplements to either draft or final environmental impact statements if the agency makes substantial changes in the proposed action that are relevant to environmental concerns; *or* there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9 (emphasis added); *see also* 33 C.F.R. § 230.13(b). As it relates to the Corps' approval of the SPE Mine, Conservationists demonstrated that both of those factors are

present and that the Corps did not consider these new and changed circumstances in either the AEIS or EA. Opening Br. at 47–54.

The Corps and Mosaic fail to directly refute the gravity of these omissions with substantive administrative record evidence. Instead, citing the "rule of reason" established by the Supreme Court in *Marsh*, they argue: (1) that the information contained in the AEIS sufficiently analyzes these environmental effects; and (2) that any changes since the AEIS do not rise to the level of significance that would require additional NEPA supplementation and analysis. *See* Corps Br. at 39–45; Mosaic Br. at 34–38.

In *Marsh*, the Court determined that NEPA's "hard look" obligations remain intact "even after the proposal has received initial approval." 490 U.S. at 374. In deciding whether to prepare a supplemental EIS, the Court further analogized to the decision of whether to prepare an EIS, and determined that "[i]f there remains 'major Federal action' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* (citation

omitted). The Court in *Marsh* went on to advise that "[i]t is also clear that, regardless of its eventual assessment of the significance of [the] information, the Corps has a duty to take a hard look at the proffered evidence." *Id.* at 385. Finding that the Corps there had "carefully scrutinized the proffered information," *id.* at 383, the Court then went on to determine that the Corps in that instance, "acted within the dictates of NEPA," *id.* at 385. Under the *Marsh* test, however, the Corps here should have prepared a supplemental EIS.

Further, the Corps and Mosaic do not support their position that the agency has, in fact, meaningfully analyzed and considered all of the environmental effects of this action. Regarding the major change in corporate ownership, the Corps and Mosaic assume that because Mosaic will need to "comply with the terms of the permit"—the details of which also changed without additional analysis as a result of the mine's change in ownership—the significant effects of this action will necessarily remain the same. Corps Br. at 40–41; Mosaic Br. at 34–35. These conclusory assertions are not supported by the record, and neither NEPA nor common sense supports such a cramped view of environmental effects or the Corps' decisionmaking obligations. *See*

*Marsh*, 490 U.S. at 371; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983).

Specifically, all direct, indirect, and cumulative effects of an action must be adequately analyzed. 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1502.1 (an EIS "shall be supported by evidence that the agency has made the necessary environmental analyses"); *see also Marsh*, 490 U.S. at 378 ("[C]ourts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision . . . ."). Those effects were reasonably likely to significantly shift when the corporate owner of the SPE Mine changed. *See* Opening Br. at 46–48. The obligation to conduct substantive *analyses* of the potential effects to the human environment of an action is a responsibility that—despite numerous efforts by Appellees to push the burden onto Conservationists—falls squarely on the shoulders of the action agency in the first instance. 40 C.F.R. § 1500.2(b) ("Environmental impact statements shall . . . be supported by evidence that agencies have made the necessary environmental analyses."); *Robertson*, 490 U.S. at 349–50

(It is the agency's duty to "adequately identif[y] and evaluate[]" negative environmental effects.).

As Mosaic itself admits, "[a]fter the Corps issued the final AEIS, Mosaic reduced the SPE mine's impacts on aquatic resources and revised its SPE application accordingly." Mosaic Br. at 5. Those changes, as well as other changes in the permit that took place between the Corps' finalization of the AEIS in 2013, Opening Br. 46–47, based on CF Industries' original permit application, and the Corps' final approval of the permit terms for Mosaic in 2016, are reasonably likely to significantly change the impact of this action, including mitigation, reclamation, and wildlife management impacts, and should have been analyzed in a supplemental EIS. See 40 C.F.R. § 1508.8 (impacts include "those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."); *Nat. Wildlife Fed'n v. Marsh*, 721 F.2d 767, 782–83 (11th Cir. 1983).

Similarly, Mosaic offers as support for the sufficiency of the Corps' NEPA review that the Corps based its analysis on "information available at the time," Mosaic Br. at 35; however, by the time the mine

had transferred from CF Industries to Mosaic, Mosaic had amended the mine application, and the "information available at the time" of its decision included the new timelines for mining. *Compare* AR_0250311 *with* AR_0275351, 0275353. In failing to analyze and consider the significant environmental effects of the revised timelines, "[t]he Corps has been blind to the lasting effects of the mining activities approved in these permits." *Strock*, 495 F. Supp. 2d at 1285.

The Corps' failure in the AEIS or the supplemental EA to analyze and make available to the public the effects of these changes is arbitrary and capricious and violates NEPA and the APA. *See Motor Vehicle Mfrs,* 463 U.S. at 43. Discounting these deficiencies undermines NEPA's purpose to protect and promote environmental quality by ensuring that the government analyzes the significant environmental impacts of its actions. *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1540–41 (11th Cir. 1990); 40 C.F.R. §§ 1502.1, 1500.1(b); *see also Calvert Cliffs' Coordinating Comm'n v. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971). Thus the Corps cannot simply rest on the original AEIS once new and additional circumstances demanded supplemental analysis. *Marsh*, 490 U.S. at 374.

Because Appellees cannot demonstrate through administrative record evidence that the Corps did, in fact, identify and analyze the full range of environmental effects of this action, the Corps has failed to truly take a "hard look" at those impacts as NEPA requires.

### III. The Corps' Failure to Consult on the Suite of Permits Authorizing Phosphate Mining in the Central Florida Phosphate District Violated the Endangered Species Act and APA.

Contrary to the Corps' post hoc denials, Corps Br. at 48, the AEIS contemplates the environmental impact of one comprehensive, programmatic action carried out by the Corps—the issuance of a suite of four Clean Water Act Section 404 permits to the one permittee who strategically operates region-wide phosphate mining and processing in the "Central Florida Phosphate District" (CFPD). AR_0250308–11; AR_0250288–90; *see generally* AR_0250373–96 (describing the related mines); *see also* AR_0275352–53 (explaining the purpose of the permits as "to continue to obtain an interrupted phosphate rock supply" from the four mines in the CFPD).

By failing to consult on the impact of permitting these precisely timed and sited mines within the CFPD, the Corps cannot meet its statutory duty to "insure" that issuing those permits collectively "is not

likely to jeopardize the existence of any endangered species or threatened species or result in the destruction or adverse modification of" the species' critical habitat in that region. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. When the Corps issues this suite of permits, it will authorize Mosaic to devastate more than 51,000 acres of land and water across four geographically and temporally proximate mines, AR_0178392–9454, leaving the land uninhabitable for endangered and threatened species for decades during the mining and "reclamation" process. AR_0250398–403; FWS 011851–52. There is no scientific evidence that once the land is reclaimed, it will ever provide the same ecological functions or support the same diversity and abundance of wildlife and plants. *See, e.g.,* AR_0288125 (wetlands designated as reclamation "successes" had "yet to achieve regulatory release criteria" to offset environmental impacts); FWS 006367, 006369 (explaining that "some species that were fairly common on relatively undisturbed, unmined lands were less common or not observed on the reclaimed mined sites"). This massive mining program will affect species protected under the Endangered Species Act (ESA), including the eastern indigo snake, wood stork, and Audubon's crested caracara. Thus, the ESA

requires the Corps to consult on its programmatic approval of the suite of permits analyzed in the AEIS. 16 U.S.C. § 1536(a)(2).

This Court has required consultation for similar programmatic actions. In *Florida Key Deer v. Paulison*, the Federal Emergency Management Agency (FEMA) set forth criteria for issuing flood insurance to a collection of similar development activities, which "effectively authoriz[ed] . . . development that pushed the Key deer to the brink of extinction." 533 F.3d 1133, 1139 (11th Cir. 2008). Likewise, here, the Corps is setting forth the permitting framework for four similar mines, which will destroy tens of thousands of acres of habitat for several species protected under the ESA. AR_0250757–71 (outlining four mines' impacts on listed species); AR_0250308–11 (describing mine acreage). As this Court found in *Paulison*, consultation is required for these types of programmatic actions. 533 F.3d at 1144.[6]

---

[6] The Corps argues that "*future* decision making" is exempt, Corps Br. at 48–49; however FEMA's flood insurance plan, which this Court found required consultation, "effectively authoriz[ed]" future development through its insurance criteria. *Paulison*, 533 F.3d at 1139.

Aside from being a permitting action, which is specifically contemplated in the definition of "agency action," 50 C.F.R. § 402.02(c), the Corps' programmatic Section 404 permitting also falls "squarely" within the definition of agency action because it constitutes an "action[] intended to conserve listed species or their habitat" or "action[] directly or indirectly causing modifications to land, water, or air," 50 C.F.R. § 402.02, as did the actions in *Lane County Audubon Society v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992), and *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir. 2015). *See also Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1051 (9th Cir. 1994).

*Forest Guardians v. Forsgren*, 478 F.3d 1149, 1156 (10th Cir. 2007), cited by both the Corps and Mosaic, Corps Br. at 54–55, Mosaic Br. at 40, is distinguishable. While the court in *Forsgren* found that forest plans are not "ongoing agency actions" requiring consultation because they "*typically* do not approve or execute projects or activities," 478 F.3d at 1156; here, the Corps' suite of permits unquestionably results in the approval of mining in the CFPD, AR_0250286.

Likewise, Mosaics' citation to *Village of Los Ranchos de Albuquerque v. Barnhart*, 906 F.2d 1477, 1481–82 (9th Circuit 1990), is

inapt. That case focused on the narrow question of whether a state's decision to request an EIS on a bridge project, without more, made the bridge project *federal*, not whether it made the project an agency action. *Id.* at 1481. It did not consider whether ESA consultation was required for the project, *id.* at 1479–80, which is the question at issue here.

Without citing legal support or evidence in the record, the Corps incorrectly claims that the suite of permits considered in the AEIS is not an agency action because "[t]he Corps prepared the area-wide EIS to comply with NEPA, not to design or carry out a specific program mandated by Congress," Corps Br. at 48. While the AEIS itself is not the programmatic agency action, it identifies programmatic permitting of at least four mines in the CFPD as the agency action. AR_0250373–96. Moreover, neither the ESA nor its implementing regulations require that "Congress . . . charge the Corps" with taking an action, Corps Br. at 48, for it to be an agency action requiring consultation. *See generally* 50 C.F.R. § 402.02.

Similarly, Mosaic argues that the comprehensive permitting action analyzed in the AEIS is not an agency action because it "is not a regulation, license, permit, or project funding mechanism," Mosaic Br.

at 41. This characterization focuses on a limited range of agency actions to the exclusion of a wide range of actions captured in FWS's "broad" interpretation of the term "agency action." *Fla. Key Deer v. Stickney*, 864 F. Supp. 1222, 1228 (S.D. Fla. 1994); 50 C.F.R. § 402.02. Moreover, it ignores that Clean Water Act Section 404 permitting—even when undertaken for several projects as one programmatic action—is precisely the type of agency action that requires consultation. *See* 50 C.F.R. § 402.02.

Although consultation "may be consolidated with interagency cooperation procedures required by other statutes" like NEPA, Corps Br. at 47(citing 50 C.F.R. § 402.06); Mosaic Br. at 41 (same), it does not preclude the Corps from consulting on the suite of permits considered in the AEIS. In fact, it militates in favor of Conservationists' very point that consultation should have begun concurrently with the Corps' NEPA review. Because the Corps is issuing four interrelated permits in one programmatic action, reviewing "each mine" separately, Mosaic Br. at 44–47; Corps Br. at 49, is insufficient because it only captures the impacts of one fragment of the agency's overall action. There is no other opportunity to consider the joint impact of all four similarly timed,

located, and operated mines. The U.S. Fish and Wildlife Service's (Service) "species-related comments during the scoping period for the AEIS," Mosaic Br. at 43, do not meet the ESA's comprehensive consulting requirements. *See* 16 U.S.C. § 1536(a)(2), (b); 50 C.F.R. § 402.14.

Consultation should occur at "the earliest possible time," 50 C.F.R. § 402.14, to ensure the action as a whole will not push a species beyond the brink of extinction or preclude its recovery. *See* 16 U.S.C. § 1536; 50 C.F.R. § 402.02. For instance, here, the Corps and Service concluded that ESA-listed species on the SPE Mine site will not be jeopardized because they will simply move to adjacent habitat during the decades of mining and reclamation, FWS 022189–98; however, by analyzing the mine in isolation, instead of reviewing the suite of mines to be permitted together, the agencies fail to disclose or analyze that mines directly abutting the SPE Mine to the north, west, and south will be active during the SPE Mine's lifetime, AR_0250307–11, thus eliminating adjacent habitat to which the species can flee.[7]

---

[7] For example, species in the southwest corner of the SPE Mine, where parcels are slated to be mined between 2020 and 2025, will only be able

The Corps' and Service's failure to consider the comprehensive impacts of approving a network of mines on endangered and threatened species in CFPD region violates the substantive and procedural requirements of the ESA.

## CONCLUSION

For the foregoing reasons, and to avoid significant environmental harm, Conservationists respectfully request that the Court reverse and remand the ruling and judgment of the district court.

Respectfully submitted,

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez
Florida Bar No. 96445
Hannah Mary Margaret Connor
Florida Bar No. 125378
Elise Pautler Bennett
Florida Bar No. 106573
Rachael Curran
Florida Bar No. 1002221

CENTER FOR BIOLOGICAL
DIVERSITY
P.O. Box 2155
St. Petersburg, FL 33731

---

to move directly south, onto Ona Mine, which will be mined during the same timeframe. AR_0250308.

jlopez@biologicaldiversity.org
ebennett@biologicaldiversity.org
hconnor@biologicaldiversity.org
rcurran@biologicaldiversity.org
Tel: (727) 490-9190
Fax: (510) 844-7150

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

This is to certify that the foregoing Reply Brief complies with the type-volume limitations and typeface requirements of FED. R. APP. P. 32(a). Specifically, this brief is printed in proportionally spaced, 14-point Century Schoolbook font in compliance with FED. R. APP. P. 32(a)(5)–(6), and with the exception of footnotes and indented quotations, it is printed with double-spacing and one-inch margins in compliance with FED. R. APP. P. 32(a)(4). Excluding the items that are exempted under FED. R. APP. P. 32(f), this brief contains a total of 6,495 words to meet the type-volume limitation of FED. R. APP. P. 32(a)(7)(B)(ii). This certificate was prepared in reliance on the word-processing system (Microsoft Word) used in this brief.

/s/ Jaclyn M. Lopez
Jaclyn M. Lopez

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 27th day of December 2018, I filed the foregoing corrected REPLY BRIEF OF PLAINTIFFS-APPELLANTS electronically through the Court's CM/ECF system, which caused all parties and counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Jaclyn M. Lopez*
Jaclyn M. Lopez